# EXHIBIT A

**ENVISION MANAGEMENT HOLDING, INC.**
**EMPLOYEE STOCK OWNERSHIP PLAN**

THIS INDENTURE is made as of December 19, 2017, by ENVISION MANAGEMENT HOLDING, INC., a corporation organized and existing under the laws of the State of Delaware (hereinafter called the "Primary Sponsor").

**W I T N E S S E T H:**

WHEREAS, Envision Management LLC established the Envision Management LLC Profit Sharing Plan, effective as of January 1, 2017;

WHEREAS, pursuant to a transaction which was consummated on September 1, 2017, Envision Management LLC became a wholly-owned subsidiary of the Primary Sponsor; and

WHEREAS, the Plan was assigned to the Primary Sponsor by Envision Management LLC and the Primary Sponsor now desires to amend and restate the Plan as the Envision Management Holding, Inc. Employee Stock Ownership Plan (the "Plan"), an employee stock ownership plan within the meaning of Section 4975(e)(7) of the Code.

NOW, THEREFORE, the Primary Sponsor does hereby amend and restate the Plan, effective as of September 1, 2017, except where otherwise provided herein, to read as follows:

ENVISION MANAGEMENT HOLDING, INC.
EMPLOYEE STOCK OWNERSHIP PLAN

## TABLE OF CONTENTS

Page

SECTION 1 DEFINITIONS .................................................................1

SECTION 2 ELIGIBILITY .................................................................13

SECTION 3 CONTRIBUTIONS.............................................................13

SECTION 4 VALUATION AND ALLOCATION ..............................14

SECTION 5 ACQUISITION LOANS/INVESTMENT OF ASSETS ....................24

SECTION 6 PAYMENT OF BENEFITS ON TERMINATION OF
EMPLOYMENT ..............................................................................26

SECTION 7 PAYMENT OF BENEFITS ON RETIREMENT DATE OR
DISABILITY ..................................................................................28

SECTION 8 DEATH BENEFITS ..........................................................28

SECTION 9 GENERAL RULES ON DISTRIBUTIONS............................28

SECTION 10 DIVERSIFICATION OF INVESTMENTS ...........................33

SECTION 11 CONDITIONS OF DISTRIBUTION OF COMPANY STOCK ....................34

SECTION 12 VOTING OF COMPANY STOCK.......................................36

SECTION 13 ADMINISTRATION OF THE PLAN .................................37

SECTION 14 CLAIM REVIEW PROCEDURE.........................................39

SECTION 15 LIMITATION OF ASSIGNMENT, PAYMENTS TO LEGALLY
INCOMPETENT DISTRIBUTEE, AND UNCLAIMED PAYMENTS....................42

SECTION 16 PROHIBITION AGAINST DIVERSION ..............................43

SECTION 17 LIMITATION OF RIGHTS ..............................................43

SECTION 18 AMENDMENT TO OR TERMINATION OF THE  PLAN AND THE
TRUST   ........................................................................................43

SECTION 19 ADOPTION OF THE PLAN BY AFFILIATES.......................45

SECTION 20 QUALIFICATION AND RETURN OF CONTRIBUTIONS ..........45

SECTION 21 ERISA ARBITRATION AND CLASS ACTION WAIVER ..........46

SECTION 22 INCORPORATION OF SPECIAL LIMITATIONS ...................50

APPENDIX A LIMITATION ON ALLOCATIONS ............................... A-1

APPENDIX B TOP-HEAVY PROVISIONS ........................................B-1

APPENDIX C MINIMUM DISTRIBUTION REQUIREMENTS ................... C-1

# SECTION 1
# DEFINITIONS

Wherever used herein, the masculine pronoun shall be deemed to include the feminine, and the singular to include the plural, unless the context clearly indicates otherwise, and the following words and phrases shall, when used herein, have the meanings set forth below:

1.1    "Account" means a Participant's aggregate balance in the following accounts (and such subaccounts as the Plan Administrator deems necessary or appropriate in connection with the maintenance of such accounts), as adjusted pursuant to the Plan as of any given date:

(a)    "ESOP Account" which shall reflect a Participant's interest in Company Stock and other assets resulting from contributions made by a Plan Sponsor under Section 3.1 of the Plan or from releases of Company Stock from the Loan Suspense Account. The ESOP Account of Participants shall contain an Envision Management LLC Subaccount which shall reflect the Participants' interest in the portion of the contribution made pursuant to Section 3.1 for the 2017 Plan Year accrued by Envision Management LLC.

(b)    "Loan Suspense Account" which shall consist of Company Stock acquired by the Fund with the proceeds of an Acquisition Loan, which Company Stock has not been allocated to the ESOP Accounts of Participants.

Each Account shall consist of a Company Stock Subaccount and an Other Investment Subaccount. The Plan Administrator shall allocate the interest of a Participant in any funds transferred to the Plan pursuant to the merger of another tax-qualified retirement plan with the Plan among the above accounts as the Plan Administrator determines best reflects the interest of the Participant.

1.2    "Acquisition Loan" means a loan (or other extension of credit) made to the Plan by or subject to a Guarantee by a person described in Code Section 4975(e)(2), including a direct loan of cash, a purchase-money transaction, and an assumption of an obligation of the Plan, used by the Trustee to finance the acquisition of Company Stock or to repay any Acquisition Loan, as further set forth in Section 5.1 of the Plan.

1.3    "Affiliate" means: (a) any corporation which is a member of the same controlled group of corporations (within the meaning of Code Section 414(b)) as is a Plan Sponsor; (b) any other trade or business (whether or not incorporated) under common control (within the meaning of Code Section 414(c)) with a Plan Sponsor; (c) any other corporation, partnership, or other organization which is a member of an affiliated service group (within the meaning of Code Section 414(m)) with a Plan Sponsor; or (d) any other entity required to be aggregated with a Plan Sponsor pursuant to regulations under Code Section 414(o). Notwithstanding the foregoing, for purposes of applying the limitations set forth in Appendix A and for purposes of determining Annual Compensation under Appendix A, the references to Code Sections 414(b) and (c) above shall be as modified by Code Section 415(h).

1.4    "Annual Compensation" means wages within the meaning of Code Section 3401(a) (for purposes of income tax withholding at the source) paid to an Employee by a Plan

Sponsor (and Affiliates for purposes of Appendices A, B and C) during a Plan Year and all other payments of compensation to an Employee for which a Plan Sponsor is required to furnish the Employee a written statement under Code Section 6041(d), 6051(a)(3) and 6052 (but without regard to any rules that limit the remuneration included in wages based on the nature or location of the employment or the services performed, such as the exception for agricultural labor in Code Section 3401(a)(2)), to the extent not in excess of the Annual Compensation Limit for all purposes under the Plan except determining key employees under Appendix B. Notwithstanding the above, Annual Compensation shall be determined as follows:

> (a)     in determining with respect to each Plan Sponsor the amount of contributions made under Plan Section 3 and allocations under Plan Section 4, Annual Compensation shall exclude reimbursements or other expense allowances, fringe benefits (cash and noncash), moving expenses, deferred compensation and welfare benefits;

> (b)     for all purposes under the Plan, Annual Compensation shall include any amount which would have been paid during a Plan Year, but was contributed by a Plan Sponsor on behalf of an Employee pursuant to a salary reduction agreement which is not includable in the gross income of the Employee under Code Section 125, 132(f)(4), 402(g)(3), or 457;

> (c)     for Plan Years beginning after December 31, 2017, Annual Compensation shall only include wages paid while such Employee is a Participant; and

> (d)     for all purposes under the Plan, Annual Compensation shall include payments to an individual who does not currently perform services for a Plan Sponsor by reason of qualified military service (within the meaning of Code Section 414(u)(5)) to the extent those payments do not exceed the amounts the individual would have received if the individual had continued to perform services for a Plan Sponsor rather than entering qualified military service.

1.5     "Annual Compensation Limit" means $270,000, or such amount as adjusted in subsequent Plan Years under Code Section 401(a)(17) based in changes in the cost of living as announced by the Secretary of the Treasury.

1.6     "Beneficiary" means the person or trust that a Participant designated most recently in writing to the Plan Administrator.  However, upon the Participant's divorce, if the former Spouse was designated as the Participant's beneficiary, that designation shall become null and void. If the Participant has failed to make a designation, no person designated is alive, no trust has been established, or no successor Beneficiary has been designated who is alive, the term "Beneficiary" means (a) the deceased Participant's Spouse or (b) if no Spouse is alive, the deceased Participant's surviving children, or (c) if no children are alive, the deceased Participant's parent or parents, or (d) if no parent is alive, the legal representative of the deceased Participant's estate. Notwithstanding the preceding sentence, the Spouse of a married Participant shall be his Beneficiary unless that Spouse has consented in writing to the designation by the Participant of some other person or trust and the Spouse's consent acknowledges the effect of the designation and is witnessed by a notary public. A Participant may change his designation at any time. However, a Participant may not change his designation without further consent of his

10692538.6

Spouse under the terms of the preceding sentence unless the Spouse's consent permits designation of another person or trust without further spousal consent and acknowledges that the Spouse has the right to limit consent to a specific beneficiary and that the Spouse voluntarily relinquishes this right. Notwithstanding the above, the Spouse's consent shall not be required if the Participant establishes to the satisfaction of the Plan Administrator that the Spouse cannot be located, if the Participant has a court order indicating that he is legally separated or has been abandoned (within the meaning of local law) unless a "qualified domestic relations order" (as defined in Code Section 414(p)) provides otherwise, or if there are other circumstances as the Secretary of the Treasury prescribes. If the Spouse is legally incompetent to give consent, consent by the Spouse's legal guardian shall be deemed to be consent by the Spouse. If, subsequent to the death of a Participant, the Participant's Beneficiary dies while entitled to receive benefits under the Plan, benefits under the Plan will be paid to the successor Beneficiary, if any, or the Beneficiary listed under Subsection (a), (b), (c), or (d) as applicable.

1.7   "Board of Directors" means the Board of Directors of the Primary Sponsor.

1.8   "Break in Service" means the failure of an Employee, in connection with a Termination of Employment, to complete more than 500 Hours of Service in any Plan Year.

1.9   "Code" means the Internal Revenue Code of 1986, as amended, and the regulations issued thereunder.

1.10   "Company Stock" means qualifying employer securities within the meaning of Code Section 4975(e)(8) which are: (a) shares of common stock issued by the Primary Sponsor or a corporation which is a member of a controlled group of corporations which includes the Primary Sponsor (within the meaning of Code Section 1563(a), determined without regard to Code Sections 1563(a)(4) and (e)(3)(C)), which are readily tradable on an established securities market or, if there is no such common stock, shares of common stock issued by the Primary Sponsor or a corporation which is a member of a controlled group of corporations which includes the Primary Sponsor (within the meaning of Code Section 1563(a), determined without regard to Code Sections 1563(a)(4) and (e)(3)(C)), which have voting power and dividend rights no less favorable than the voting power and dividend rights of any other common stock issued by the Primary Sponsor or the other corporation; or (b) shares of noncallable preferred stock issued by the Primary Sponsor, which are at all times immediately convertible into stock described in (a) above at a reasonable conversion price.

1.11   "Company Stock Subaccount" means that portion of each Account in the Plan which is invested in Company Stock. The balance of a Company Stock Subaccount shall be expressed in terms of whole shares and, if applicable, fractional shares of Company Stock and shall be adjusted pursuant to the Plan to reflect any change in the number of shares of Company Stock attributable to the Company Stock Subaccount.

1.12   "Direct Rollover" means a payment by the Plan to an Eligible Retirement Plan specified by the Distributee.

1.13   "Disability" means a Participant is permanently and totally disabled such that he is entitled to receive disability benefits under the terms of a long-term disability plan maintained

by a Plan Sponsor in which the Participant participates or entitled to receive disability retirement benefits under the federal Social Security Act.

1.14    "<u>Distributee</u>" means an Employee or former Employee.  In addition, the Employee's or former Employee's surviving Spouse and the Employee's or former Employee's Spouse or former Spouse who is the alternate payee under a qualified domestic relations order (as defined in Code Section 414(p)), are Distributees with regard to the interest of the Spouse or former Spouse.  A non-Spouse Beneficiary of a deceased Participant who is either an individual or an irrevocable trust, where the beneficiaries of such trust are identifiable and the trustee provides the Plan Administrator with a final list of trust beneficiaries or a copy of the trust document by October 31 of the year following the Participant's death, shall be a Distributee with regard to the interest of the deceased Participant, but only if the Eligible Rollover Distribution is transferred in a direct trustee-to-trustee transfer to an Eligible Retirement Plan which is an individual retirement account described in Code Section 408(a) or an individual retirement account described in Code Section 408(b) (other than an endowment contract).

1.15    "<u>Disqualified Person</u>" means a person who is:

    (a)    a Fiduciary;

    (b)    a person providing services to the Plan;

    (c)    a Plan Sponsor;

    (d)    an employee organization any of whose members are covered by the Plan;

    (e)    an owner, direct or indirect, of fifty percent (50%) or more of:

        (1)    the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of a corporation,

        (2)    the capital interest or the profits interest of a partnership, or

        (3)    the beneficial interest of a trust or unincorporated enterprise,

which is a Plan Sponsor or an employee organization described in Subsection (c) or (d);

    (f)    a Spouse, ancestor, lineal descendant, or any Spouse of a lineal descendant of any individual described in Subsection (a), (b), (c), or (e);

    (g)    a corporation, partnership, or trust or estate of which (or in which) fifty percent (50%) or more of:

        (1)    the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of such corporation,

        (2)    the capital interest or profits interest of such partnership, or

(3)   the beneficial interest of such trust or estate,

is owned directly or indirectly, or held by persons described in Subsection (a), (b), (c), (d), or (e);

(h)   an officer, director (or an individual having powers or responsibilities similar to those of officers or directors), a ten percent (10%) or more shareholder, or a Highly Compensated Employee (earning ten percent (10%) or more of the yearly wages of a Plan Sponsor) of a person described in Subsection (c), (d), (e), or (g); or

(i)   a ten percent (10%) or more (in capital or profits) partner or joint venturer of a person described in Subsection (c), (d), (e), or (g).

1.16   "Effective Date" means the date of the initial adoption of the Plan on January 1, 2017.

1.17   "Eligibility Service" means a twelve-consecutive-month period during which the Employee completes no less than 1,000 Hours of Service beginning on the date on which the Employee first performs an Hour of Service upon his employment or reemployment or, if the Employee fails to complete 1,000 Hours of Service in that twelve-consecutive-month period, any Plan Year thereafter during which the Employee completes no less than 1,000 Hours of Service, including the Plan Year which includes the first anniversary of the date the Employee first performed an Hour of Service upon his employment or reemployment.

1.18   "Eligible Employee" means any Employee of the Primary Sponsor or any other Plan Sponsor which adopts the Plan in accordance with Section 19, other than an Employee who is:

(a)   Jeff Jones, Del Creps, Paul Sherwood, Tanweer Khan, MD or Nicole Jones;

(b)   covered by a collective bargaining agreement between a union and a Plan Sponsor, provided that retirement benefits were the subject of good faith bargaining, unless the collective bargaining agreement provides for participation in the Plan;

(c)   a Leased Employee with respect to a Plan Sponsor;

(d)   deemed to be an Employee of a Plan Sponsor pursuant to regulations under Code Section 414(o);

(e)   a non-resident alien who received no earned income from a Plan Sponsor which constitutes income from sources within the United States; or

(f)   employees who primary work location is Aspen Teleradiology, LLC, Specialty Imaging, LLC (dba Resilience Imaging), or Orthopedic Centers of Colorado, LLC (dba OCC Imaging at Pyramid Court) as shown on a Plan Sponsor's payroll records.

In addition, no person who is initially classified by a Plan Sponsor as an independent contractor for federal income tax purposes shall be regarded as an Eligible Employee for that period, regardless of any subsequent determination that any such person should have been characterized as a common law employee of the Plan Sponsor for the period in question.

1.19   "Eligible Retirement Plan" means any of the following that will accept a Distributee's Eligible Rollover Distribution:

(a)   an individual retirement account described in Code Section 408(a);

(b)   an individual retirement annuity described in Code Section 408(b) (other than an endowment contract);

(c)   an annuity plan described in Code Section 403(a) or an annuity contract described in Code Section 403(b), unless the Distributee is a non-Spouse Beneficiary of a deceased Participant;

(d)   a qualified trust described in Code Section 401(a), unless the Distributee is a non-Spouse Beneficiary of a deceased Participant; or

(e)   an eligible plan under Code Section 457(b) which is maintained by a state or political subdivision of a state, or any agency or instrumentality of a state or political subdivision, and which agrees to separately account for amounts transferred into such plan from this Plan, unless the Distributee is a non-Spouse Beneficiary of a deceased Participant.

If any portion of an Eligible Rollover Distribution is attributable to payments or distributions from a designated Roth account (as defined in Code Section 402A), an Eligible Retirement Plan with respect to such portion shall include only another designated Roth account and a Roth IRA.

1.20   "Eligible Rollover Distribution" means any distribution of all or any portion of the Distributee's Account:

(a)   including any portion of the distribution that is not includable in gross income, provided such amount is distributed directly to one of the following:

(1)   an individual retirement account described in Code Section 408(a) or an individual retirement annuity described in Code Section 408(b) (other than an endowment contract); or

(2)   a qualified trust as described in Code Section 401(a) or an annuity contract described in Code Section 403(b), but only to the extent that:

(i)   the distribution is made in a direct trustee-to-trustee transfer; and

(ii)   the transferee trust or contract provides for separate accounting for amounts so transferred (and earnings thereon), including

separately accounting for the portion of the distribution which is includable in income and the portion which is not includable in income; and

(b)    excluding:

(1)    any distribution that is one of a series of substantially equal periodic payments made (not less frequently than annually) for the life (or life expectancy) of the Distributee or the joint lives (or joint life expectancies) of the Distributee and the Distributee's designated Beneficiary, or for a specified period of ten (10) years of more;

(2)    any distribution to the extent such distribution is required under Code Section 401(a)(9);

(3)    any distribution which is made upon hardship of the Employee;

(4)    except as otherwise provided in this Section, the portion of any distribution that is not includable in gross income (determined without regard to the exclusions for net unrealized appreciation with respect to employer securities); and

(5)    if the Distributee is a non-Spouse Beneficiary of a deceased Participant, any distribution other than a direct trustee-to-trustee transfer to an individual retirement account described in Code Section 408(a) or an individual retirement annuity described in Code Section 408(b) (other than an endowment contract).

1.21    "Employee" means any person who is: (a) a common law employee of a Plan Sponsor or Affiliate; (b) a Leased Employee with respect to a Plan Sponsor; or (c) deemed to be an employee of a Plan Sponsor pursuant to regulations under Code Section 414(o).

1.22    "Entry Date" means January 1, April 1, July 1, and October 1.

1.23    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations issued thereunder.

1.24    "ESOP Committee" means a committee, which may be established to direct the Trustee with respect to investments of the Fund pursuant to the terms of the Trust, and, if such committee is not established, means the Primary Sponsor.

1.25    "Fair Market Value" means:

(a)    if the Company Stock is not Publicly Traded, the value arrived at through a valuation carried on by an Independent Appraiser; or

(b)      if the Company Stock is Publicly Traded, the price most recently bid or asked, as appropriate, or paid for Company Stock listed on an exchange or quoted through a national securities exchange or association.

1.26      "Fiduciary" means each Named Fiduciary and any other person who exercises or has any discretionary authority or control regarding management or administration of the Plan, any other person who renders investment advice for a fee or has any authority or responsibility to do so with respect to any assets of the Plan, or any other person who exercises or has any authority or control respecting management or disposition of assets of the Plan.

1.27      "Financed Shares" means shares of Company Stock acquired by the Trustee with the proceeds of an Acquisition Loan.

1.28      "Fund" means the amount at any given time of cash, Company Stock, and other property held by the Trustee pursuant to the Plan.

1.29      "Guarantee" means any guarantee of payment of an Acquisition Loan by a person or entity other than the Plan.

1.30      "Highly Compensated Employee" means, with respect to a Plan Year, an Employee who:

(a)      was at any time during the Plan Year or the immediately preceding Plan Year, an owner of more than five percent (5%) of the outstanding stock of a Plan Sponsor or Affiliate or more than five percent (5%) of the total combined voting power of all stock of a Plan Sponsor or Affiliate; or

(b)      received Annual Compensation in excess of $120,000 for the immediately preceding Plan Year, which amount shall be adjusted for changes in the cost of living as provided in regulations issued by the Secretary of the Treasury and was in the top-paid group of employees, for such preceding year; or

(c)      is a former Employee who met the requirements of Subsection (a) or (b) at the time the former Employee separated from service with the Plan Sponsor or an Affiliate or at any time after the former Employee attained age fifty-five (55).

Pursuant to Code Section 414(q)(3), an Employee is in the top-paid group for any year if an Employee is in the group consisting of the top twenty percent (20%) of Employees ranked on the basis of Annual Compensation paid to Employees during such year (the "top-paid group"). For purposes of this Section, an Employee (who is not a five percent (5%) owner) who has Annual Compensation in excess of $120,000 is not a Highly Compensated Employee if the Employee is not in the top-paid group.

1.31      "Hour of Service" means:

(a)      Each hour for which an Employee is paid, or entitled to payment, for the performance of duties for a Plan Sponsor or any Affiliate during the applicable

10692538.6

computation period, and such hours shall be credited to the computation period in which the duties are performed.

(b)     Each hour for which an Employee is paid, or entitled to payment, by a Plan Sponsor or any Affiliate on account of a period of time during which no duties are performed (irrespective of whether the employment relationship has terminated) due to vacation, holiday, illness, incapacity (including disability), layoff, jury duty, military duty, or leave of absence.

(c)     Each hour for which back pay, irrespective of mitigation of damages, is either awarded or agreed to by a Plan Sponsor or any Affiliate, and such hours shall be credited to the computation period or periods to which the award or agreement for back pay pertains rather than to the computation period in which the award, agreement or payment is made; provided, that the crediting of Hours of Service for back pay awarded or agreed to with respect to periods described in Subsection (b) of this Section shall be subject to the limitations set forth in Subsection (f);

(d)     Solely for purposes of determining whether a Break in Service has occurred, each hour during any period that the Employee is absent from work: (1) by reason of the pregnancy of the Employee; (2) by reason of the birth of a child of the Employee; (3) by reason of the placement of a child with the Employee in connection with the adoption of the child by the Employee; or (4) for purposes of caring for such child for a period immediately following its birth or placement shall be credited: (A) only in the computation period in which the absence from work begins, if the Employee would be prevented from incurring a Break in Service in that year solely because of that credit; or (B), in any other case, in the next following computation period;

(e)     Without duplication of the Hours of Service counted pursuant to Subsection (d) hereof and solely for such purposes as required pursuant to the Family and Medical Leave Act of 1993 and the regulations thereunder (the "FMLA"), each hour (as determined pursuant to the FMLA) for which an Employee is granted leave under the FMLA: (1) for the birth of a child; (2) for placement with the Employee of a child for adoption or foster care; (3) to care for the Employee's Spouse, child or parent with a serious health condition; or (4) for a serious health condition that makes the Employee unable to perform the functions of the Employee's job;

(f)     The Plan Administrator shall credit Hours of Service in accordance with the provisions of Sections 2530.200b-2(b) and (c) of the U.S. Department of Labor Regulations or such other federal regulations as may from time to time be applicable and determine Hours of Service from the employment records of a Plan Sponsor or in any other manner consistent with regulations promulgated by the Secretary of Labor, and shall construe any ambiguities in favor of crediting Employees with Hours of Service. Notwithstanding any other provision of this Section, in no event shall an Employee be credited with more than 501 Hours of Service during any single continuous period during which he performs no duties for the Plan Sponsor or Affiliate;

10692538.6

(g)     In the event that a Plan Sponsor or an Affiliate acquires substantially all of the assets of another corporation or entity or a controlling interest of the stock of another corporation or merges with another corporation or entity and is the surviving entity, then service of an Employee who was employed by the prior corporation or entity and who is employed by the Plan Sponsor or an Affiliate at the time of the acquisition or merger shall be counted in the manner provided, with the consent of the Primary Sponsor, in resolutions adopted by the Plan Sponsor which authorizes the counting of such service; and

(h)     Notwithstanding any other provision of the Plan, Hours of Service will be provided in accordance with Code Section 414(u) with respect to qualified military service.

1.32    "Independent Appraiser" means an individual meeting requirements similar to those contained in Treasury Regulations under Code Section 170(a)(1) who holds himself out to the public as an appraiser, who is qualified to make an appraisal of Company Stock, who understands that a false or fraudulent overstatement of the value of Company Stock may subject him to a civil penalty under Code Section 6701 and who is not:

(a)     the seller of Company Stock;

(b)     a Plan Sponsor or an Affiliate;

(c)     any person employed by or related to (within the meaning of Code Section 267(b)) the persons described in Subsections (a) and (b) above;

(d)     a party to the transaction by which the person selling, or contributing any Company Stock to the Plan acquired the Company Stock (unless the Company Stock is sold or contributed to the Plan within two (2) months of its acquisition and its appraised price does not exceed its acquisition cost); or

(e)     any person whose relationship with a person described in Subsections (a), (b), (c), or (d) above is such that a reasonable person would question the independence of the appraiser.

1.33    "Investment Manager" means a Fiduciary, other than the Trustee, the ESOP Committee, the Plan Administrator, or a Plan Sponsor, who may be appointed by the Primary Sponsor:

(a)     who has the power to manage, acquire, or dispose of any assets of the Fund or a portion thereof; and

(b)     who

(1)     is registered as an investment adviser under the Investment Advisers Act of 1940;

(2)     is a bank as defined in the Investment Advisers Act of 1940; or

(3)     is an insurance company qualified to perform services described in Subsection (a) above under the laws of more than one state; and

(c)     who has acknowledged in writing that he is a Fiduciary with respect to the Plan.

1.34    "Leased Employee" means an Employee (other than a common law employee of the Plan Sponsor or an Affiliate) who, pursuant to an agreement between the Plan Sponsor or an Affiliate and any other person, has performed services for the Plan Sponsor or an Affiliate (or for the Plan Sponsor and related persons determined in accordance with Code Section 414(n)(6)) on a substantially full-time basis for a period of at least one (1) year, and such services are performed under the primary direction or control of the Plan Sponsor or an Affiliate.

1.35    "Named Fiduciary" means only the following:

(a)     the Plan Administrator;

(b)     the Trustee;

(c)     the Board of Directors;

(d)     the ESOP Committee; and

(e)     the Investment Manager.

1.36    "Normal Retirement Age" means age sixty-five (65).

1.37    "Other Investment Subaccount" means the subaccount within each Account invested in assets other than Company Stock.  The balance of the Other Investment Subaccount shall be expressed as a dollar amount and shall be adjusted pursuant to the Plan to reflect income, gains, losses and other credits or charges attributable thereto.

1.38    "Participant" means any Employee or former Employee who has become a Participant in the Plan for so long as his vested Account has not been fully distributed pursuant to the Plan.

1.39    "Payment Policy" means the policy adopted by the Plan Administrator from time to time which shall provide rules on distributions that are not inconsistent with the terms of the Plan, including the form and timing of distributions.

1.40    "Plan Administrator" means the organization or person designated to administer the Plan by the Primary Sponsor and, in lieu of any such designation, means the ESOP Committee.

1.41    "Plan Sponsor" means individually the Primary Sponsor and any Affiliate or other entity which has adopted the Plan and Trust.

1.42    "Plan Year" means the calendar year.

1.43    "Publicly Traded" means Company Stock that is listed on a national securities exchange  under Section 6 of the Securities Exchange Act of 1934 (15 U.S.C. Section 78f) or that is quoted on a system sponsored by a national securities association registered under Section 15A(b) of the Securities Exchange Act of 1934 (15 U.S.C. Section 78o).

1.44    "Put and First Refusal Rights" means the rights described in Section 11 of the Plan.

1.45    "Qualified Plan" means any plan qualified under Code Section 401.

1.46    "Retirement Date" means a Termination of Employment for reasons other than death after the Participant attains Normal Retirement Age.

1.47    "Spouse" means a person who, by reason of marriage valid under the laws of the state or jurisdiction where it was entered into, is the lawful spouse of the Participant.

1.48    "Termination Completion Date" means the last day of the fifth (5th) consecutive Break in Service computation period, determined under the Section which defines Break in Service, in which a Participant completes a Break in Service.

1.49    "Termination of Employment" means a severance from employment (within the meaning of Code Section 401(k)(2)(B)(i)(I)) of an Employee from all Plan Sponsors and Affiliates for any reason other than death, Disability, or attainment of a Retirement Date.  Any absence from active employment of the Plan Sponsor and Affiliates by reason of an approved leave of absence shall not be deemed for any purpose under the Plan to be a Termination of Employment.  Transfer of an Employee from one Plan Sponsor to another Plan Sponsor or to an Affiliate shall not be deemed for any purpose under the Plan to be a Termination of Employment.  In addition, transfer of an Employee to another employer (other than a Plan Sponsor or an Affiliate) in connection with a corporate transaction involving a sale of assets, merger, or sale of stock, shall not be deemed to be a Termination of Employment, for purposes of the timing of distributions under Section 9.1 of the Plan, if the employer to which such Employee is transferred agrees with the Plan Sponsor to accept a transfer of assets from the Plan to its tax-qualified retirement plan in a trust-to-trust transfer meeting the requirements of Code Section 414(l).

1.50    "Trust" means the Envision Management Holding, Inc. Employee Stock Ownership Trust established under an agreement between the Primary Sponsor and the Trustee to hold the Fund or any successor agreement.

1.51    "Trustee" means the trustee under the Trust.

1.52    "Valuation Date" means the last day of the Plan Year or any other day which the Plan Administrator, declares to be a Valuation Date.

1.53    "Vesting Service" means each Plan Year during which an Employee has completed no less than 1,000 Hours of Service. Notwithstanding anything contained herein to the contrary, Vesting Service shall not include:

(a)      in the case of an Employee who completes five (5) consecutive Breaks in Service, for purposes of determining the vested portion of his Account derived from Plan Sponsor contributions which accrued before his Termination Completion Date, all service in Plan Years after his Termination Completion Date; and

(b)      in the case of an Employee who completes five (5) consecutive Breaks in Service and at that time does not have any vested right in Plan Sponsor contributions, all service before those Breaks in Service commenced.

## SECTION 2
## ELIGIBILITY

2.1      <u>New Hires</u>.  For the 2017 Plan Year, each Eligible Employee shall become a Participant as of the date the Eligible Employee first performs an Hour of Service in 2017.  Each Eligible Employee who first becomes an Eligible Employee on or after January 1, 2018 shall become a Participant as of the Entry Date coinciding with or next following the date he completes his Eligibility Service.

2.2      <u>Former Participants Rehired</u>.  Each former Participant who is reemployed by a Plan Sponsor shall become a Participant as of the date he is reemployed as an Eligible Employee.

2.3      <u>Former Employees Rehired</u>.  Each former Employee who terminates employment with a Plan Sponsor before becoming a Participant shall become a Participant as of the latest of the date he (a) is reemployed, (b) would have become a Participant if he had not incurred a Termination of Employment, or (c) becomes an Eligible Employee.

## SECTION 3
## CONTRIBUTIONS

3.1      <u>Employer Contributions</u>.  The Plan Sponsor shall make aggregate contributions to the Fund with respect to each Plan Year in an amount determined at the Plan Sponsor's discretion, but not less than the amount necessary to pay when due all required payments of interest and principal under any and all Acquisition Loans, reduced to the extent of any dividends paid or other distributions made with respect to shares of Company Stock held by the Plan and applied towards the payment of any such Acquisition Loan in accordance with Section 4.1 of the Plan.  The share of each Plan Sponsor in the aggregate contributions for each Plan Year shall be equal to the amount of the contributions attributable to Participants who are Eligible Employees of the Plan Sponsor, as determined by the Plan Administrator.  The contribution under this Section 3.1 of the Plan will be allocated in accordance with Section 4.1 of the Plan.

3.2      <u>Form and Deductibility of Contributions</u>.  Contributions may be made only in Company Stock or cash; provided that, Plan Sponsor contributions shall be made in cash as needed to pay any principal and interest payments required by an Acquisition Loan, if any.  In no event will the sum of contributions under Section 3.1 of the Plan exceed the deductible limits under Code Section 404.

3.3      <u>Forfeitures</u>.  Forfeitures shall be used to repay an Acquisition Loan or reallocated at the end of each Plan Year to Participants, as provided in Section 4.1 of the Plan.

3.4    Qualified Military Service.   Notwithstanding any provision of the Plan to the contrary, contributions, benefits and service credit with respect to qualified military service will be provided in accordance with Code Section 414(u).

# SECTION 4
# VALUATION AND ALLOCATION

4.1    Allocations of Contributions and Forfeitures.

(a)    Amounts Not Used to Repay an Outstanding Acquisition Loan.  As of the last day of each Plan Year, Plan Sponsor contributions of Company Stock, cash or other property made under Section 3.1 and forfeitures from ESOP Accounts under Section 3.3, in each case, to the extent not used to repay an Acquisition Loan shall be allocated to the ESOP Account of each Participant who

(1)    for the 2017 Plan Year is (1) an Eligible Employee and (2) is employed by the Plan Sponsor on the last day of the Plan Year; or

(2)    for any Plan Year beginning on or after January 1, 2018, is (i) an Eligible Employee; (ii) has been credited with one (1) year of Vesting Service for that Plan Year; and (iii) is employed by the Plan Sponsor on the last day of the Plan Year or who, while an Employee, reached a Retirement Date, incurred a Disability or died during the Plan Year;

in the proportion that the Annual Compensation of the Participant bears to the Annual Compensation of all such Participants.

(b)    Repayment of Outstanding Acquisition Loans.  As of the last day of each Plan Year, Plan Sponsor cash contributions made under Section 3.1, forfeitures of cash held in Participants' ESOP Accounts under Section 3.3 and cash dividends paid or other cash distributions made on shares of Company Stock held in the Loan Suspense Account shall be used to make principal and interest payments then due on outstanding Acquisition Loans.  In addition, to the extent permitted by applicable law, cash dividends paid or cash distributions made with respect to shares of Company Stock allocated to Participants' ESOP Accounts may be used to repay an Acquisition Loan incurred in connection with the acquisition of such shares.  The Plan Administrator may, in its discretion, use any cash contributions made by the Plan Sponsor pursuant to Section 3.1 in excess of any amount then due on an Acquisition Loan to prepay the balance of such Acquisition Loan.  Each such payment with respect to an Acquisition Loan will result in a release of Financed Shares from the Loan Suspense Account in an amount described in Section 5.1(b), which Financed Shares shall be allocated to Participants' ESOP Accounts as provided in Section 4.2.

4.2    Allocations of Shares Released from the Loan Suspense Account.  Shares of Company Stock released from the Loan Suspense Account as provided in Section 5.1(b) shall be allocated to Participants' ESOP Accounts as follows:

10692538.6

(a)     To the extent cash dividends paid or other cash distributions made with respect to Company Stock held in Participants' ESOP Accounts are used to repay an Acquisition Loan incurred in connection with the acquisition of such Financed Shares, the number of Financed Shares released from the Loan Suspense Account to be allocated to such Participants' ESOP Accounts shall be determined as follows:

(1)     The aggregate number of released Financed Shares to be allocated to Participants' Company Stock Subaccounts as a result of the use of such cash dividends or cash distributions to repay an Acquisition Loan during a Plan Year shall be equal to the greater of:

(i)     the aggregate number of Financed Shares released due to the payment of principal and interest on the Acquisition Loan during the Plan Year, multiplied by a fraction, the numerator of which is the total amount of cash dividends or other cash distributions used from all Participants' Other Investment Subaccounts to repay the Acquisition Loan during the Plan Year, and the denominator of which is the amount of the aggregate payment of principal and interest paid with respect to the Acquisition Loan for such Plan Year; and

(ii)     the number of released Financed Shares having a Fair Market Value at least equal to the amount of the cash dividends or other cash distributions paid with respect to Company Stock held in Participants' Company Stock Subaccounts which are used to repay the Acquisition Loan.

(2)     The number of Financed Shares determined pursuant to Subsection (1) hereof shall be allocated to each Participant's Company Stock Subaccount in the same proportion that the cash dividends or other cash distributions used from such Participant's Other Investment Subaccount to repay the Acquisition Loan during the Plan Year bears to the total amount of cash dividends and other cash distributions so used from all Participants' Other Investment Subaccounts.

(b)     following the allocation to Participants' ESOP Accounts pursuant to Subsection (a) hereof, any remaining Financed Shares released from the Loan Suspense Account shall be allocated to Participants' Company Stock Subaccounts in accordance with Section 4.1(a);

4.3     <u>Allocation of Dividends, Other Distributions and Net income/Loss</u>.  As of each Valuation Date, dividends paid and other distributions made with respect to Company Stock allocated to Participants' ESOP Accounts or held in the Loan Suspense Account (and any income thereon) and any other net income or loss of the Fund shall be allocated as follows:

(a)     Cash dividends and other cash distributions (and any income thereon) paid with respect to Company Stock held in the Loan Suspense Account on the record date of such dividend or distribution shall be used to repay an Acquisition Loan incurred in connection with the acquisition of such shares, and the released Financed Shares

attributable to the use of such dividends or other distributions shall be allocated in accordance with Section 4.2.

(b)     Cash dividends and other cash distributions (and any income thereon) paid with respect to shares of Company Stock held in a Participant's Company Stock Subaccount on the record date of such dividend or distribution shall be credited to such Participant's Other Investment Subaccount.

(c)     Any additional shares of Company Stock which are issued with respect to any Company Stock held in a Company Stock Subaccount, including, but not limited to, stock dividends, shall be allocated to that Company Stock Subaccount as of the Valuation Date coinciding with or next following the date on which the additional shares of Company Stock are delivered to the Trustee. The additional shares of Company Stock shall be allocated to each Company Stock Subaccount based upon the number of shares of Company Stock in each Company Stock Subaccount as of the record date of the stock dividend or other equity right.

(d)     Allocation of Net Income and Loss.  Except as otherwise provided in the Plan and Trust, the net loss and the net income of the Other Investment Subaccounts shall be determined separately by the Plan Administrator or its designee as of each Valuation Date as follows:

(i)     To the cash income, if any, since the last Valuation Date there shall be added or subtracted, as the case may be, any net increase or decrease in the fair market value of the assets of the Fund (other than Company Stock Subaccounts), any gain or loss on the sale or exchange of assets of the Fund (other than Company Stock Subaccounts), accrued interest with respect to any interest-bearing security, the amount of any dividend declared but not paid on shares of stock owned by the Fund (other than Company Stock Subaccounts) if the market quotation used in determining the value of the shares is ex-dividend, and the amount of any other assets of the Fund (other than Company Stock Subaccounts) determined by the Trustee to be income; and

(ii)     From the sum thereof there shall be deducted all charges, expenses, and liabilities accrued since the last Valuation Date which are proper under the provisions of the Plan and Trust and which in the discretion of the Plan Administrator are properly chargeable against income of the Fund (other than Company Stock Subaccounts) for the period; provided, however, that interest paid on any Acquisition Loan shall be disregarded.

The net income or net loss so determined of the Fund (other than Company Stock Subaccounts) shall be allocated as of the Valuation Date to each Other Investment Subaccount in the proportion that the value of the Other Investment Subaccount as of the preceding Valuation Date, reduced by the full amount of any distributions from that Other Investment Subaccount since that Valuation Date, bears to all such Other Investment Subaccounts of all Participants as of the preceding Valuation Date, as so reduced.

10692538.6

4.4    Valuation of Company Stock.  All valuations of shares of Company Stock made with respect to activities carried on by the Plan which shares of Company Stock are not Publicly Traded shall be made by an Independent Appraiser.

4.5    Section 1042 Transactions.  At any time during which the Plan Sponsor does not have an election in effect under Subchapter S of the Code, no portion of the Plan assets attributable to Company Stock purchased pursuant to a sale with respect to which Code Section 1042(a) applies shall accrue under the Plan or any other plan maintained by a Plan Sponsor, either directly or indirectly, for the benefit of:

(a)    a seller or any individual who is related to the seller (within the meaning of Code Section 267(b)) at any time from the date of sale until the later of:

(1)    the date which is ten years after the date of the sale; or

(2)    the date of the allocation attributable to the final payment of any Acquisition Loan incurred in connection with the sale; or

(b)    any other person who owns after application of Code Section 318(a) (but without regard to paragraph (2)(B)(i) thereof) more than twenty-five percent (25%) of the outstanding portion of:

(1)    any class of; or

(2)    the total value of any class of;

stock of the corporation that issued the Company Stock acquired or of any member of the same controlled group of corporations within the meaning of Code Section 409(1).

However, Participants who are lineal descendants of the seller may receive an aggregate allocation of not more than five percent (5%) of the Company Stock purchased by the Plan, and a Participant who is described in Subsection (b) of this Section may receive allocations of the Company Stock purchased by the Plan if he failed to meet the criteria set forth in that Subsection either: (i) during the one-year period ending on the date of the purchase; or (ii) on the date as of which that Company Stock is allocated to Participants' Accounts.

4.6    Prohibited Allocations to S Corporation Owners.

(a)    General Rule. In the event the Plan Sponsor is an S Corporation, there shall be no impermissible accrual or impermissible allocation under the Plan or any other plan maintained by the Plan Sponsor and qualified under Code Section 401(a) for the benefit of any Disqualified Person.

(1)    There is an impermissible accrual to the extent that Company Stock consisting of stock in an S corporation owned by the Plan and any assets attributable thereto are held under the Plan for the benefit of a Disqualified Person during a Nonallocation Year. For this purpose, assets attributable to stock in an S

Corporation owned by the Plan include any distributions, within the meaning of Code Section 1368, made on S Corporation stock held in a Disqualified Person's Account in the Plan (including earnings thereon), plus any proceeds from the sale of S Corporation securities held for a Disqualified Person's Account in the Plan (including any earnings thereon).

(2)     An impermissible allocation occurs during a Nonallocation Year to the extent that a contribution or other annual addition (within the meaning of Code Section 415(c)(2)) is made with respect to the account of a Disqualified Person, or the Disqualified Person otherwise accrues additional benefits, directly or indirectly under the Plan or any other plan of the Plan Sponsor qualified under Code Section 401(a) (including a release and allocation of assets from a suspense account, as described at Treasury Regulation Section 54.4975-11(c) and (d)) that, for the Nonallocation Year, would have been added to the Account of the Disqualified Person under the Plan and invested in Company Stock consisting of stock in an S Corporation owned by the Plan but for a provision in the Plan that precludes such addition to the Account of the Disqualified Person, and investment in Company Stock during a Nonallocation Year.

(b)     <u>Definitions</u>. As used in this Section, the following terms shall have the following meanings:

(1)     "Disqualified Person" shall mean any person if:

(i)     the number of such person's Deemed Owned Shares is at least ten percent (10%) of the total number of all Deemed Owned Shares;

(ii)     the aggregate number of such person's Deemed Owned Shares and Synthetic Equity Shares is at least ten percent (10%) of the sum of: (A) the total number of all Deemed Owned Shares; and (B) such person's Synthetic Equity Shares;

(iii)     the aggregate number of Deemed Owned Shares of such person and such person's Family is at least twenty percent (20%) of the total number of all Deemed Owned Shares; or

(iv)     the aggregate number of such persons' Deemed Owned Shares and Synthetic Equity Shares is at least twenty percent (20%) of the sum of (A) the total number of all Deemed Owned Shares; and (B) such person's Synthetic Equity Shares;

provided, however, that for purposes of subparagraphs (iii) and (iv), a member of such person's Family shall not be deemed to be a Disqualified Person if such Family member does not own any Deemed Owned Shares or Synthetic Equity Shares.

(2)     "Deemed Owned Shares" shall mean with respect to any person,

(i)     shares of Company Stock allocated to such person's Account; and

(ii)     any unallocated shares of Company Stock held by the Plan that would be allocated to such person's Account if the unallocated shares of Company Stock in the Plan were allocated to all Participants in the same proportion as the most recent allocation of Company Stock under the Plan.

(3)     "Nonallocation Year" is any Plan Year if, at any time during such Plan Year, the Plan holds Company Stock of a Plan Sponsor, the Plan Sponsor is an S Corporation, and either:

(i)     Disqualified Persons own at least fifty percent (50%) of the total number of shares of outstanding Company Stock (including the Deemed Owned Shares); or

(ii)     Disqualified Persons own at least fifty percent (50%) of the sum of: (A) the number of shares of outstanding Company Stock (including the Deemed Owned Shares); and (B) the Synthetic Equity Shares held by Disqualified Persons.

(4)     "Family" means with respect to a person:

(i)     The person's Spouse;

(ii)     The person's and the person's Spouse's ancestors and lineal descendants;

(iii)     The person's and person's Spouse's brothers and sisters and such brothers' and sisters' lineal descendants; and

(iv)     The Spouse of any individual described in clauses (ii) or (iii) hereof.

For purposes of this paragraph (4), a Spouse of a person who is legally separated from such person under a decree of divorce or separate maintenance is not treated as such person's Spouse.

(5)     "Synthetic Equity" means:

(i)     A right to acquire Company Stock determined as follows:

(A)     a right to acquire Company Stock includes any stock option, warrant, restricted stock, deferred issuance stock

right, stock appreciation right payable in stock, or similar interest or right that gives the holder the right to acquire or receive Company Stock in the future. Rights to acquire Company Stock with respect to Company Stock that is, at all times during the period when such rights are effective, both issued and outstanding and held by a person other than the Plan, the Plan Sponsor or a related entity are not Synthetic Equity but only if that person is subject to federal income taxes; and

(B)     A right of first refusal to acquire stock held by the Plan is not treated as a right to acquire Company Stock if:

(I)     the right would not be taken into account under Treasury Regulation Section 1.1361-1(l)(2)(iii)(A) in determining if an S Corporation has a second class of stock and the price at which the stock is acquired under the right of first refusal is not less than the price determined under Code Section 409(h), and

(II)     the right complies with the requirements of Treasury Regulation Section 54.4975-7(b)(9) of the Excise Tax Regulations;

(ii)     A right to a future payment (payable in cash or any other form other than Company Stock) from the Plan Sponsor that is based on the value of the Company Stock, such as appreciation in value;

(iii)     A right to acquire stock or other similar interests in a Related Entity to the extent of the Plan Sponsor's ownership. Synthetic Equity also includes a right to acquire the assets of the Plan Sponsor or a Related Entity other than either rights to acquire goods, services or property at fair market value in the ordinary course of business or fringe benefits excluded from gross income under Code Section 132; and

(iv)     Any remuneration to which Code Section 404(a)(5) applies; remuneration for which a deduction would be permitted under Code Section 404(a)(5) if separate accounts were maintained; any right to receive property, as defined in Treasury Regulation Section 1.83-3(e) (including a payment to a trust described in Code Section 402(b) or to an annuity described in Code Section 403(c)) in a future year for the performance of services; any transfer of property in connection with the performance of services to which Code Section 83 applies to the extent that the property is not substantially vested within the meaning of Treasury Regulation Section 1.83-3(i) by the end of the Plan Year in which transferred; and a split-dollar life insurance arrangement under Treasury Regulation Section 1.61-22(b) entered into in connection with

the performance of services (other than one under which, at all times, the only economic benefit that will be provided under the arrangement is current life insurance protection as described in Treasury Regulation Section 1.61-22(d)(3)). Synthetic Equity also includes any other remuneration for services under a plan, method, or arrangement, deferring the receipt of compensation to a date that is after the 15th day of the 3rd calendar month after the end of the entity's taxable year in which the related services are rendered.

Notwithstanding the foregoing, Synthetic Equity does not include the following:

(A)     any interest described in clause (iv) to the extent that:

(I)     the interest is nonqualified deferred compensation (within the meaning of Code Section 3121(v)(2)) that was outstanding on December 17, 2004;

(II)     the interest is an amount that was taken into account (within the meaning of Treasury Regulation Section 31.3121(v)(2)-1(d)) prior to January 1, 2005, for purposes of taxation under Chapter 21 of the Code (or income attributable thereto); and

(III)     the interest was held before the first date on which the Plan acquires any Company Stock;

(B)     benefits under a plan that is an eligible retirement plan within the meaning of Code Section 402(c)(8)(B); or

(v)     Notwithstanding clauses (i), (ii), (iii) and (iv), Synthetic Equity does not include shares that are Deemed Owned Shares held by the Plan (or any rights with respect to such Deemed Owned Shares to the extent such rights are specifically provided under Code Section 409(h)).

(6)     "Related Entity" means any entity in which the Plan Sponsor holds an interest and which is a partnership, a trust, an eligible entity that is disregarded as an entity that is separate from its owner under Treasury Regulation Section 301.7701-3, or a Qualified Subchapter S Subsidiary under Code Section 1361(b)(3).

(7)     "Synthetic Equity Shares" means the number of shares of Synthetic Equity determined under the rules of Section 4.5(d).

(8)    "S Corporation" means an "S corporation" as defined in Code Section 1361(a)(1).

(c)    <u>Attribution Rules</u>.

(1)    <u>In General</u>.  For purposes of determining ownership of shares in the Plan Sponsor (including the Deemed Owned Shares) and Synthetic Equity Shares to determine whether a Nonallocation Year exits, the attribution rules in Code Section 318(a) (other than Code Section 318(a)(4)) shall apply; provided, however, that for purposes of applying Code Section 318(a)(1), the members of an individual's family shall be determined with reference to the definition of Family in this Section 4.5 of the Plan.  In addition, for purposes of this paragraph, an individual shall be treated as owning any Deemed Owned Shares of the individual notwithstanding the employee trust exception in Code Section 318(a)(2)(B)(i).

(2)    <u>Synthetic Equity</u>.  Synthetic Equity is treated as owned by the person that has any of the rights specified in Subsection (d). In addition, the attribution rules as set forth in paragraph (1) of this Subsection apply for purposes of attributing ownership of Synthetic Equity.  The attribution of Synthetic Equity under this paragraph (2) shall be applied before the general attribution rules of paragraph (1) hereof.

(3)    <u>Special Rule for Certain Stock Rights</u>.

(A)    For purposes of determining if a Plan Year is a Nonallocation Year, a person is treated as owning stock if the person has an exercisable right to acquire the stock, the stock is both issued and outstanding, and the stock is held by persons other than the Plan, the Primary Sponsor, or a Related Entity.

(B)    This paragraph (3) applies only if treating persons as owning the shares described in subparagraph (A) above results in a Nonallocation Year. This paragraph (3) does not apply to a right to acquire stock of the Primary Sponsor held by a shareholder that is subject to Federal income tax that, under Treasury Regulation Section 1.1361-1(l)(2)(iii)(A) or (l)(4)(iii)(C), would not be taken into account in determining if an S Corporation has a second class of stock, provided that a principal purpose of the right is not the avoidance or evasion of Code Section 409(p).  This paragraph (3) does not apply for purposes of determining ownership of Deemed Owned Shares or whether an interest constitutes Synthetic Equity.

(4)    <u>Application with Respect to Shares Treated as Owned by More Than One Person</u>.  For purposes of determining if a Plan Year is a Nonallocation Year if, by application of the rules of paragraphs (1), (2), or (3) of this Subsection, any share is treated as owned by more than one person, then that share is counted

as a single share and that share is treated as owned by Disqualified Persons if any of the owners is a Disqualified Person.

(d)    <u>Rules of Application</u>.

    (1)    <u>Number of Synthetic Equity Shares</u>.

    (i)    <u>Based on Value of Company Stock</u>.  If Synthetic Equity is determined in reference to the value of Company Stock, the person entitled to such Synthetic Equity is treated as owning the number of shares of stock deliverable pursuant to such Synthetic Equity.  If payment of such Synthetic Equity is to be made in a form other than Company Stock, the number of shares of Synthetic Equity treated as owned is equal to the number of shares of Company Stock having a Fair Market Value equal to the cash or other property in which payment is to be made (disregarding lapse restrictions as described in Treasury Regulation Section 1.83-3(i)).

    (ii)    <u>Based on Related Entity</u>.  If Synthetic Equity is determined by reference to shares of stock (or similar interests) in a Related Entity, the person entitled to the Synthetic Equity is treated as owning shares of Company Stock with the same aggregate value as the number of shares of stock (or similar interests) of the Related Entity (disregarding lapse restrictions as defined in Treasury Regulation Section 1.83-3(i)).

    (iii)    <u>Other Synthetic Equity</u>.  In the case of Synthetic Equity not described in clause (i) or (ii) hereof, the person entitled to such Synthetic Equity is treated as owning on any date the number of shares of Company Stock equal to the present value (on that date) of the Synthetic Equity (determined without regard to lapse restrictions as defined in Treasury Regulation Section 1.83-3(i)) divided by the fair market value of a share of Company Stock as of that date.  For purpose of the Synthetic Equity described in this clause (iii), the number of shares of Synthetic Equity owned by a person for a Plan Year shall be determined annually as of the first day of the Plan Year and such number of shares shall be treated as owned by such person for the remainder of the Plan Year, regardless of changes in such Synthetic Equity during such Plan Year.

    (iv)    <u>Synthetic Equity for Rights to Supervoting Stock</u>.  If a Synthetic Equity right includes (directly or indirectly) a right to purchase or receive shares of Company Stock that have per-share voting rights greater than the per-share voting rights of one or more shares of Company Stock held by the Plan, then the number of shares of deemed owned Synthetic Equity attributable to such right is not less than the number of shares of Company Stock that would have the same voting rights if such shares had the same per-share voting rights as shares held by the Plan with the least voting rights.

(2)    <u>Adjustment of Number of Shares of Synthetic Equity</u>.  If the Plan owns less than 100% of the shares of Company Stock outstanding, the number of shares of Synthetic Equity otherwise determined under paragraph (1) hereof shall be decreased ratably to the extent that shares of Company Stock are owned by a person who is not an employee stock ownership plan as described in Treasury Regulation Section 54.4975-11(a)(5) (and who is subject to Federal income taxes).

(e)    <u>Transfers from the Plan to Other Qualified Plans</u>. In the event a Plan Year is a Nonallocation Year or an allocation would otherwise be prohibited under Section 4.5(a) of the Plan, the Plan Administrator may transfer all or a portion of the accounts in the Plan of a Participant who is a Disqualified Person (or a person reasonably expected to become a Disqualified Person absent a transfer described in this Section 4.5(e)) to the Participant's account in a separate part of this Plan which is not an employee stock ownership plan as described in Treasury Regulation Section 54.4975-11(a)(5), if any, or to another plan sponsored by the Employer that satisfies the requirements of Code Section 401(a) (and that is not an employee stock ownership plan as described in Treasury Regulation Section 54.4975-11(a)(5)).  Any such transfer must be effectuated by affirmative action taken no later than the date of the transfer, and all subsequent actions (including benefit statements) generally must be consistent with the transfer having occurred on that date.

## SECTION 5
## ACQUISITION LOANS/INVESTMENT OF ASSETS

5.1    <u>Acquisition Loans</u>.

(a)    Except in instances where the Trustee has discretionary authority under the Trust, the ESOP Committee may direct the Trustee to obtain Acquisition Loans.  An Acquisition Loan shall meet all requirements necessary to constitute an "exempt loan" within the meaning of Treasury Regulation Section 54.4975-7(b)(1)(iii). At the time an Acquisition Loan is made, the interest rate for the Acquisition Loan and the price of Company Stock to be acquired therewith may not be such that assets of the Plan might be drained off. The terms of an Acquisition Loan must, at the time the Acquisition Loan is made, be at least as favorable to the Plan as the terms of a comparable loan resulting from arm's length negotiations between independent parties. The proceeds of any Acquisition Loan shall be used within a reasonable time after the Acquisition Loan is obtained and may only be used to purchase Company Stock, to repay the Acquisition Loan, or to repay any prior Acquisition Loan. An Acquisition Loan shall provide for no more than a reasonable rate of interest. An Acquisition Loan must be without recourse against the Plan and must be for a specific term and not payable at the demand of any person, except in case of default. For purposes of this Section, "default" shall mean the failure to pay any amount due under the Acquisition Loan, or any other event specified in the agreement memorializing the Acquisition Loan. The Acquisition Loan's number of years to maturity must be definitely ascertainable. The only assets of the Fund that may be given as collateral for an Acquisition Loan are shares of Company Stock acquired with its proceeds or used as collateral on a prior Acquisition Loan repaid with the proceeds of the

current Acquisition Loan. The Company Stock pledged shall be placed in the Loan Suspense Account. No person entitled to payment under an Acquisition Loan shall have recourse against the Fund other than that collateral, Plan Sponsor contributions in cash that are made to meet obligations under the Acquisition Loan, and earnings attributable to that collateral and investment of Plan Sponsor contributions. In the event of a default upon an Acquisition Loan, the value of assets of the Plan transferred in satisfaction thereof shall not exceed the amount of default. If the lender under an Acquisition Loan is a person described in Code Section 4975(e)(2), the Acquisition Loan shall provide for a transfer of Plan assets upon default only upon and to the extent of the failure of the Plan to meet the payment schedule of the Acquisition Loan. A pledge of Company Stock must provide for the release of shares pledged, as provided in Subsection (b) below, upon the payment of any portion of the Acquisition Loan. An amendment of a loan in order to qualify under this Section shall not be a refinancing of the loan or the making of another loan.

(b)      For each Plan Year during the duration of the Acquisition Loan, the number of shares of Company Stock released from any pledge and from the Loan Suspense Account must equal the number of shares acquired with the proceeds of the Acquisition Loan held immediately before release for the current Plan Year multiplied by a fraction, the numerator of which is the amount of principal and interest paid for that Plan Year and the denominator of which is the sum of the numerator plus the principal and interest to be paid for all future Plan Years. These years are determined without taking into account any possible extension or renewal periods. In the event the interest is variable, the interest to be paid in future years must be computed by using the interest rate applicable as of the end of the Plan Year. If collateral in the Loan Suspense Account includes more than one class of Company Stock, the number of shares of each class to be released for a Plan Year must be determined by applying the same fraction to each class. Notwithstanding the above, the number of shares of Company Stock released from any pledge and from the Loan Suspense Account for each Plan Year during the duration of an Acquisition Loan may be determined by reference to principal payments only, if: (1) the Acquisition Loan provides for payments of principal and interest no less frequently than annually at a cumulative rate that is not less rapid at any time than level annual payments of those amounts for ten (10) years; (2) interest included in any payment is disregarded only to the extent that it would be determined to be interest under standard loan amortization tables; and (3) by reason of a renewal, extension, or refinancing during or prior to the Plan Year, the sum of the expired duration of the Acquisition Loan, the renewal period, the extension period, and the duration of a new Acquisition Loan do not exceed ten (10) years.

(c)      Payments of principal and interest on any Acquisition Loan during a Plan Year shall be made by the Trustee, as directed by the Plan Administrator, only from (1) Plan Sponsor contributions made to the Trust to meet the Plan's obligation under an Acquisition Loan, earnings from Plan Sponsor contributions, and any cash dividends attributable to Company Stock given as collateral for an Acquisition Loan (both received during or prior to the Plan Year) and any cash dividends attributable to Company Stock acquired with the proceeds of an Acquisition Loan and allocated to Participants' ESOP Accounts; (2) the proceeds of a subsequent Acquisition Loan made to repay a prior

10692538.6

Acquisition Loan; and (3) the proceeds of the sale of shares of Company Stock held as collateral for the Acquisition Loan. The payments made with respect to an Acquisition Loan by the Plan during a Plan Year will not exceed an amount equal to the sum of such contributions and earnings described in clause (1) received during or prior to the year less such payments in prior years. Plan Sponsor contributions and earnings must be accounted for separately by the Plan until the Acquisition Loan is repaid.

(d)    The provisions of this Section 5.1 shall continue to be applicable to shares of Company Stock acquired hereunder and held in the Loan Suspense Account even if the Plan ceases to be an employee stock ownership plan under Code Section 4975(e)(7).

5.2    <u>Use of Plan Assets to Purchase Company Stock</u>. Except as otherwise specifically provided in the Plan, assets in the Plan may be used to acquire shares of Company Stock from shareholders or from any Plan Sponsor.

5.3    <u>Purchases of Company Stock</u>. All purchases of Company Stock by the Fund shall be made at Fair Market Value of the Company Stock to the extent required by ERISA.

5.4    <u>Investment of Plan Assets</u>. The Fund shall be invested primarily in Company Stock to the extent shares are available.  The Trustee may invest and hold up to one hundred percent (100%) of the Fund in Company Stock.

5.5    <u>Transactions with a Disqualified Person</u>.  If there is a transaction involving Company Stock between the Plan and a Disqualified Person, the Plan must use a valuation of Company Stock as of the date of such transaction.

### SECTION 6
### PAYMENT OF BENEFITS ON TERMINATION OF EMPLOYMENT

6.1    <u>Eligibility for Payment</u>. A Participant who has a Termination of Employment shall be eligible to receive payment of his vested Account.

6.2    <u>Timing of Payment</u>.  Subject to Section 9.1 of the Plan, payment of a Participant's Account shall commence prior to the last day of the fifth (5th) Plan Year following the Plan Year in which occurs the Participant's Termination of Employment.

6.3    <u>Vesting</u>. That portion of a Participant's Account in which he is vested as of a Valuation Date shall be computed based on years of Vesting Service in accordance with the following vesting schedule:

10692538.6

| Years of Vesting Service | Percentage Vested |
|---|---|
| Less than 2 | 0% |
| 2 | 20% |
| 3 | 40% |
| 4 | 60% |
| 5 | 80% |
| 6 | 100% |

6.4    Cash-Out/Buyback.

(a)    The nonvested portion of the Account of a Participant who has had a Termination of Employment shall be forfeited as of the earlier of the date the Participant receives a distribution of the vested portion of his Account or the Participant's Termination Completion Date. For such purposes, a Participant who has had a Termination of Employment and who is not vested in any portion of his Account, the Participant shall be deemed to have received a distribution of his Account.

(b)    If a Participant who has received (or has been deemed to have received) a distribution of the vested portion of his Account is reemployed by a Plan Sponsor or an Affiliate prior to his Termination Completion Date and: (1) if the Participant's Account was partially vested, and the Participant repays to the Fund no later than the fifth anniversary of the Participant's reemployment by the Plan Sponsor or an Affiliate all of that portion of his vested Account which was paid to him; or (2) if the Participant's Account was not vested upon his Termination of Employment, then any portion of his Account which was forfeited shall be restored effective on the Valuation Date coinciding with or next following the repayment or the Participant's reemployment, respectively. The restoration on any Valuation Date of the forfeited portion of the Account of a Participant pursuant to the preceding sentence shall be made first from forfeitures available for allocation on that Valuation Date, to the extent available, and secondly from contributions by the Plan Sponsor.   Only after restorations have been made shall the remaining net income be available for allocation under Section 4 of the Plan.

(c)    Notwithstanding anything contained in the Plan to the contrary, if all or any portion of a Participant's Account is forfeited, Company Stock allocated to the Account shall be forfeited only after other assets from such Account have been forfeited; provided, however, if interests in more than one class of Company Stock have been allocated to the Participant's Account, any forfeiture of such interests will apply in the same proportion to each class of Company Stock.

6.5    Changes to Vesting Schedule.  If a Plan amendment directly or indirectly changes the vesting schedule, the vesting percentage for each Participant in his Account accumulated to the date when the amendment is adopted shall not be reduced as a result of the amendment.  In addition, any Participant with at least three (3) years of Vesting Service may irrevocably elect to remain under the pre-amendment vesting schedule with respect to all of his benefits accrued both before and after the amendment.

10692538.6

6.6    <u>Suspension for Rehires</u>.  If a Participant has a Termination of Employment and is subsequently reemployed by a Plan Sponsor or an Affiliate prior to receiving a distribution of his Account under the Plan, such Participant shall not be entitled to a distribution under this Section while he is an Employee.

**SECTION 7**
**PAYMENT OF BENEFITS ON RETIREMENT DATE OR DISABILITY**

7.1    <u>Eligibility for Payment</u>. A Participant who has reached a Retirement Date or incurs a Disability while an Employee shall be eligible to receive payment of his Account.

7.2    <u>Timing of Payment</u>. Subject to Section 9.1 of the Plan, payment of a Participant's Account may commence prior to the last day of the Plan Year following the Plan Year in which occurs the Participant's Retirement Date or Disability while an Employee.

7.3    <u>Vesting</u>. The Account of a Participant who has attained a Retirement Date, has attained Normal Retirement Age while an Employee, or has become subject to a Disability while an Employee shall be fully vested and nonforfeitable.

**SECTION 8**
**DEATH BENEFITS**

8.1    <u>Eligibility for Payment</u>.  If a Participant dies before receiving a distribution of his vested Account, his Beneficiary shall be eligible to receive payment of his Account.

8.2    <u>Timing of Payment</u>. Subject to Section 9.1 of the Plan, payment of a Participant's Account may commence prior to the last day of the Plan Year following the Plan Year in which occurs the Participant's death.  If a Participant dies after beginning to receive a distribution of his Account, the Participant's Beneficiary shall receive the undistributed portion of the Account in the form elected by the Participant.

8.3    <u>Vesting</u>.  The Account of a Participant who dies while an Employee shall be fully vested and nonforfeitable.

8.4    <u>Death Benefits under USERRA</u>.  In the case of a Participant who dies while performing "qualified military service" (as defined in Code Section 414(u)(5)), the survivors of the Participant are entitled to any additional benefits (other than benefit accruals relating to the period of qualified military service) provided under the Plan, if any, had the Participant resumed and then terminated employment on account of death.

**SECTION 9**
**GENERAL RULES ON DISTRIBUTIONS**

9.1    <u>Form and General Timing Requirements</u>.

(a)    If the vested Account balance of a Participant or a Beneficiary of a deceased Participant (in the case of a Participant who did not begin to receive payment of his vested Account balance before his death) is $1,000 or less, it shall be distributed in

28

one lump sum as soon as administratively feasible after the Participant or Beneficiary is eligible for a distribution pursuant to Section 6, 7, or 8, as applicable.

(b)     If the vested Account balance of a Participant, or a Beneficiary of a deceased Participant (in the case of a Participant who did not begin to receive payment of his vested Account balance before his death) is $5,000 or less but more than $1,000, and the Participant or the Beneficiary of a deceased Participant is eligible for a distribution pursuant to Section 6, 7, or 8, as applicable, such vested Account shall be distributed in one cash lump sum upon a written request to the Plan Administrator by the Participant or Beneficiary for payment of such vested Account; provided, however, if such Participant or Beneficiary does not make a written request to the Plan Administrator for payment of the vested Account balance in cash or an election for a Direct Rollover pursuant to Section 9.3 of the Plan, the Plan Administrator shall direct that such Account be paid in cash in a direct rollover to the individual retirement plan or arrangement designated by the Plan Administrator.

(c)     If the vested Account balance of a Participant or a Beneficiary of a deceased Participant (in the case of a Participant who did not begin to receive payment of his vested Account balance before his death) exceeds $5,000, and the Participant or Beneficiary of a deceased Participant is eligible for a distribution pursuant to Section 6, 7 or 8, as applicable, the Participant or Beneficiary will receive payment of the Account after the Participant's or Beneficiary's written request to the Plan Administrator for payment of the of the vested Account balance in accordance with the Payment Policy and the following provisions:

(i)     except as provided in Subsection (a) and (b) of this Section, payment of the Participant's vested Account shall begin no earlier than the dates provided pursuant to Section 6, 7, or 8, as applicable; provided, however, that payment of a Participant's Account shall not be made without his request before he reaches Normal Retirement Age and, notwithstanding any provision of the Plan to the contrary, payment of a Participant's vested Account will commence not later than sixty (60) days after the last day of the Plan Year in which the Participant reaches Normal Retirement Age, attains a Retirement Date or the tenth (10th) anniversary of the Participant's participation in the Plan, whichever is latest;

(ii)     distribution of a Participant's vested Account shall be by either of the following methods:  (A) in substantially equal periodic payments (not less frequently than annually) in cash over a period not longer than five (5) years, except that, for Participants eligible for payment pursuant to Section 6 hereof, this five (5) year period may be increased by one (1) year (up to five (5) additional years), for each $215,000 (or fraction thereof) by which such Participant's vested Account balance exceeds $1,080,000; or (B) if so provided in the Payment Policy, in the form of a lump sum payment in cash, to the extent such vested Account balance does not exceed the limitation set forth in the Payment Policy; and

(iii)    notwithstanding any other provision of this Subsection (c) to the contrary, unless otherwise provided in the Payment Policy, with respect to benefits payable pursuant to Section 6, payment of that portion of a Participant's vested Account held under the Plan that is attributable to Company Stock acquired with the proceeds of an outstanding Acquisition Loan, shall not be made until the close of the Plan Year following the Plan Year in which such Acquisition Loan has been paid in full.

(d)    (1)    at any time during which the Primary Sponsor does not have an election in effect under Subchapter S of the Code, the Participant or Beneficiary will have the right to demand to receive payment of the Participant's Account in the form of Company Stock; and

(2)    at any time during which the Primary Sponsor has an election in effect under Subchapter S of the Code, in the sole discretion of the Plan Administrator, distributions under the Plan may be made in the form of Company Stock subject to immediate resale to the Primary Sponsor.

Notwithstanding the foregoing, if sufficient cash is not held in the Fund at the time of the distribution to allow a cash distribution to all Participants to whom payment is to be made, payment of that portion of each affected Participant's Account attributable to Company Stock Subaccounts shall be made in kind in shares of Company Stock; and provided further that, the value of any fractional share or right to a fractional share shall be paid in cash.  If cash is not available, then a fractional share shall be distributed in kind.  In order to distribute in cash the value of any Company Stock, the Trustee may exchange any Company Stock for cash in the Other Investment Subaccounts of all Participants who are not then receiving payment to the extent the required amount of cash is available and shall immediately allocate the Company Stock to the Company Stock Subaccounts of all such Participants.  Shares of Company Stock distributed pursuant to this Section shall be subject to the conditions described in Section 11 of the Plan.

(e)    If the amount of the payment required to commence under the Plan cannot be ascertained by such date, or if it is not possible to make such payment on such date because the Plan Administrator has been unable to locate the Participant after making reasonable efforts to do so, a payment retroactive to such date may be made no later than sixty (60) days after the earliest date on which the amount of such payment can be ascertained or the date on which the Participant is located.

(f)    Notwithstanding any other provision hereof, in the event that the total value of an amount directed to be paid pursuant to a "qualified domestic relations order" (as defined in Code Section 414(p)), is not in excess of $5,000, such amount shall be paid to the alternate payee or payees (as defined in Code Section 414(p)), identified in such order in one lump sum payment as soon as practicable after such order has been determined to be a qualified domestic relations order.

9.2 <u>Adjustments for Income</u>. Except for installment distributions, Accounts shall not be adjusted for earnings or losses incurred after the Valuation Date with respect to which the Account is valued for imminent payout purposes coinciding with or preceding the date of distribution of the Account provided, however, that such Account shall be increased by any contributions allocated to the Account of the Participant after that Valuation Date and reduced by any distributions thereafter.

9.3 <u>Direct Rollovers</u>. Notwithstanding any provisions of the Plan to the contrary that would otherwise limit a Distributee's election under this Section 9.3 of the Plan, a Distributee may elect, at the time and in the manner prescribed by the Plan Administrator, to have any portion of a distribution pursuant to this Section which is an Eligible Rollover Distribution paid directly to an Eligible Retirement Plan specified by the Distributee in a Direct Rollover so long as all Eligible Rollover Distributions to a Distributee for a calendar year total or are expected to total at least $200 and, in the case of a Distributee who elects to directly receive a portion of an Eligible Rollover Distribution and directly roll the balance over to an Eligible Retirement Plan, the portion that is to be directly rolled over totals at least $500. If the Eligible Rollover Distribution is one to which Code Sections 401(a)(11) and 417 do not apply, such Eligible Rollover Distribution may commence less than thirty (30) days after the notice required under Treasury Regulation Section 1.411(a)-11(c) is given, provided that:

(a) the Plan Administrator clearly informs the Distributee that the Distributee has a right to a period of at least thirty (30) days after receiving the notice to consider the decision of whether or not to elect a distribution (and, if applicable, a particular distribution option); and

(b) the Distributee, after receiving the notice, affirmatively elects a distribution.

Notwithstanding the foregoing, if the Distributee is a non-Spouse Beneficiary of a deceased Participant and a direct trustee-to-trustee transfer is made to an individual retirement account described in Code Section 408(a) or an individual retirement annuity described in Code Section 408(b) (other than an endowment contract):

(i) the transfer shall be treated as an Eligible Rollover Distribution;

(ii) the individual retirement plan shall be treated as an inherited individual retirement account or individual retirement annuity (within the meaning of Code Section 408(d)(3)(C)); and

(iii) Code Section 401(a)(9)(B) (other than clause (iv) thereof) shall apply to such plan.

9.4 <u>Required Minimum Distributions</u>. Notwithstanding any other provisions of the Plan:

10692538.6

(a)     Prior to the death of a Participant, all retirement payments hereunder shall:

    (1)     be distributed to the Participant not later than the required beginning date (as defined below); or

    (2)     be distributed, commencing not later than the required beginning date (as defined below):

        (i)     in accordance with regulations prescribed by the Secretary of the Treasury, over the life of the Participant or over the lives of the Participant and his designated individual Beneficiary, if any; or

        (ii)     in accordance with regulations prescribed by the Secretary of the Treasury, over a period not extending beyond the life expectancy of the Participant or the joint life and last survivor expectancy of the Participant and his designated individual Beneficiary, if any.

(b)     (1)     If:

        (i)     the distribution of a Participant's retirement payments have begun in accordance with Subsection (a)(2) of this Section; and

        (ii)     the Participant dies before his entire vested Account has been distributed to him;

then the remaining portion of his vested Account shall be distributed at least as rapidly as under the method of distribution being used under Subsection (a)(2) of this Section as of the date of his death.

    (2)     If a Participant dies before the commencement of retirement payments hereunder, the entire interest of the Participant shall be distributed within five (5) years after his death.

    (3)     If:

        (i)     any portion of a Participant's vested Account is payable to or for the benefit of the Participant's designated individual Beneficiary, if any;

        (ii)     that portion is to be distributed, in accordance with regulations prescribed by the Secretary of the Treasury, over the life of the designated individual Beneficiary or over a period not extending beyond the life expectancy of the designated individual Beneficiary; and

        (iii)     the distributions begin not later than one (1) year after the date of the Participant's death or such later date as the Secretary of the Treasury may by regulations prescribe;

then, for purposes of paragraph (2) of this Subsection (b), the portion referred to in subparagraph (i) of this paragraph (3) shall be treated as distributed on the date on which the distributions to the designated individual Beneficiary begin.

(4)     If the designated individual Beneficiary referred to in paragraph (3)(i) of this Subsection (b) is the surviving Spouse of the Participant, then:

(i)     the date on which the distributions are required to begin under paragraph (3)(iii) of this Subsection (b) shall not be earlier than the date on which the Participant would have attained age 70½; and

(ii)     if the surviving Spouse dies before the distributions to such Spouse begin, this Subsection (b) shall be applied as if the surviving Spouse were the Participant.

(c)     For purposes of this Section, the term "required beginning date" means April 1 of the calendar year following the later of the calendar year in which the Participant attains age 70½ or the calendar year in which the Participant retires, except that in the case of a person described in Section 1(b)(3) of Appendix B the "required beginning date" shall be April 1 of the calendar year following the calendar year in which the Participant attains age 70½.

(d)     Distributions will be made in accordance with Code Section 401(a)(9) and the regulations issued thereunder, including the incidental benefit requirements. Notwithstanding the foregoing, any distributions pursuant to Code Section 401(a)(9) shall be administered in accordance with the requirements of Appendix C hereto.

9.5     <u>Distributions of Company Stock</u>.  Except as provided in Section 9.1(d), if a Participant receives a distribution from the Fund in the form of Company Stock and the Company Stock is not Publicly Traded, the Participant has a right to require that the Primary Sponsor repurchase the Company Stock distributed at the Fair Market Value of Company Stock pursuant to Section 11.3 of the Plan.

9.6     <u>Conversion of Company Stock in Accounts of Terminated Participants</u>.  For a Participant eligible to receive a distribution of his vested Account pursuant to Article 6 hereof, the Plan Administrator may provide, in a uniform and nondiscriminatory manner, for the transfer of Company Stock held in the Participant's vested Account out of such Account upon such terms and conditions as may be set forth from time to time in the Payment Policy.

# SECTION 10
# DIVERSIFICATION OF INVESTMENTS

10.1     <u>Eligibility for Diversification Election</u>.  Each Participant who is an Employee and who has both completed ten (10) years of membership in the Plan and attained age 55 may elect within ninety (90) days after the close of each Plan Year in the election period described in Section 10.4 to direct the Plan to diversify a number of shares of Company Stock equal to (a) twenty-five percent ( 25%) of the Company Stock that has been allocated to the Participant's ESOP Account valued as of the Valuation Date preceding the date of diversification (b) reduced

by the number of shares of Company Stock previously distributed pursuant to this Section. The resulting number of shares of Company Stock may be rounded to the nearest whole integer. For the last year in which a Participant may make an election, this Section shall be applied by substituting fifty percent (50%) for twenty-five percent (25%).

10.2     Transfers to Other Qualified Plans. The Participant who has the right to diversify under Section 10.1 may direct the Plan to transfer the portion of the Participant's ESOP Account that is covered by the election to another qualified plan of the Plan Sponsor which accepts such transfers, provided that such plan permits employee-directed investment among at least three (3) diversified investment funds, none of which invests in Company Stock to a substantial degree.

10.3     Time Limit for Diversification. Company Stock subject to elections made under Section 10.1 shall be diversified no later than ninety (90) days after the period during which the election may be made.

10.4     Election Period. As used in Section 10.1, "election period" shall mean the six (6) Plan Year period beginning with the Plan Year in which the Participant has attained age 55 and completed ten (10) years of membership in the Plan.

10.5     Limitation of Diversification Election. Notwithstanding the preceding provisions of this Section, if the Fair Market Value of Company Stock allocated to a Participant's ESOP Account is five hundred dollars ($500) or less on the Valuation Date immediately preceding the first day on which a Participant is eligible to make an election described in Section 10.1, then that Participant shall not be eligible to make a diversification election.

# SECTION 11
## CONDITIONS OF DISTRIBUTION OF COMPANY STOCK

11.1     To the extent necessary to comply with federal or state securities laws, each share certificate for Company Stock distributed pursuant to the Plan shall be clearly marked "RESTRICTED" on its face and, to the extent appropriate at that time, shall bear on its reverse side legends to the following effect;

(a)     That the securities evidenced by the certificate were issued and distributed without registration under the federal Securities Act of 1933 (the "1933 Act") or under the applicable laws of any state (collectively referred to as the "State Acts"), in reliance upon certain exemptive provisions of the 1933 Act or any applicable State Acts;

(b)     That the securities cannot be sold or transferred unless, in the opinion of counsel reasonably acceptable to the Primary Sponsor, the sale or transfer would be:

(1)     pursuant to an effective registration statement under the 1933 Act or pursuant to an exemption from registration, and

(2)     a transaction which is exempt under any applicable State Acts or pursuant to an effective registration statement under or in a transaction which is in compliance with the State Acts.

     (c)     That the securities evidenced by the certificate were issued and distributed in accordance with the provisions of the Plan and Trust Agreement, are subject to the provisions thereof, and may not be sold or transferred except in compliance with those provisions.

11.2     If necessary to comply with the 1933 Act or any applicable State Acts, shares of Company Stock distributable under the Plan must be acquired for investment and not with a view to the public distribution thereof. In furtherance thereof, as a condition of receiving Company Stock under the Plan, the Distributee may be required to execute an investment letter and any other documents that in the opinion of counsel reasonably acceptable to the Primary Sponsor, as issuer, are necessary to comply with the 1933 Act or any applicable State Acts or any other applicable laws regulating the issuance or transfer of securities.

11.3    (a)     At any time during which the Primary Sponsor does not have an election in effect under Subchapter S of the Code, each share of Company Stock acquired with the proceeds of an Acquisition Loan distributed from the Plan shall be subject to Put and First Refusal Rights. The Put Rights grant to the Distributee (or his heirs or legatees) the right to require the Primary Sponsor or its designee to purchase any shares of Company Stock which have been distributed from the Plan provided that the Company Stock is not Publicly Traded at the time (the "Put"). The Put shall be exercisable by giving written notice to the Primary Sponsor for a period of sixty (60) days following the date of distribution, and if the Put is not exercised within that 60-day period, for an additional period of 60 days which begins on the later of: (1) the first day of the Plan Year following the Plan Year of distribution; or (2) the day following the expiration of the initial 60-day period. The number of days between the tenth (10th) day and the date on which notice is actually given, if later, must be added to the duration of the Put. The period during which the Put is exercisable does not include the time when a Distributee (or his heirs or legatees) is unable to exercise it because the Primary Sponsor is prohibited from honoring it by applicable federal or state law. Payment under the Put may not be restricted by the provisions of any loan or any other arrangement, including the terms of the Primary Sponsor's articles of incorporation, unless required by applicable state law.

The terms of a Put exercised pursuant to this Section shall provide that:

    (1)     In the event that a Participant has received a lump sum distribution of his vested Account in the form of Company Stock in accordance with Section 11.1, the amount to be paid by the Company for the Company Stock under the Put shall be paid in substantially equal yearly payments beginning not less than thirty (30) days after the exercise of the Put and over five (5) years; provided, that the Company may prepay such obligation without penalty at any time. The Company shall secure the payments under the Put with the Company Stock so purchased and the unpaid balance of such payments shall be credited with interest at the prime rate of interest as reported in the Wall Street Journal.

    (2)     In the event that a Participant has received an installment distribution of his vested Account in the form of Company Stock in accordance with Section 11.1, the amount to be paid by the Company for the Company Stock

under the Put shall be paid not less than thirty (30) days after the exercise of the Put.

The First Refusal Rights provide that prior to any sale of Company Stock which is not Publicly Traded at that time, the Distributee (or his heirs or legatees) must first offer the Company Stock which he wishes to sell to the Primary Sponsor or its designee at the greater of: (1) the Fair Market Value of Company Stock; or (2) the same purchase price and on the same terms as a bona fide offer made by a third party within the preceding fourteen (14) days to whom the Distributee (or his heirs or legatees) desires to sell the Company Stock, and that if the Primary Sponsor or its designee is not willing to purchase the Company Stock within fourteen (14) days after receipt by the Primary Sponsor of written notification by the Distributee of the purchase price and payment terms, then the Distributee (or his heirs or legatees) may proceed to sell the Company Stock to the third party in accordance with the offer within twenty-eight (28) days after receipt by the Primary Sponsor of the written notification. In no event may the Company Stock be sold or transferred for value, nor shall the Primary Sponsor recognize any purchaser or transferee as the owner of the Company Stock, unless the terms of the First Refusal Rights, as specified above, have been followed.

(b)     Except as provided in Sections 9.1(d) and 11.3(a) above, no Company Stock acquired with the proceeds of an Acquisition Loan may be subject to a put, call, option, buy-sell or similar arrangement while held by or when distributed from the Plan.

(c)     The provisions of this Section 11.3 shall continue to be applicable to shares of Company Stock acquired with the proceeds of an Acquisition Loan even if the Plan ceases to be an employee stock ownership plan under Code Section 4975(e)(7).

(d)     Each share of Company Stock distributed from the Plan may contain legends indicating the rights contained in this Section 11.3 of the Plan.

## SECTION 12
## VOTING OF COMPANY STOCK

12.1   Voting Provisions. Except as provided in this Section 12.1, in instances where the Trustee has discretionary authority under the Trust, the Trustee shall vote shares of Company Stock held in the Fund. In all other cases, except as provided in this Section 12.1, the Trustee shall vote shares of Company Stock held in the Fund in the manner directed by the ESOP Committee. As to any corporate matter which involves the voting of shares of Company Stock with respect to the approval or disapproval of any merger or consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all of the assets or any similar transaction as provided in regulations issued by the Secretary of the Treasury, the Trustee shall vote shares of Company Stock held in the Fund as follows:

(a)     Shares of Company Stock held in Accounts for which the Trustee has received instructions from Participants shall be voted in accordance with those instructions, unless the fiduciary requirements of ERISA require otherwise. In the

absence of voting instructions by a Participant, shares of Company Stock held in a Participant's Account shall be voted by the Trustee.

(b)     Shares of Company Stock held in the Loan Suspense Account shall be voted by the Trustee.

(c)     The Primary Sponsor shall furnish the Trustee, Participants and Beneficiaries, and the ESOP Committee with notices and information statements when voting or other rights as to Company Stock are to be exercised.

12.2     Other Decisions.  All decisions affecting Company Stock held under the Fund which do not involve voting of such Company Stock, including, without limitation, decisions to reject or consent to tender or exchange offers and similar decisions, shall be determined by the Trustee, subject to the direction of the ESOP Committee, unless the Trustee has been granted discretionary authority over the matter or fiduciary requirements of ERISA require otherwise.

## SECTION 13
## ADMINISTRATION OF THE PLAN

13.1     Trust Agreement. The Primary Sponsor shall establish a Trust with the Trustee designated by the Board of Directors for the management of the Fund, which Trust shall form a part of the Plan and is incorporated herein by reference.

13.2     Operation of the Plan Administrator. The Primary Sponsor shall appoint a Plan Administrator. If an organization is appointed to serve as the Plan Administrator, then the Plan Administrator may designate in writing one or more persons who may act on behalf of the Plan Administrator. If more than one person is so designated with respect to the same administrative function, a majority of such persons shall constitute a quorum for the transaction of business and shall have the full power to act on behalf of the Plan Administrator. The Primary Sponsor shall have the right to remove the Plan Administrator at any time by notice in writing. The Plan Administrator may resign at any time by written notice of resignation to the Trustee and the Primary Sponsor. Upon removal or resignation of the Plan Administrator, or in the event of the dissolution of the Plan Administrator, the Primary Sponsor shall appoint a successor.

13.3     Fiduciary Responsibility.

(a)     The Plan Administrator, as a Named Fiduciary, may allocate its fiduciary responsibilities among Fiduciaries, other than the Trustee, designated in writing by the Plan Administrator and may designate in writing persons other than the Trustee to carry out its fiduciary responsibilities under the Plan.  The Plan Administrator may remove any person designated to carry out its fiduciary responsibilities under the Plan by notice in writing to such person.

(b)     The Plan Administrator and each other Fiduciary may employ persons to perform services and to render advice with regard to any of the Fiduciary's responsibilities under the Plan.  Charges for all such services performed and advice rendered may be paid by the Fund to the extent permitted by ERISA.

10692538.6

(c)     Each Plan Sponsor shall indemnify and hold harmless each person constituting the Plan Administrator or the ESOP Committee, except those individuals who are not a Plan Sponsor or an employee of a Plan Sponsor, if any, from and against any and all claims, losses, costs, expenses (including, without limitation, attorney's fees and court costs), damages, actions or causes of action arising from, on account of or in connection with the performance by such person of his duties in such capacity, other than such of the foregoing arising from, on account of or in connection with the willful neglect or willful misconduct of such person.   Each Plan Sponsor shall also indemnify and hold harmless the Trustee pursuant to the terms of the Trust.

13.4   Duties of the Plan Administrator.

(a)     The Plan Administrator shall advise the Trustee with respect to all payments under the terms of the Plan and shall direct the Trustee in writing to make such payments from the Fund; provided, however, in no event shall the Trustee be required to make such payments if the Trustee has actual knowledge that such payments are contrary to the terms of the Plan and the Trust.

(b)     The Plan Administrator shall from time to time establish rules, not contrary to the provisions of the Plan and the Trust, for the administration of the Plan and the transaction of its business.   All elections and designations under the Plan by a Participant or Beneficiary shall be made on forms prescribed by the Plan Administrator. The Plan Administrator shall have discretionary authority to construe the terms of the Plan and shall determine all questions arising in the administration, interpretation and application of the Plan, including, but not limited to, those concerning eligibility for benefits and it shall not act so as to discriminate in favor of any person.   All determinations of the Plan Administrator shall be conclusive and binding on all Employees, Participants, Beneficiaries and Fiduciaries, subject to the provisions of the Plan and the Trust and subject to applicable law.

(c)     The Plan Administrator shall furnish Participants and Beneficiaries with all disclosures now or hereafter required by ERISA or the Code.   The Plan Administrator shall file, as required, the various reports and disclosures concerning the Plan and its operations as required by ERISA and by the Code, and shall be solely responsible for establishing and maintaining all records of the Plan and the Trust.

(d)     The Fair Market Value of shares of Company Stock shall be determined as of each Valuation Date.   In the case of a transaction between the Plan and a disqualified person within the meaning of Code Section 4975, the Fair Market Value of shares of Company Stock must be determined as of the date of the transaction.

(e)     The statement of specific duties for a Plan Administrator in this Section is not in derogation of any other duties which a Plan Administrator has under the provisions of the Plan or the Trust or under applicable law.

13.5   Investment Manager. The ESOP Committee may, by action in writing certified by notice to the Trustee, appoint an Investment Manager.   Any Investment Manager may be

10692538.6

removed in the same manner in which appointed, and in the event of any removal, the Investment Manager shall, as soon as possible, but in no event more than thirty (30) days after notice of removal, turn over all assets managed by it to the Trustee or to any successor Investment Manager appointed, and shall make a full accounting to the ESOP Committee with respect to all assets managed by it since its appointment as an Investment Manager.

13.6   <u>ESOP Committee</u>.  The Primary Sponsor may, by action in writing certified by notice to the Trustee, appoint an ESOP Committee.  The Primary Sponsor shall have the right to remove any person on the ESOP Committee at any time by notice in writing to such person.  A person on the ESOP Committee may resign at any time by written notice of resignation to the Primary Sponsor.  Upon such removal or resignation, or in the event of the death of a person on the ESOP Committee, the Primary Sponsor may appoint a successor.  Until a successor has been appointed, the remaining persons on the ESOP Committee may continue to act as the ESOP Committee.

13.7   <u>Action by a Plan Sponsor</u>.  Any action to be taken by a Plan Sponsor shall be taken by resolution or written direction duly adopted by its board of directors or appropriate governing body, as the case may be; provided, however, that by such resolution or written direction, the board of directors or appropriate governing body, as the case may be, may delegate to any officer or other appropriate person of a Plan Sponsor the authority to take any such actions as may be specified in such resolution or written direction, other than the power to amend, modify or terminate the Plan or the Trust or to determine the basis of any Plan Sponsor contributions.

13.8   <u>Expenses of the Plan and Trust</u>.  All expenses of administering the Plan and Trust shall be charged to and paid out of the Trust assets to the extent permissible under ERISA.  The Primary Sponsor in its discretion may pay all or any portion of such expenses, and payment of expenses by the Primary Sponsor shall not be deemed to be employer contributions.

13.9   <u>Corrective Action</u>.  Notwithstanding any provision of the Plan to the contrary, the Plan Sponsor may make corrective contributions, allocations, or distributions or take any other corrective action required to comply with, or otherwise permitted by, any program provided pursuant to applicable law, including without limitation the Employee Plans Compliance Resolution System or any successor guidance.

## SECTION 14
## CLAIM REVIEW PROCEDURE

14.1   <u>Notice of Denial</u>.  If a Participant or a Beneficiary is denied a claim for benefits under a Plan, the Plan Administrator shall provide to the claimant written notice of the denial within ninety (90) days after the Plan Administrator receives the claim, unless special circumstances require an extension of time for processing the claim. If such an extension of time is required, written notice of the extension shall be furnished to the claimant prior to the termination of the initial 90-day period.  In no event shall the extension exceed a period of ninety (90) days from the end of such initial period. Any extension notice shall indicate the special circumstances requiring the extension of time, the date by which the Plan Administrator expects to render the final decision, the standards on which entitlement to benefits are based, the

10692538.6

unresolved issues that prevent a decision on the claim and the additional information needed to resolve those issues.

14.2    Contents of Notice of Denial. If a Participant or Beneficiary is denied a claim for benefits under the Plan, the Plan Administrator shall provide to such claimant written notice of the denial which shall set forth, in language calculated to be understood by the claimant:

(a)    the specific reasons for the denial;

(b)    specific references to the pertinent provisions of the Plan on which the denial is based;

(c)    a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and

(d)    an explanation of the Plan's claim review procedures, and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under Section 502(a) of ERISA following an adverse benefit determination on review.

14.3    Right to Review. After receiving written notice of the denial of a claim or that a domestic relations order is a qualified domestic relations order, a claimant or his representative shall be entitled to:

(a)    request a full and fair review of the denial of the claim or determination that a domestic relations order is a qualified domestic relations order by written application to the Plan Administrator;

(b)    request, free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claim;

(c)    submit written comments, documents, records, and other information relating to the denied claim to the Plan Administrator; and

(d)    a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

14.4    Application for Review. If the claimant wishes a review of the decision denying his claim to benefits under the Plan or if a claimant wishes to appeal a decision that a domestic relations order is a qualified domestic relations order, he must submit the written application to the Plan Administrator within sixty (60) days after receiving written notice of the denial or notice that the domestic relations order is a qualified domestic relations order.

14.5    Hearing. Upon receiving such written application for review, the Plan Administrator may schedule a hearing for purposes of reviewing the claimant's claim, which

10692538.6

hearing shall take place not more than thirty (30) days from the date on which the Plan Administrator received such written application for review.

14.6     Notice of Hearing. At least ten (10) days prior to the scheduled hearing, the claimant and his representative designated in writing by him, if any, shall receive written notice of the date, time, and place of such scheduled hearing. The claimant or his representative, if any, may request that the hearing be rescheduled, for his convenience, on another reasonable date or at another reasonable time or place.

14.7     Counsel. All claimants requesting a review of the decision denying their claim for benefits may employ counsel for purposes of the hearing.

14.8     Decision on Review. No later than sixty (60) days following the receipt of the written application for review, the Plan Administrator shall submit its decision on the review in writing to the claimant and to his representative, if any, unless the Plan Administrator determines that special circumstances (such as the need to hold a hearing) require an extension of time, to a day no later than one hundred twenty (120) days after the date of receipt of the written application for review. If the Plan Administrator determines that the extension of time is required, the Plan Administrator shall furnish to the claimant written notice of the extension before the expiration of the initial sixty (60) day period. The extension notice shall indicate the special circumstances requiring an extension of time and the date by which the Plan Administrator expects to render its decision on review. In the case of a decision adverse to the claimant, the Plan Administrator shall provide to the claimant written notice of the denial which shall include:

> (a)     the specific reasons for the decision;

> (b)     specific references to the pertinent provisions of the Plan on which the decision is based;

> (c)     a statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits; and

> (d)     an explanation of the Plan's claim review procedures, and the time limits applicable to such procedures, including a statement of the claimant's right to bring an action under Section 502(a) of ERISA following the denial of the claim upon review.

14.9     Limitations. No legal action may be commenced or maintained against the Plan more than ninety (90) days after the Plan Administrator's decision on review pursuant to Section 14.8 of the Plan. Before any person may bring legal action against the Plan, Plan Administrator, or any other designated claim or review official, all claims procedures under Section 14.8 of the Plan must be exhausted.

## SECTION 15
## LIMITATION OF ASSIGNMENT, PAYMENTS TO LEGALLY
## INCOMPETENT DISTRIBUTEE, AND UNCLAIMED PAYMENTS

15.1    Anti-Alienation. No benefit which shall be payable under the Plan to any person shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber or charge the same shall be void; and no such benefit shall in any manner be liable for, or subject to, the debts, contracts, liabilities, engagements or torts of any person, nor shall it be subject to attachment or legal process for, or against, such person, and the same shall not be recognized under the Plan, except to such extent as may be required by law. Notwithstanding the above, this Section shall not apply to a "qualified domestic relations order" (as defined in Code Section 414(p)), and benefits may be paid pursuant to the provisions of such an order. The Plan Administrator shall develop procedures (in accordance with applicable federal regulations) to determine whether a domestic relations order is qualified, and, if so, the method and the procedures for complying therewith. In addition, a distribution to an "alternate payee" (as defined in Code Section 414(p)) shall be permitted if such distribution is authorized by a qualified domestic relations order, even if the affected Participant has not yet separated from service and has not yet reached the "earliest retirement age" (as defined in Code Section 414(p)).

15.2    Exceptions to Anti-Alienation. Notwithstanding any other provision of the Plan, the benefit of a Participant shall be subject to legal process and may be assigned, alienated or attached pursuant to a court judgment or settlement provided:

(a)    such Participant is ordered or required to pay the Plan in accordance with the following:

(1)    a judgment or conviction for a crime involving the Plan;

(2)    a civil judgment entered by a court in an action brought in connection with a violation of part 4 of subtitle B of Title I of ERISA; or

(3)    a settlement agreement between such Participant and the Secretary of Labor, in connection with a violation (or alleged violation) of part 4 of subtitle B of Title I of ERISA by a fiduciary or any other person; and

(b)    the judgment, order, decree, or settlement agreement shall expressly provide for the offset of all or part of the amount ordered or required to be paid to the Plan against such Participant's benefits under the Plan.

15.3    Termination of Payment. If any person who shall be entitled to any benefit under the Plan shall become bankrupt or shall attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber or charge such benefit under the Plan, then the payment of any such benefit in the event a Participant or Beneficiary is entitled to payment shall, in the discretion of the Plan Administrator, cease and terminate and in that event the Plan Administrator shall direct the Trustee to hold or apply the same for the benefit of such person, his Spouse, children, other dependents or any of them in such manner and in such proportion as the Plan Administrator shall determine.

15.4   <u>Minors and Incompetents</u>. Whenever any benefit which shall be payable under the Plan is to be paid to or for the benefit of any person who is then a minor or determined to be incompetent by qualified medical advice, the Plan Administrator need not require the appointment of a guardian or custodian, but shall be authorized to cause the same to be paid over to the person having custody of such minor or incompetent, or to cause the same to be paid to such minor or incompetent without the intervention of a guardian or custodian, or to cause the same to be paid to a legal guardian or custodian of such minor or incompetent if one has been appointed or to cause the same to be used for the benefit of such minor or incompetent.

15.5   <u>Missing Participants</u>. If the Plan Administrator cannot ascertain the whereabouts of any Participant to whom a payment is due under the Plan, the Plan Administrator may direct that the payment and all remaining payments otherwise due to the Participant be cancelled on the records of the Plan and the amount thereof applied as a forfeiture in accordance with Plan Sections 3.3 and 4.1 except that, in the event the Participant later notifies the Plan Administrator of his whereabouts and requests the payments due to him under the Plan, the forfeited amount shall be restored either from Trust income or by a special contribution by the Plan Sponsor to the Plan, as determined by the Plan Administrator, in an amount equal to the payment to be paid to the Participant.

## SECTION 16
## PROHIBITION AGAINST DIVERSION

At no time shall any part of the Fund be used for or diverted to purposes other than the exclusive benefit of the Participants or their Beneficiaries, subject, however, to the payment of all taxes and administrative expenses and subject to the provisions of the Plan with respect to returns of contributions.  Expenses incurred in the administration of the Plan shall be paid from the Trust, to the extent permitted by ERISA, unless such expenses are paid by the Plan Sponsor; provided, further, that the Plan Sponsor may be reimbursed by the Fund, to the extent permitted by ERISA, for Plan expenses originally paid by the Plan Sponsor.

## SECTION 17
## LIMITATION OF RIGHTS

Participation in the Plan shall not give any Employee any right or claim except to the extent that such right is specifically fixed under the terms of the Plan. The adoption of the Plan and the Trust by any Plan Sponsor shall not be construed to give any Employee a right to be continued in the employ of a Plan Sponsor or as interfering with the right of a Plan Sponsor to terminate the employment of any Employee at any time.

## SECTION 18
## AMENDMENT TO OR TERMINATION OF THE
## PLAN AND THE TRUST

18.1   <u>Right of Primary Sponsor to Amend or Terminate.</u> The Primary Sponsor reserves the right at any time to modify or amend or terminate the Plan or the Trust in whole or in part; provided, however, that the Primary Sponsor shall have no power to modify or amend the Plan in such manner as would cause or permit any portion of the funds held under a Plan to be used for,

or diverted to, purposes other than for the exclusive benefit of Participants or their Beneficiaries, or as would cause or permit any portion of a fund held under the Plan to become the property of a Plan Sponsor; and provided further, that the duties or liabilities of the Trustee shall not be modified without its written consent. No such modifications or amendments shall have the effect of retroactively changing or depriving Participants or Beneficiaries of rights already accrued under the Plan. No Plan Sponsor other than the Primary Sponsor shall have the right to so modify, amend or terminate the Plan or the Trust. Notwithstanding the foregoing, each Plan Sponsor may terminate its own participation in the Plan and Trust pursuant to the Plan.

18.2    <u>Right of Plan Sponsor to Terminate Participation</u>.  Each Plan Sponsor other than the Primary Sponsor shall have the right to terminate its participation in the Plan and Trust by resolution of its board of directors or other appropriate governing body and notice in writing to the Primary Sponsor unless such termination would result in the disqualification of the Plan or the Trust or would adversely affect the exempt status of the Plan or the Trust as to any other Plan Sponsor. If contributions by or on behalf of a Plan Sponsor are completely terminated, the Plan and Trust shall be deemed terminated as to such Plan Sponsor. Any termination by a Plan Sponsor shall not be a termination as to any other Plan Sponsor.

18.3    <u>Plan Termination</u>.

(a)    If the Plan is terminated by the Primary Sponsor, or if contributions to the Trust are permanently discontinued, it shall terminate as to all Plan Sponsors and the Fund shall be used, subject to the payment of expenses and taxes, for the benefit of Participants and Beneficiaries, and for no other purposes, and the Account of each affected Participant shall be fully vested and nonforfeitable, notwithstanding the provisions of the Section of the Plan which sets forth the vesting schedule.

(b)    In the event of the partial termination of the Plan, each affected Participant's Account shall be fully vested and nonforfeitable, notwithstanding the provisions of the Section of the Plan which sets forth the vesting schedule.

18.4    <u>Payments Upon Plan Termination</u>. In the event of the termination of the Plan or the Trust with respect to a Plan Sponsor, the Accounts of the Participants with respect to the Plan as adopted by such Plan Sponsor shall be distributed in accordance with the provisions of the Plan pursuant to the instructions of the Plan Administrator; provided that the Trustee shall not be required to make any distribution until it receives a copy of an Internal Revenue Service determination letter to the effect that the termination does not affect the qualified status of the Plan or the exempt status of the Trust.

18.5    <u>Plan Merger</u>. In the case of any merger or consolidation of the Plan with, or any transfer of the assets or liabilities of the Plan to, any other plan qualified under Code Section 401, the terms of the merger, consolidation, or transfer shall be such that each Participant would receive (in the event of termination of the Plan or its successor immediately thereafter) a benefit which is no less than the benefit which the Participant would have received in the event of termination of the Plan immediately before the merger, consolidation, or transfer.

10692538.6

18.6    Optional Benefits. Notwithstanding any other provision of the Plan, an amendment to the Plan --

(a)    which eliminates or reduces an early retirement benefit, if any, or which eliminates or reduces a retirement-type subsidy (as defined in regulations issued by the Department of the Treasury), if any, or

(b)    which eliminates an optional form of benefit (except to the extent otherwise provided in Treasury Regulations);

shall not be effective with respect to benefits attributable to service before the amendment is adopted. In the case of a retirement-type subsidy described in Subsection (a) above, this Section shall be applicable only to a Participant who satisfies, either before or after the amendment, the preamendment conditions for the subsidy.

## SECTION 19
## ADOPTION OF THE PLAN BY AFFILIATES

Any corporation or other business entity related to the Primary Sponsor by function or operation and any Affiliate, if the corporation, business entity or Affiliate is authorized to do so by written direction adopted by the Board of Directors, may adopt the Plan and the related Trust by action of the board of directors or other appropriate governing body of such corporation, business entity or Affiliate.  Any adoption shall be evidenced by certified copies of the resolutions of the foregoing board of directors or governing body indicating the adoption and by the execution of the Trust by the adopting corporation, or business entity or Affiliate.  The resolution shall state and define the effective date of the adoption of the Plan by the Plan Sponsor and, for the purpose of Code Section 415, the "limitation year" as to such Plan Sponsor. Notwithstanding the foregoing, however, if the Plan and Trust as adopted by an Affiliate or other corporation or business entity under the foregoing provisions shall fail to receive the initial approval of the Internal Revenue Service as a Qualified Plan and Trust under Code Sections 401(a) and 501(a), any contributions by the Affiliate or other corporation or business entity after payment of all expenses will be returned to such Plan Sponsor free of any trust, and the Plan and Trust shall terminate, as to the adopting Affiliate or other corporation or business entity.

## SECTION 20
## QUALIFICATION AND RETURN OF CONTRIBUTIONS

20.1    Initial Qualification Failure. If the Plan and the related Trust fail to receive the initial approval of the Internal Revenue Service as a Qualified Plan and trust within one (1) year after the date of denial of qualification: (a) the contribution of a Plan Sponsor after payment of all expenses will be returned to a Plan Sponsor free of the Plan and Trust; (b) contributions made by a Participant shall be returned to the Participant who made the contributions; and (c) the Plan and Trust shall thereupon terminate.

20.2    Deductibility.  All Plan Sponsor contributions to the Plan are contingent upon deductibility.  To the extent permitted by the Code and other applicable laws and regulations thereunder, upon a Plan Sponsor's request, a contribution which was made by reason of a

mistake of fact or which was nondeductible under Code Section 404, shall be returned to a Plan Sponsor within one (1) year after the payment of the contribution, or the disallowance of the deduction (to the extent disallowed), whichever is applicable.

In the event of a contribution which was made by reason of a mistake of fact or which was nondeductible, the amount to be returned to the Plan Sponsor shall be the excess of the contribution above the amount that would have been contributed had the mistake of fact or the mistake in determining the deduction not occurred, less any net loss attributable to the excess. Any net income attributable to the excess shall not be returned to the Plan Sponsor. No return of any portion of the excess shall be made to the Plan Sponsor if the return would cause the balance in a Participant's Account to be less than the balance would have been had the mistaken contribution not been made.

## SECTION 21
## ERISA ARBITRATION AND CLASS ACTION WAIVER

21.1    Arbitration Requirement and Procedure.    Subject to and without waiver of full compliance with the Plan's claims procedures as described in Section 14 which, to the extent applicable, must be exhausted with respect to any claim before any arbitration pursuant to this Section 21, all Covered Claims must be resolved exclusively pursuant to the provisions of this Section 21 (the "Arbitration Procedure").

(a)    Covered Claims.    Any claim made by or on behalf of an Eligible Employee, Participant or Beneficiary (a "Claimant") which arises out of, relates to, or concerns this Plan, the Trust Agreement, or the Trust, including without limitation, any claim for benefits under the Plan, Trust Agreement, or Trust; any claim asserting a breach of, or failure to follow, the Plan or Trust; and any claim asserting a breach of, or failure to follow, any provision of ERISA or the Code, including without limitation claims for breach of fiduciary duty, ERISA § 510 claims, and claims for failure to timely provide notices or information required by ERISA or the Code (collectively, "Covered Claims"), shall be resolved exclusively by binding arbitration administered in accordance with the National Rules for the Resolution of Employment Disputes (the "Rules") of the American Arbitration Association ("AAA") then in effect.    Under no circumstances are the AAA Supplementary Rules for Class Arbitrations to be used.    If the Covered Claims solely involve (i) claims under ERISA § 502(a)(1)(B) to recover benefits due to the Claimant under the terms of the Plan, to enforce the Claimant's rights under the terms of the Plan, or to clarify the Claimant's rights to future benefits under the terms of the Plan, and/or (ii) claims for penalties under ERISA § 502(c), the Covered Claims shall be submitted to and decided by only one (1) arbitrator.    For all other disputes, the Covered Claims shall be submitted to and decided by three (3) arbitrators.    Claimant shall assert all Covered Claims in the same arbitration and shall not split Covered Claims.    If, for example, a Claimant wishes to pursue both a claim for benefits under ERISA § 502(a)(1)(B) and a claim for breach of fiduciary duty under ERISA § 502(a)(2) and/or ERISA § 502(a)(3), the Claimant shall first exhaust the claims procedure described in Section 8.10 of the Plan to the extent the claims procedure is applicable and then assert both claims in one arbitration demand.    The judgment on the final award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof and shall be res judicata as to all

46

Covered Claims that the Claimant asserted or could have asserted in the arbitration demand.

(b)     No Group, Class, or Representative Arbitrations.    All Covered Claims must be brought solely in the Claimant's individual capacity and not in a representative capacity or on a class, collective, or group basis.  Each arbitration shall be limited solely to one Claimant's Covered Claims, and that Claimant may not seek or receive any remedy which has the purpose or effect of providing additional benefits or monetary or other relief to any Eligible Employee, Participant or Beneficiary other than the Claimant.  For instance, with respect to any claim brought under ERISA § 502(a)(2)  to seek appropriate relief under ERISA § 409, the Claimant's remedy, if any, shall be limited to (i) the alleged losses to the Claimant's individual Account resulting from the alleged breach of fiduciary duty, (ii) a pro-rated portion of any profits allegedly made by a fiduciary through the use of Plan assets where such pro-rated amount is intended to provide a remedy solely to Claimant's individual Account, and/or (iii) such other remedial or equitable relief as the arbitrator(s) deems proper so long as such remedial or equitable relief does not include or result in the provision of additional benefits or monetary relief to any Eligible Employee, Participant or Beneficiary other than the Claimant, and is not binding on the Plan Administrator or Trustee with respect to any Eligible Employee, Participant or Beneficiary other than the Claimant.  The requirement that (x) all Covered Claims be brought solely in a Claimant's individual capacity and not in a purported group, class, collective, or representative capacity, and (y) that no Claimant shall be entitled to receive, and shall not be awarded, any relief other than individual relief, shall govern irrespective of any AAA rule or decision to the contrary and is a material and non-severable term of this Section 21.  The arbitrator(s) shall consequently have no jurisdiction or authority to compel or permit any class, collective, or representative action in arbitration, to consolidate different arbitration proceedings, or to join any other party to any arbitration.  Any dispute or issue as to the applicability or validity of this Section 21(b) (the "Class Action Waiver") shall be determined by a court of competent jurisdiction. Moreover, nothing in this Arbitration Procedure shall preclude seeking interim or provisional relief or remedies in aid of arbitration from a court of competent jurisdiction.  In the event a court of competent jurisdiction were to find these requirements to be unenforceable or invalid, then the entire Arbitration Procedure (i.e., all of this Section 14) shall be rendered null and void in all respects.

(c)     Selection of Arbitrator.  The arbitrator(s) shall be mutually acceptable to all parties to the dispute and must be attorney(s) with prior experience with ERISA claims.  The arbitrator(s) need not be selected from the AAA's panel of arbitrators if the parties to the dispute can reach agreement on the selection of the arbitrator(s).  If, however, the parties cannot agree on the selection of the arbitrator(s) within twenty-one (21) days of the demand for arbitration, then the arbitrator(s) shall be selected pursuant to the AAA's National Rules for the Resolution of Employment Disputes; provided, however, that (i) the list of potential arbitrators provided by the AAA shall be limited to attorneys with prior ERISA experience; (ii) for an arbitration to be heard by one arbitrator, the AAA shall provide a list of names of seven (7) potential arbitrators from which the two sides (Claimant on one side and all Respondents on the other side) shall alternatively strike names until only one name remains, with the Claimant striking first;

and (iii) for an arbitration to be heard by three (3) arbitrators, the AAA shall provide a list of names of eleven (11) potential arbitrators from which the two sides shall alternatively strike names until only one name remains, with the Claimant striking first.

(d)     <u>Location and Administration of Arbitration</u>.   The arbitration proceedings shall be held in Colorado Springs, Colorado or at such other place as may be selected by mutual agreement of the parties.   A Claimant may initiate arbitration by serving a demand for arbitration on the Committee and, if applicable, the Trustee and by filing such demand for arbitration with the appropriate office of the AAA.   In order to save time and expenses, the parties may agree to have the arbitrator(s), and not the AAA, administer the arbitration.   In the absence of such an agreement, however, the AAA will administer the arbitration.

(e)     <u>Limitation on Actions</u>.     Any Covered Claim must be submitted to arbitration within the earlier of the applicable statutory period of limitations or three (3) years of the date on which it accrued or shall be barred as untimely; provided, however, any Covered Claim under ERISA § 502(a)(1)(B) for a denial of benefits shall be deemed to have accrued on the date the Committee's final denial is issued under the Plan's claims procedure, and any demand for arbitration involving such a claim shall be served on the Committee and, if applicable, Trustee, and filed with the AAA within twelve (12) months of the date on which the denial of claim is issued by the Committee.

(f)     <u>Arbitrator's Standard of Review</u>.     The arbitrator(s)'s review of the Committee's claim denial shall be limited to a review of the administrative record as submitted to the Committee, and the Committee's determination may only be overturned if the arbitrator(s) determines that the Committee's decision was arbitrary and capricious. Subject to that limitation, the arbitrator(s) shall have the discretion to order such discovery as permitted under the National Rules for the Resolution of Employment Disputes of the AAA.   All disputes regarding discovery shall be decided by the arbitrator(s).

(g)     <u>Arbitration Award</u>.  The arbitration award shall be in writing.  In rendering the award, the arbitrator(s) shall determine the respective rights and obligations of the parties under federal law, or, if federal law is not applicable, the laws of the State of Colorado.  The arbitration award shall be binding on all parties solely with respect to the Claimant's individual claims, and it shall have no effect with respect to claims of any other Participant or Beneficiary. To the fullest extent permitted by law, no application or appeal to any court of competent jurisdiction may be made in connection with any question of law arising in the course of arbitration pursuant to this arbitration agreement or with respect to any award, except as to the Class Action Waiver or for actions relating to enforcement of this Arbitration Procedure or any award seeking interim or other provisional relief or remedies in aid of arbitration.

(h)     <u>Fees and Expenses</u>.  Except as may be awarded by the arbitrator(s) in a final award: (i) the fees and expenses of the arbitrator(s) and arbitration shall be advanced by the Primary Sponsor; and (ii) each party shall bear the expense of his, her or its own counsel, experts, witnesses, and preparation and presentation of evidence.     The

10692538.6

arbitrator(s) may include in his, her, or their final award an award of arbitration fees and expenses and/or attorneys' fees and expenses to the extent allowed under ERISA. However, if any party prevails on a statutory claim that entitles the prevailing party to attorneys' fees and costs, or if there is a written agreement between the parties providing for attorneys' fees and costs, the arbitrator(s) may award reasonable attorneys' fees and costs in accordance with the applicable statute or written agreement. In that event, the arbitrator(s) shall resolve any dispute as to the reasonableness of any fee or cost that may be awarded.

      (i)    <u>Confidentiality</u>.  Neither the Claimant nor the arbitrator(s) may disclose the existence, content, subject matter, or results of any arbitration proceeding without the prior written consent of the Primary Sponsor. This nondisclosure provision shall apply to all aspects of the arbitration proceeding, including without limitation, discovery, testimony, other evidence, briefs, and the award. In the event of a breach or threatened breach of this confidentiality provision, the Primary Sponsor may seek temporary, preliminary and/or permanent injunctive relief to prevent such breach or threatened breach, as well as any damages suffered by the Primary Sponsor, Plan Administrator, or Trustee. In the event the Primary Sponsor brings an action to enforce this confidentiality provision and receives any remedy (whether temporary or permanent), the Claimant or arbitrator responsible for the breach or threatened breach shall pay the Primary Sponsor's attorneys' fees and expenses. In any action to confirm or set aside the arbitration award, the parties shall cooperatively seek to file the arbitration award under seal or for an *in camera* inspection by the court without the award being filed in the public record.

      (j)    <u>Arbitrator Independence</u>.  The parties intend that the arbitrator(s) be independent and impartial. To this end, the arbitrator(s) shall disclose to the parties, both before and during the arbitration proceedings, any professional, family, or social relationships, past or present, with any party or counsel.

      (k)    <u>Applicable Law</u>.  This Arbitration Procedure shall be governed and enforced under ERISA, the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, et seq., and, to the extent that it does not conflict with ERISA or the FAA, applicable state law. The final award rendered by the arbitrator(s) shall be final and binding on the parties to the arbitration with respect to the Claimant's individual claims only.

      (l)    <u>Covered Claims Against Non-Fiduciaries</u>.  This Arbitration Procedure shall apply to all Covered Claims asserted by a Claimant, whether such Covered Claims are asserted solely against one or more of the Plan's fiduciaries or are also asserted against the Primary Sponsor or any other non-fiduciary (e.g., a Plan service provider).

21.2   <u>Restriction on Venue</u>.  If a Claimant wishes to pursue any Covered Claim, that Claimant shall comply with the Arbitration Procedure, set forth in this Section 21 of the Plan, and shall not file any such claim in a state or federal court. To the extent, however, any Claimant fails or refuses to comply with the Arbitration Procedure, wishes to challenge the legal enforceability of the Arbitration Procedure, or to the extent the Arbitration Procedure is invalidated, such action or challenge shall be filed exclusively in the United States District Court for the District of Colorado, which is where the Plan is administered. In the event a Claimant

makes an unsuccessful challenge to the validity, enforceability or scope of the Arbitration Procedure in any court, the Claimant shall, to the maximum extent permitted by law, reimburse the defendants in that action for all attorneys' fees, costs, and expenses incurred by them in defending against the Claimant's unsuccessful court challenge.

**SECTION 22**
**INCORPORATION OF SPECIAL LIMITATIONS**

Appendices A, B, and C to the Plan, attached hereto, are incorporated by reference and the provisions of the same shall apply notwithstanding anything to the contrary contained herein.

10692538.6

IN WITNESS WHEREOF, the Primary Sponsor has caused this indenture to be executed as of the date first above written.

ENVISION MANAGEMENT HOLDING, INC.

By: _____

Name:      Darrel Creps III

Title:       Chief Executive Officer

# APPENDIX A
# LIMITATION ON ALLOCATIONS

## SECTION 1

The "annual addition" for any Participant for any one limitation year may not exceed the lesser of.

      (a)    $54,000, as adjusted under Code Section 415(d); or

      (b)    100% of the Participant's Annual Compensation (as modified by this Appendix A).

The limit described in Subsection (b) shall not apply to any contribution for medical benefits after a separation from service (within the meaning of Code Section 401(h) or 419A(f)(2)) which is otherwise treated as an annual addition.

Notwithstanding the foregoing, at such times as the Primary Sponsor does not maintain an effective election under Subchapter S of the Code, if no more than one-third (1/3) of the Plan Sponsor contributions to the Plan for the limitation year which are deductible under Code Section 404(a)(9) are allocated to Highly Compensated Employees, the annual addition shall not include forfeitures of Company Stock acquired with the proceeds of an Acquisition Loan or Plan Sponsor contributions applied to the payment of interest on an Acquisition Loan. Furthermore, the amount of any qualified gratuitous transfer (as defined in Code Section 664(g)(1)) allocated to a Participant for any limitation year is not taken into account in determining whether any other annual addition exceeds the limitations imposed by Code Section 415, provided that the amount of the qualified gratuitous transfer does not exceed the limitations imposed by Code Section 415.

## SECTION 2

For the purposes of this Appendix A, the term "annual addition" for any Participant means for any limitation year, the sum of certain Plan Sponsor contributions and forfeitures to the Plan, Participant contributions to any individual medical account (as defined in Code Section 415(1)(2) or 419A(d)) which is part of the Plan, and other amounts as determined in Code Section 415(c)(2) in effect for that limitation year. Participant contributions shall be determined without regard to rollover amounts, employee contributions to a simplified employee pension which are excludable from gross income under Code Section 401(k)(6), and catch up contributions as described in Code Section 414(v).

If an Acquisition Loan has been made to the Plan, annual additions for a limitation year include Plan Sponsor contributions of both principal and interest used to repay the Acquisition Loan for the limitation year. Notwithstanding the foregoing, the Fair Market Value of the shares of Company Stock released from the Loan Suspense Account and allocated to the Company Stock Subaccounts of Plan Participants' ESOP Accounts for the limitation year may be used in calculating annual additions, in lieu of Plan Sponsor contributions used to repay an Acquisition Loan, if the Fair Market Value of the shares of Company Stock released from the

Loan Suspense Account is less than Plan Sponsor contributions used to repay the Acquisition Loan.

## SECTION 3

For purposes of this Appendix A, the term "limitation year" shall mean a Plan Year.

## SECTION 4

For purposes of this Appendix A, "Annual Compensation" shall include compensation paid to the Participant by the later of (i) 2½ months after the Participant's severance from employment with the Plan Sponsor, or (ii) the end of the limitation year that includes the date of the Participant's severance from employment with the Plan Sponsor, if such compensation is regular compensation for services during the Participant's regular working hours, or compensation for services outside the Participant's regular working hours (such as overtime and shift differential), commissions, bonuses, or other similar payments, and the compensation would have been paid to the Participant prior to a severance from employment if the Participant had continued in employment with the Plan Sponsor. Annual Compensation shall include compensation paid after a Participant's severance from employment if the payment is for unused bona fide sick, vacation, or other leave (but only if the Participant would have been able to use the leave if employment had continued) or the payment is received by a Participant pursuant to a nonqualified unfunded deferred compensation plan (but only if the payment would have been paid to the Participant at the same time if the Participant had continued in employment with the Plan Sponsor and only to the extent that the payment is includible in the Participant's gross income).

## SECTION 5

For purposes of applying the limitations of this Appendix A, all defined contribution plans maintained or deemed to be maintained by a Plan Sponsor shall be treated as one defined contribution plan. In the event any corrective actions are required to be taken with respect to this Plan or with respect to another defined contribution plan pursuant to any program described in Section 13.9 of the Plan as a result of the annual additions of a Participant exceeding the limitations set forth in Section 1 of this Appendix A and Code Section 415, because of the Participant's participation in more than one defined contribution plan, such actions shall be taken first with regard to this Plan.

## SECTION 6

The provisions of this Appendix A shall be construed in a manner consistent with the provisions of final Treasury Regulations issued under Code Section 415 and any successor guidance.

# APPENDIX B
## TOP-HEAVY PROVISIONS

### SECTION 1

As used in this Appendix B, the following words shall have the following meanings:

(a)    "Determination Date" means, with respect to any Plan Year, the last day of the preceding Plan Year, or, in the case of the first Plan Year, means the last day of the first Plan Year.

(b)    "Key Employee" means an Employee or former Employee (including a Beneficiary of a Key Employee or former Key Employee) who at any time during the Plan Year containing the Determination Date was:

(1)    an officer of the Plan Sponsor or any Affiliate whose Annual Compensation was greater than $175,000 (as adjusted for changes in the cost of living as provided in regulations issued by the Secretary of the Treasury) for the calendar year in which the Plan Year ends, where the term "officer" means an administrative executive in regular and continual service to the Plan Sponsor or an Affiliate; provided, however, that in no event shall the number of officers exceed the lesser of: (A) fifty (50) employees; or (B) the greater of: (I) three (3) employees; or (II) ten percent (10%) of the number of Employees during the Plan Year, with any non-integer being increased to the next integer. If for any year, no officer of the Plan Sponsor meets the requirements of this subparagraph (1), the highest paid officer of the Plan Sponsor for the Plan Year shall be considered an officer for purposes of this subparagraph (1);

(2)    an owner of more than five percent (5%) of the outstanding stock of the Plan Sponsor or an Affiliate or more than five percent (5%) of the total combined voting power of all stock of the Plan Sponsor or an Affiliate; or

(3)    an owner of more than one percent (1%) of the outstanding stock of the Plan Sponsor or an Affiliate or more than one percent (1%) of the total combined voting power of all stock of the Plan Sponsor or an Affiliate, and who in such Plan Year had Annual Compensation from the Plan Sponsor and all of its Affiliates of more than $150,000.

For purposes of determining ownership under Subsections (2) and (3) above, the rules set forth in Code Section 318(a)(2) shall be applied as follows: (i) in the case of any Plan Sponsor or Affiliate which is a corporation, by substituting five percent (5%) for fifty percent (50%); and, (ii) in the case of any Plan Sponsor or Affiliate which is not a corporation, ownership shall be determined in accordance with Treasury Regulations which shall be based on principles similar to the principles of Code Section 318 (modified as described in clause (i) above).

Employees other than Key Employees are sometimes referred to in this Appendix B as "non-key employees."

(c)    "Required Aggregation Group" means:

(1)     each plan of the Plan Sponsor and its Affiliates which qualifies under Code Section 401(a) in which a Key Employee is a participant, and

(2)     each other plan of the Plan Sponsor and its Affiliates which qualifies under Code Section 401(a) and which enables any plan described in Paragraph (1) of this Subsection to meet the requirements of Code Section 401(a)(4) or 410.

(d)     (1)     "Top-Heavy" means:

(A)     if the Plan is not included in a Required Aggregation Group, the Plan's condition in a Plan Year for which, as of the Determination Date:

(i)     the present value of the cumulative Accounts under the Plan for all Key Employees exceeds sixty percent (60%) of the present value of the cumulative Accounts under the Plan for all Participants; and

(ii)     the Plan, when included in every potential combination, if any, with any or all of:

(a)     any Required Aggregation Group, and

(b)     any plan of the Plan Sponsor which is not part of any Required Aggregation Group and which qualifies under Code Section 401(a)

is part of a Top-Heavy Group (as defined in Paragraph (2) of this Subsection); and

(B)     if the Plan is included in a Required Aggregation Group, the Plan's condition in a Plan Year for which, as of the Determination Date:

(i)     the Required Aggregation Group is a Top-Heavy Group (as defined in Paragraph (2) of this Subsection); and

(ii)     the Required Aggregation Group, when included in every potential combination, if any, with any or all of the plans of the Plan Sponsor and its Affiliates which are not part of the Required Aggregation Group and which qualify under Code Section 401(a), is part of a Top-Heavy Group (as defined in Paragraph (2) of this Subsection).

(C)     For purposes of Subparagraphs (A)(ii) and (B)(ii) of this Paragraph (1), any combination of plans must satisfy the requirements of Code Sections 401(a)(4) and 410.

(2)     A group shall be deemed to be a Top-Heavy Group if:

(A)      the sum, as of the Determination Date, of the present value of the cumulative accrued benefits for all Key Employees under all plans included in such group exceeds

(B)      sixty percent (60%) of a similar sum determined for all participants in such plans.

(3)      (A)      For purposes of this Section, the present value of the accrued benefit for any participant in a defined contribution plan as of any Determination Date or last day of a plan year shall be the sum of:

(i)      as to any defined contribution plan other than a simplified employee pension, the account balance as of the most recent valuation date occurring within the plan year ending on the Determination Date or last day of a plan year,

(ii)      as to any simplified employee pension, the aggregate employer contributions, and

(iii)      an adjustment for contributions due as of the Determination Date or last day of a plan year.

In the case of a plan that is not subject to the minimum funding requirements of Code Section 412, the adjustment in Clause (iii) of this Subparagraph (A) shall be the amount of any contributions actually made after the valuation date but on or before the Determination Date or last day of the plan year to the extent not included under Clause (i) or (ii) of this Subparagraph (A). However, in the first plan year of the plan, the adjustment in Clause (iii) of this Subparagraph (A) shall also reflect the amount of any contributions made thereafter that are allocated as of a date in such first plan year. In the case of a plan that is subject to the minimum funding requirements, the account balance in Clause (i) and the aggregate contributions in Clause (ii) of this Subparagraph (A) shall include contributions that would be allocated as of a date not later than the Determination Date or last day of a plan year, even though those amounts are not yet required to be contributed, and the adjustment in Clause (iii) of this Subparagraph (A) shall be the amount of any contribution actually made (or due to be made) after the valuation date but before the expiration of the extended payment period in Code Section 412(c)(10) to the extent not included under Clause (i) or (ii) of this Subparagraph (A).

(B)      For purposes of this Subsection, the present value of the accrued benefit for any participant in a defined benefit plan as of any Determination Date or last day of a plan year must be determined as of the most recent valuation date which is within a 12-month period ending on the Determination Date or last day of a plan year as if such participant terminated as of such valuation date; provided, however, that in the first plan year of a plan, the present value of the accrued benefit for a current participant must be determined either (i) as if the

participant terminated service as of the Determination Date or last day of a plan year or (ii) as if the participant terminated service as of such valuation date, but taking into account the estimated accrued benefit as of the Determination Date or last day of a plan year. For purposes of this Subparagraph (B) the valuation date must be the same valuation date used for computing plan costs for minimum funding, regardless of whether a valuation is performed that year.  The actuarial assumptions utilized in calculating the present value of the accrued benefit for any participant in a defined benefit plan for purposes of this Subparagraph (B) shall be established by the Plan Administrator after consultation with the actuary for the plan, and shall be reasonable in the aggregate and shall comport with the requirements set forth by the Internal Revenue Service in Q&A T-26 and T-27 of Treasury Regulation Section 1.416-1.

(C)     For purposes of determining the present value of the cumulative accrued benefit under a plan for any Participant in accordance with this Subsection, the present value shall be increased by the aggregate distributions made with respect to the Participant (including distributions paid on account of death to the extent they do not exceed the present value of the cumulative accrued benefit existing immediately prior to death) under each plan being considered and under any terminated plan which if it had not been terminated would have been in a Required Aggregation Group with the Plan during the one-year period ending on the Determination Date or the last day of the Plan Year that falls within the calendar year in which the Determination Date falls. In the case of a distribution made for a reason other than severance from employment, death, or disability, this provision shall be applied by substituting "five-year period" for "one-year period."

(D)     For purposes of this Paragraph (3), participant contributions which are deductible as "qualified retirement contributions" within the meaning of Code Section 219 or any successor, as adjusted to reflect income, gains, losses, and other credits or charges attributable thereto, shall not be considered to be part of the accrued benefits under any plan.

(E)     For purposes of this Paragraph (3), if any employee is not a Key Employee with respect to any plan for any plan year, but such employee was a Key Employee with respect to such plan for any prior plan year, any accrued benefit for such employee shall not be taken into account.

(F)     For purposes of this Paragraph (3), if any Employee has not performed any service for the Plan Sponsor or Affiliate during the one-year period ending on the Determination Date, any accrued benefit for that Employee shall not be taken into account.

(G)     (i)     In the case of an "unrelated rollover" (as defined below) between plans which qualify under Code Section 401(a), (a) the plan providing the distribution shall count the distribution as a distribution under Subparagraph (C) of this Paragraph (3), and (b) the plan accepting

the distribution shall not consider the distribution part of the accrued benefit under this Section; and

(ii)     in the case of a "related rollover" (as defined below) between plans which qualify under Code Section 401(a), (a) the plan providing the distribution shall not count the distribution as a distribution under Subparagraph (C) of this Paragraph (3), and (b) the plan accepting the distribution shall consider the distribution part of the accrued benefit under this Section.

For purposes of this Subparagraph (G), an "unrelated rollover" is a rollover as defined in Code Section 402(c)(4) or 408(d)(3) or a plan-to-plan transfer which is both initiated by the participant and made from a plan maintained by one employer to a plan maintained by another employer where the employers are not Affiliates. For purposes of this Subparagraph (G), a "related rollover" is a rollover as defined in Code Section 402(c)(4) or 408(d)(3) or a plan-to-plan transfer which is either not initiated by the participant or made to a plan maintained by the employer or an Affiliate.

## SECTION 2

(a)     Notwithstanding anything contained in the Plan to the contrary, except as otherwise provided in Subsection (b) of this Section, in any Plan Year during which the Plan is Top-Heavy, allocations of Plan Sponsor contributions and forfeitures for the Plan Year for the Account of each Participant who is not a Key Employee and who has not separated from service with the Plan Sponsor prior to the end of the Plan Year shall not be less than three percent (3%) of the Participant's Annual Compensation. For purposes of this Subsection, an allocation to a Participant's Account resulting from any Plan Sponsor contribution attributable to a salary reduction or similar arrangement shall not be taken into account.

(b)     (1)     The percentage referred to in Subsection (a) of this Section for any Plan Year shall not exceed the percentage at which allocations are made or required to be made under the Plan for the Plan Year for the Key Employee for whom the percentage is highest for the Plan Year. For purposes of this Paragraph, an allocation to the Account of a Key Employee resulting from any Plan Sponsor contribution attributable to a salary reduction or similar agreement shall be taken into account.

(2)     For purposes of this Subsection (b), all defined contribution plans which are members of a Required Aggregation Group shall be treated as part of the Plan.

(3)     This Subsection (b) shall not apply to any plan which is a member of a Required Aggregation Group if the plan enables a defined benefit plan which is a member of the Required Aggregation Group to meet the requirements of Code Section 401(a)(4) or 410.

## APPENDIX C
## MINIMUM DISTRIBUTION REQUIREMENTS

### SECTION 1
### GENERAL RULES

(a)   <u>Effective Date and Precedence</u>.   The provisions of this Appendix C will apply for purposes of determining required minimum distributions.  The requirements of this Appendix C will take precedence over any inconsistent provisions of the Plan.

(b)   <u>Requirements of Treasury Regulations Incorporated</u>.   All distributions required under this Appendix C will be determined and made in accordance with the Treasury Regulations under Code Section 401(a)(9).

(c)   <u>TEFRA Section 242(b)(2) Elections</u>.   Notwithstanding the other provisions of this Appendix C, distributions may be made under a designation made before January 1, 1984, in accordance with Section 242(b)(2) of the Tax Equity and Fiscal Responsibility Act (TEFRA) and the provisions of the Plan that relate to Section 242(b)(2) of TEFRA.

### SECTION 2
### TIME AND MANNER OF DISTRIBUTION

(a)   <u>Required Beginning Date</u>.   The Participant's entire interest will be distributed, or begin to be distributed, to the Participant no later than the Participant's Required Beginning Date.

(b)   <u>Death of Participant Before Distributions Begin</u>.   If the Participant dies before distributions begin, the Participant's entire interest will be distributed, or begin to be distributed, no later than as follows:

(1)   If the Participant's surviving Spouse is the Participant's sole Designated Beneficiary, then, distributions to the surviving Spouse will begin by December 31 of the calendar year immediately following the calendar year in which the Participant died, or by December 31 of the calendar year in which the Participant would have attained age 70½, if later.

(2)   If the Participant's surviving Spouse is not the Participant's sole Designated Beneficiary, then, distributions to the Designated Beneficiary will begin by December 31 of the calendar year immediately following the calendar year in which the Participant died.

(3)   If there is no Designated Beneficiary as of September 30 of the year following the year of the Participant's death, the Participant's entire interest will be distributed by December 31 of the calendar year containing the fifth anniversary of the Participant's death.

(4)    If the Participant's surviving Spouse is the Participant's sole Designated Beneficiary and the surviving Spouse dies after the Participant but before distributions to the surviving Spouse begin, this Section 2(b), other than Section 2(b)(1) of this Appendix C, will apply as if the surviving Spouse were the Participant.

For purposes of this Section 2(b) and Section 4 of this Appendix C, unless Section 2(b)(4) of this Appendix C applies, distributions are considered to begin on the Participant's Required Beginning Date.  If Section 2(b) of this Appendix C applies, distributions are considered to begin on the date distributions are required to begin to the surviving Spouse under Section 2(b)(1) of this Appendix C. If distributions under an annuity purchased from an insurance company irrevocably commence to the Participant before the Participant's Required Beginning Date (or to the Participant's surviving Spouse before the date distributions are required to begin to the surviving Spouse under Section 2(b)(1)), the date distributions are considered to begin is the date distributions actually commence.

(c)    <u>Forms of Distribution</u>.  Unless the Participant's interest is distributed in the form of an annuity purchased from an insurance company or in a single sum on or before the Required Beginning Date, as of the first Distribution Calendar Year, distributions will be made in accordance with Sections 3 and 4 of this Appendix C.  If the Participant's interest is distributed in the form of an annuity purchased from an insurance company, distributions thereunder will be made in accordance with the requirements of Code Section 401(a)(9) and the regulations issued thereunder.

## SECTION 3
## <u>REQUIRED MINIMUM DISTRIBUTIONS DURING PARTICIPANT'S LIFETIME</u>

(a)    <u>Amount of Required Minimum Distribution For Each Distribution Calendar Year</u>.  During the Participant's lifetime, the minimum amount that will be distributed for each Distribution Calendar Year is the lesser of:

(1)    the quotient obtained by dividing the Participant's Account Balance by the distribution period in the Uniform Lifetime Table set forth in Section 1.401(a)(9)-9 of the Treasury Regulations, using the Participant's age as of the Participant's birthday in the Distribution Calendar Year; or

(2)    if the Participant's sole Designated Beneficiary for the Distribution Calendar Year is the Participant's Spouse, the quotient obtained by dividing the Participant's Account Balance by the number in the Joint and Last Survivor Table set forth in Section 1.401(a)(9)-9 of the Treasury Regulations, using the Participant's and Spouse's attained ages as of the Participant's and Spouse's birthdays in the Distribution Calendar Year.

10692538.6

(b)     Lifetime Required Minimum Distributions Continue Through Year of Participant's Death.   Required minimum distributions will be determined under this Section 3 beginning with the first Distribution Calendar Year and up to and including the Distribution Calendar Year that includes the Participant's date of death.

## SECTION 4
## REQUIRED MINIMUM DISTRIBUTIONS AFTER PARTICIPANT'S DEATH

(a)     Death On or After Date Distributions Begin.

(1)     Participant Survived by Designated Beneficiary.  If the Participant dies on or after the date distributions begin and there is a Designated Beneficiary, the minimum amount that will be distributed for each Distribution Calendar Year after the year of the Participant's death is the quotient obtained by dividing the Participant's Account Balance by the longer of the remaining Life Expectancy of the Participant or the remaining Life Expectancy of the Participant's Designated Beneficiary, determined as follows:

(i)     The Participant's remaining Life Expectancy is calculated using the age of the Participant in the year of death, reduced by one for each subsequent year.

(ii)     If the Participant's surviving Spouse is the Participant's sole Designated Beneficiary, the remaining Life Expectancy of the surviving Spouse is calculated for each Distribution Calendar Year after the year of the Participant's death using the surviving Spouse's age as of the Spouse's birthday in that year.  For Distribution Calendar Years after the year of the surviving Spouse's death, the remaining Life Expectancy of the surviving Spouse is calculated using the age of the surviving Spouse as of the Spouse's birthday in the calendar year of the Spouse's death, reduced by one for each subsequent calendar year.

(iii)     If the Participant's surviving Spouse is not the Participant's sole Designated Beneficiary, the Designated Beneficiary's remaining Life Expectancy is calculated using the age of the Designated Beneficiary in the year following the year of the Participant's death, reduced by one for each subsequent year.

(2)     No Designated Beneficiary.  If the Participant dies on or after the date distributions begin and there is no Designated Beneficiary as of September 30 of the year after the year of the Participant's death, the minimum amount that will be distributed for each Distribution Calendar Year after the year of the Participant's death is the quotient obtained by dividing the Participant's Account Balance by the Participant's remaining Life Expectancy calculated using the age of the Participant in the year of death, reduced by one for each subsequent year.

(b)    Death Before Date Distributions Begin.

(1)    Participant Survived by Designated Beneficiary.  If the Participant dies before the date distributions begin and there is a Designated Beneficiary, the minimum amount that will be distributed for each Distribution Calendar Year after the year of the Participant's death is the quotient obtained by dividing the Participant's Account Balance by the remaining Life Expectancy of the Participant's Designated Beneficiary, determined as provided in Section 4(a).

(2)    No Designated Beneficiary.  If the Participant dies before the date distributions begin and there is no Designated Beneficiary as of September 30 of the year following the year of the Participant's death, distribution of the Participant's entire interest will be completed by December 31 of the calendar year containing the fifth anniversary of the Participant's death.

(3)    Death of Surviving Spouse Before Distributions to Surviving Spouse Are Required to Begin.  If the Participant dies before the date distributions begin, the Participant's surviving Spouse is the Participant's sole Designated Beneficiary, and the surviving Spouse dies before distributions are required to begin to the surviving Spouse under Section 2(b)(1) of this Appendix C, this Section (b) will apply as if the surviving Spouse were the Participant.

## SECTION 5
## DEFINITIONS

As used in this Appendix C, the following words and phrases shall have the meaning set forth below:

(a)    Designated Beneficiary.    The individual who is designated as the Beneficiary under Section 1.6 of the Plan and is the designated Beneficiary under Section 401(a)(9) of the Internal Revenue Code and Section 1.401(a)(9)-4, Q&A-1, of the Treasury Regulations.

(b)    Distribution Calendar Year.    A calendar year for which a minimum distribution is required.  For distributions beginning before the Participant's death, the first distribution calendar year is the calendar year immediately preceding the calendar year which contains the Participant's Required Beginning Date.    For distributions beginning after the Participant's death, the first distribution calendar year is the calendar year in which distributions are required to begin under Section 2(b). The required minimum distribution for the Participant's first distribution calendar year will be made on or before the Participant's Required Beginning Date.  The required minimum distribution for other distribution calendar years, including the required minimum distribution for the distribution calendar year in which the Participant's Required Beginning Date occurs, will be made on or before December 31 of that distribution calendar year.

      (c)    <u>Life Expectancy</u>.  Life expectancy as computed by use of the Single Life Table in Section 1.401(a)(9)-9 of the Treasury Regulations.

      (d)    <u>Participant's Account Balance</u>.  The Account balance as of the last Valuation Date in the calendar year immediately preceding the Distribution Calendar Year ("Valuation Calendar Year") increased by the amount of any contributions made and allocated or forfeitures allocated to the Account balance as of dates in the Valuation Calendar Year after the Valuation Date and decreased by distributions made in the Valuation Calendar Year after the Valuation Date.  The Account balance for the Valuation Calendar Year includes any amounts rolled over or transferred to the Plan either in the Valuation Calendar Year or in the Distribution Calendar Year if distributed or transferred in the Valuation Calendar Year.

      (e)    <u>Required Beginning Date</u>.  The date specified in Section 9.4 of the Plan.

10692538.6