**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 1:21-cv-304-CNS-MDB**

ROBERT HARRISON and GRACE HEATH, on behalf of themselves, the ENVISION MANAGEMENT HOLDING, INC. ESOP, and all other similarly situated individuals,

Plaintiffs,

v.

ENVISION MANAGEMENT HOLDING, INC. BOARD OF DIRECTORS, ENVISION MANAGEMENT HOLDING, INC. EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE, ARGENT TRUST COMPANY, DARREL CREPS, III, PAUL SHERWOOD, JEFF JONES, NICOLE JONES, AARON RAMSAY, TANWEER KHAN, and LORI SPAHN,

Defendants.

---

**ENVISION DEFENDANTS' PRE-TRIAL BRIEF**

---

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........ 1
II. BACKGROUND ........ 4
III. ARGUMENT ........ 8
A. Plaintiffs' Derivative Claims Against the Envision Defendants Fail Because Argent Determined Fair Market Value in Good Faith and the Transaction Was For Adequate Consideration ........ 8
B. Alternatively, Plaintiffs Have Failed to Prove Their Derivative Claims Against the Envision Defendants. ........ 9
1. The Board Defendants and Ramsay Did Not "Cause" the ESOP Transaction ........ 9
2. The Board Defendants and Ramsay Satisfied Their Duty to Monitor ........ 11
3. Plaintiffs Are Not Entitled to Equitable Remedies Under ERISA § 502(a)(3) Against the Seller Defendants and Nicole Jones ........ 16
4. The Board Defendants and Ramsay Are Not Liable As Co-Fiduciaries ........ 19
5. The Seller Defendants Did Not Violate ERISA § 406(b)(3) ........ 19
6. EMHI Indemnification Provisions Do Not Violate ERISA ........ 20
IV. CONCLUSION ........ 20

# TABLE OF AUTHORITIES


**Cases** **Page(s)**

*Birse v. CenturyLink, Inc*,
2019 WL 1292861 (D. Colo. Mar. 20, 2019) ........ 9

*Cunningham v. Cornell Univ.*,
604 U.S. 693 (2025) ........ 18

*Del Castillo v. Cmty. Child Care Council of Santa Clara Cnty., Inc.*,
2019 WL 6841222 (N.D. Cal. Dec. 16, 2019) ........ 17, 18

*Donovan v. Cunningham*,
716 F.2d 1455 (5th Cir. 1983) ........ 1

*Fish v. Greatbanc Tr. Co.*,
2016 WL 5923448 (N.D. Ill. Sept. 1, 2016) ........ 10, 13

*Foster v. Adams & Assocs., Inc.*,
2020 WL 3639648 (N.D. Cal. July 6, 2020) ........ 10

*Great–West Life & Annuity Ins. Co. v. Knudson*,
534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002) ........ 17

*Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*,
530 U.S. 238 (2000) ........ 16, 17

*Hudson v. Nat'l Football League Mgmt. Council*,
2020 WL 1547467 (S.D.N.Y. Mar. 31, 2020) ........ 12

*Lingis v. Motorola, Inc.*,
649 F. Supp. 2d 861 (N.D. Ill. 2009), *aff'd sub nom. Howell v. Motorola, Inc.*, 633 F.3d 552 (7th Cir. 2011) ........ 12

*Martin v. Feilen*,
965 F.2d 660 (8th Cir. 1992) ........ 20

*Mertens v. Hewitt Assocs.*,
508 U.S. 248, 113 S. Ct. 2063, 124 L. Ed. 2d 161 (1993) ........ 16, 17

*Neil v. Zell*,
677 F. Supp. 2d 1010 (N.D. Ill. 2009) ........ 10

*Pegram v. Herdrich*,
530 U.S. 211 (2000) ........ 10

*Ramos v. Banner Health*,
461 F. Supp. 3d 1067 (D. Colo. 2020), *aff'd*, 1 F.4th 769 (10th Cir. 2021) ........ 9

*Romano v. John Hancock Life Ins. Co. (USA)*,
120 F.4th 729 (11th Cir. 2024) ........ 9, 10, 11

*Tibble v. Edison Int'l*,
2010 WL 2757153 (C.D. Cal. July 8, 2010) ........ 12

*Walsh v. Bowers*,
561 F. Supp. 3d 973 (D. Haw. 2021) ........ 15

*In re Williams Companies ERISA Litig.*,
271 F. Supp. 2d 1328 (N.D. Okla. 2003) ........ 12

*In re Williams Companies*,
2003 WL 22794417 (N.D. Okla. Oct. 27, 2003) ........ 13

**Statutes, Rules & Regulations**

18 U.S.C. § 3(18) ........ 1

29 U.S.C. § 1002(21) ........ 9

29 U.S.C. § 1105 ........ 19

29 U.S.C. § 1106(a) ........ 17

29 U.S.C. § 1106(b)(3) ........ 19

29 U.S.C. § 1108(e) ........ 1

29 U.S.C. § 1110(a) ........ 20

29 U.S.C. § 1132(a)(3) ........ 16

**Other Authorities**

House Conference Report 93-1280, 1974 U.S.C.C.A.N. 5038, 5089 ........ 19

## I. INTRODUCTION

This case concerns a December 19, 2017 transaction in which the Envision Management Holding, Inc. Employee Stock Ownership Plan (the "ESOP" or "Plan") acquired 100% of the outstanding stock of Envision Management Holding, Inc. ("EMHI" or "Envision") for approximately $177 million, at a price of $1,770 per share, from five selling shareholders (the "Transaction"). Reading Plaintiffs' various submissions in this case, one would never know that ERISA regulates ESOP stock transactions like the one at issue here by imposing a statutory standard of conduct on the "*trustee*" who, also by statute, has the "exclusive authority and discretion" to act on behalf of the ESOP in approving a transaction. 29 U.S.C. §§ 1108(e) (a fiduciary can cause an ESOP to acquire employer stock if for "adequate consideration"); 1002(18) (defining "adequate consideration" as fair market value determined in good faith by the trustee or named fiduciary); 1103(a) (trustee "shall have exclusive authority and discretion to manage and control the assets of the plan"). One also would never know that the governing statutory standard of conduct, which requires the trustee to make a "good faith" determination of "fair market value," does not allow a plaintiff to nitpick valuation issues and seek a *de novo* assessment of fair market value.[1] ERISA focuses on *how* the trustee reached its decision, and a challenge to an ESOP stock transaction fails if the trustee relied in good faith on a qualified valuation advisor.

---

[1] *See Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983) ("the adequate consideration test, like the prudent man rule, is expressly focused upon the *conduct* of the fiduciaries. A court reviewing the adequacy of consideration under Section 3(18) is to ask if the price paid is 'the fair market value of the asset *as determined in good faith by the ... fiduciary;*' it is not to redetermine the appropriate amount for itself *de novo."*).

Those are the principal legal standards that govern Plaintiffs' claims in this case. Here, the trustee who agreed to the Transaction on behalf of the ESOP was Argent Trust Company ("Argent"), and the evidence here of Argent's good-faith determination of fair market value is *overwhelming.* In fact, Argent did not just rely reasonably on the advice of a qualified financial advisor, Argent *hired a second expert, with a special expertise with healthcare companies,* for the specific purpose of advising Argent that it was reasonable to rely on the advice of the first advisor. Such a belt-and-suspenders approach to ensuring good-faith reliance on an advisor is unheard of in the ESOP space, probably because ERISA does not require a trustee to obtain a second opinion or become an expert itself in order to rely on the advice of a qualified expert.[2] Argent didn't just meet its statutory obligations, it exceeded them, and Plaintiffs' claims will fail.

Facing the insurmountable challenge of trying to prove that Argent failed to act in good faith, Plaintiffs are trying to shift this Court's focus with a barrage of allegations directed not at Argent, but at the Envision Defendants. At the outset, this should raise serious concerns with this Court. As noted above, an ESOP stock transaction is permissible, *and the Court's inquiry ends*, if the trustee made a good-faith determination of fair market value, and everyone, including Plaintiffs until very recently,[3] agreed that

---

[2] The Envision Defendants would like to remind this Court that Plaintiffs have repeatedly tried to influence this Court's opinion of this case by *claiming*, in argument, that Argent acted as a mere "rubber stamp" and took direction from the selling shareholders. Such an argument is frivolous. The Envision Defendants are eager for this Court to see how misleading Plaintiffs have been on this point, and many others, throughout this case.

[3] In their opposition to the Envision Defendants' Motion for Partial Summary Judgment, Plaintiffs for the first time argued that Aaron Ramsay was also the trustee for the Plan, but such a claim was not made in any pleading in this case or any briefing. The Envision Defendants reserve their rights with respect to this issue.

Argent was retained to act as, and did act as, the institutional trustee on behalf of the Plan in the Transaction.

Plaintiffs will attempt to make this case about the Envision Defendants' motives, actions taken in their corporate or personal capacities, and dual loyalties/conflicts. But the supposed conflicts and motives that Plaintiffs will raise are nothing out of the ordinary in an ESOP stock transaction, and certainly not a violation of ERISA. In an ESOP stock transaction, there are corporate personnel and selling shareholders that will *always, without exception*, have interests that conflict with interests of the ESOP. Selling shareholders, for example, need to be paid for their stock. That interest conflicts with the interests of an ESOP, which would prefer to get all of that stock for free. Corporations set limits and conditions on the terms of the ESOP, including by imposing limitations on vesting of stock and requirements for eligibility to participate in the plan. Those limits and conditions conflict with interests of an ESOP, which would prefer immediate vesting and the broadest eligibility and other rights for participants. These conflicts are not evidence of wrongdoing; they are natural and inherent aspects of the various corporate and personal decisions involved in the establishment of an ESOP. When it comes to protecting the interests of the Plan in deciding whether to agree to the terms of a proposed ESOP transaction, ERISA makes that the duty of the trustee, whose statutory obligation is to make a good-faith determination of fair market value.

At trial, Plaintiffs will try to convince this Court to eviscerate the line between the trustee who represented the Plan, which was Argent, and everyone else who had any involvement in the Transaction. This Court will hear wild conspiracy theories that have no evidentiary support and, at bottom, seek a determination from this Court that nearly

everyone involved in an ESOP transaction assumes limitless fiduciary duties and is tainted by disqualifying conflicts.

The Envision Defendants ask this Court to decide this case based on the actual evidence of what Argent and its advisors did to evaluate and approve its terms. With respect to Plaintiffs' derivative claims against the Envision Defendants, which allege that the Envision Defendants knew or should have known that Argent was failing to act in good faith, the Envision Defendants spent over 1,000 work hours working on the Transaction, not including the hours invested by their investment advisor, *two* separate law firms, ESOP compliance advisor, and collection of outside lenders. The Envision Defendants knew Argent and its team were diligently working on the Transaction, and Plaintiffs' claims should fail.

## II. BACKGROUND

At the time of the Transaction, EMHI was owned by individual defendants Darrel ("Del") Creps, III ("Creps"), Jeffery Jones ("Jones"), Dr. Tanweer Khan ("Dr. Khan"), and Paul Sherwood ("Sherwood") (the "Seller Defendants" or "Sellers"). A fifth shareholder, Nicole Jones ("Nicole"), who is Jones's wife, received some gifted stock from Jones in anticipation of the ESOP Transaction as part of Jones's and Nicole's family tax-planning.

Creps, Jones, Dr. Khan, and Sherwood also comprised EMHI's four-member Board of Directors (the "Board"). These four individuals are referred to as the Board Defendants. In addition, Creps was CEO, Jones the Managing Director of Finance, and Sherwood the Chairman of the Board. Dr. Khan was not an officer of the Company and was not involved in its day-to-day operations. Defendant Aaron Ramsay ("Ramsay") was EMHI's Chief Financial Officer at the time of the ESOP Transaction. He did not own stock in EMHI and did not sell any stock. He was also not on the Board.

By all measures, Envision was the perfect company to form an ESOP. An ESOP is a type of optional employee benefit plan designed with two principal goals — to provide employees with beneficial ownership of stock and act as a method of corporate finance, allowing companies to borrow funds with various tax benefits that flow from the ESOP structure. As Congress explained, a successful ESOP is one where employees work hard and grow the company over time, and an ESOP aligns the employees' interests with the interests of the corporation itself. Envision, which Sherwood, an accountant with experience in healthcare, and Creps, also experienced in healthcare accounting and marketing, started in 2000, quickly expanded, and became incredibly successful. Jones joined as Chief Financial Officer and eventually became a shareholder, and Dr. Khan, a board-certified radiologist and neuroradiologist, became a shareholder, and the four led Envision to continued growth and financial successes with a unique focus on industry-leading patient scheduling, record-keeping, and reporting that dramatically reduced imaging turnaround times.

By 2016, Envision had 32 imaging centers in Colorado, Texas, Oklahoma, and Louisiana. Sherwood, facing health issues, and Creps were thinking about transitioning the business. All four owners have an impressive concern for employee wellbeing and corporate culture, and when Creps learned about ESOPs, they all thought an ESOP would align with their interests by allowing them to transition the company to the next generation and maintain the company's legacy and culture.

It is extremely important that this Court consider precisely how the various parties involved in the Transaction were selected. The first thing the Board did was hire Bryan Cave, a firm it had done work with and a nationally recognized ESOP/ERISA compliance

firm, to help them learn about ESOPs and handle legal issues. Bryan Cave attorneys then recommended three investment firms to help Envision and the sellers with financial issues, interacting with lenders and a trustee team, and other matters. After interviewing the three firms, CSG, an investment banker, was ultimately selected. At the time of its selection, CSG had won accolades for its ESOP work, had structured over 200 ESOP transactions, and came highly recommended by Bryan Cave.

Both CSG and Bryan Cave told the Board that an institutional trustee would have to be retained to represent the ESOP in a potential transaction. Importantly, *Bryan Cave* advised the Board to establish an independent trustee selection committee, and Bryan Cave advised that committee—without any Board involvement whatsoever—on three trustee candidates to interview, what information to request, and how to document its decision. That committee, which included Ramsay, independently selected Argent because of Argent's extensive experience with ESOP transactions and depth of expertise. None of the Sellers played any role whatsoever in the committee's selection or decision-making process.

After that, Argent independently chose a team of advisors to assist it with evaluating the transaction: ComStock, to estimate the range of the fair market value of EMHI's stock, Morrison Cohen, a law firm experienced in ESOP transactions, and Charles Wilhoite of Willamette, who was experienced in healthcare transactions, to advise Argent on whether ComStock's valuation opinion was reasonably reliable. Again, none of the Sellers played any role whatsoever in this selection process.

EMHI spent more than 1,000 hours working on transaction-related issues. This included meeting with Argent's team in person, meeting with lenders, responding to

Argent's and its advisors' due diligence requests, providing financial information, answering various questions, and uploading documents to a data room for Argent managed by CSG. CSG also secured $82 million in third-party financing from a syndicate of banks, each of which conducted their own extensive due diligence.

EMHI did not direct Argent's team to make any particular decisions or reach any particular conclusions. And EMHI personnel took significant action to ensure that the transaction, from their perspective, was compliant. When the Sellers had questions about potentially selling warrants and a real-estate investment opportunity proposed by CSG, *they retained another law firm* to review the issues and advise them that everything was appropriate.

The Board, primarily through Creps and Jones and the work requested of Ramsay and interactions with CSG, the lawyers, and another ESOP advisory firm, were aware of all the work that Argent's team was doing and never had any reason to have to meet to consider whether they might need to fire Argent and hire a replacement trustee. Nothing remotely suggested that such action was required. Thousands of documents and thousands of emails were exchanged, and hundreds of hours were spent vetting the deal.

Days before the Transaction was set to close, all the parties to the Transaction—meaning Envision, the Sellers, and Argent's team—expected that Congress was about to pass the Tax Cuts and Jobs Act ("TCJA") and reduce Envision's corporate tax rate from 35% to 21%. Because an ESOP transaction requires "fair market value" as determined in good faith, a future corporate tax cut can have an immediate impact on a company's value, particularly because a company is valued based on expected future cash flows. The various parties to the ESOP Transaction approximated that the increase in value could

be $20 million or more, and the parties were aware that if the Transaction did not close, the Sellers could properly request that additional amount for their stock.

But the Sellers—whom Plaintiffs accuse of masterminding some improper transaction and dictating the conduct of Argent—decided not to delay the closing specifically because they wanted the increase in value to go to the ESOP and the employees. If, as Plaintiffs claim, the Sellers wanted more, they simply could have waited a couple of days.

After the Transaction closed, Envision's founders remained on the Board as part of a planned transition of the company to new leadership. It is extremely common in ESOP companies—and endorsed by Congress—for selling shareholders to remain on the board after a transaction rather than dropping the keys at the door and wishing the employees 'good luck.' Ramsay succeeded Creps as CEO, and ultimately, Creps, Sherwood, and Dr. Khan transitioned off the Board, as intended. Jones remains on the Board, but has reduced his involvement in the day-to-day and leads a company effort to support employee well-being. The ESOP has been a resounding success. The stock's value has gone from $349.60 to ***$2,842.59 per share*** as of 12/31/24. The ESOP has allowed employees to participate in this exceptional financial growth.

## III. ARGUMENT

### A. Plaintiffs' Derivative Claims Against the Envision Defendants Fail Because Argent Determined Fair Market Value in Good Faith and the Transaction Was For Adequate Consideration

As stated above, an ESOP stock transaction is permissible, and the Court's inquiry ends, if Argent made a good-faith determination of fair market value, because the Plan will not have "overpaid" for the EMHI stock. Moreover, Plaintiffs' claims against the Envision Defendants for breach of the duty to monitor and co-fiduciary obligations, as well

as the non-fiduciary equitable claim, are premised on underlying ERISA violations by Argent. *See Birse v.* CenturyLink, Inc., No. 17-CV-02872-CMA-NYW, 2019 WL 1292861, at *6 (D. Colo. Mar. 20, 2019) (duty to monitor and co-fiduciary claims are derivative to breach of fiduciary duty claims); *Ramos v. Banner Health*, 461 F. Supp. 3d 1067, 1140 (D. Colo. 2020) (same), *aff'd*, 1 F.4th 769 (10th Cir. 2021). As thoroughly set forth in Argent's Pretrial Brief, Argent relied reasonably on its advisor ComStock's valuation analysis, Argent assessed fair market value in good faith, and Plaintiffs' primary complaint, brought through their expert Marc Brown, that ComStock did not apply discounts for lack of marketability and control, is fundamentally flawed. Because the claims against Argent fail, all the claims against the Envision Defendants fail too.

### B. Alternatively, Plaintiffs Have Failed to Prove Their Derivative Claims Against the Envision Defendants.

#### 1. <u>The Board Defendants and Ramsay Did Not "Cause" the ESOP Transaction</u>

Plaintiffs also accuse the Board Defendants and Ramsay of violating Section 406(a), which here, technically prohibited "a fiduciary from causing" the Plan to enter into the Transaction. None of the Board Defendants or Ramsay were fiduciaries who caused the Transaction. Under ERISA, a person is a fiduciary only "to the extent" a person performs a particular fiduciary function, which include exercising discretion or control over plan administration, management, or assets. 29 U.S.C. § 1002(21). Because of this, fiduciary status "is not an 'all-or-nothing concept,'" meaning a person can be a fiduciary for some purposes, but not for others. *Romano v. John Hancock Life Ins. Co. (USA)*, 120 F.4th 729, 739 (11th Cir. 2024). A court takes a functional approach to analyzing fiduciary status and must ask if the defendant was *acting* as a fiduciary "with respect to the particular activity at issue." *Id.*; *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).

Here, the "activity at issue" is the decision on behalf of the Plan to agree to the terms of the Transaction. The evidence is indisputably clear that Argent was hired to make that decision, and in fact made that decision. Throughout the life of the deal, the Board Defendants and Ramsay acted in their corporate capacities as directors, officers, and shareholders of EMHI—not as Plan fiduciaries directing the Plan's decision to purchase stock. *See, e.g., Neil v. Zell*, 677 F. Supp. 2d 1010, 1023 (N.D. Ill. 2009) (distinguishing between corporate settlor acts and fiduciary acts in an ESOP transaction). No Board Defendant or Ramsay executed any document on behalf of the Plan, had any communications with Argent about its decision to approve the Transaction, or had any authority to demand that Argent approve the deal.

Under these circumstances, Plaintiffs' claims cannot stand. *See, e.g.*, *Foster v. Adams & Assocs., Inc.*, No. 18-CV-02723-JSC, 2020 WL 3639648, at *6, 7 (N.D. Cal. July 6, 2020) (holding that when a trustee is appointed to represent an ESOP in a transaction, the board does not act in a fiduciary capacity for purposes of the decision to cause the ESOP to agree to the transaction); *Fish v. Greatbanc Tr. Co*., No. 09 C 1668, 2016 WL 5923448, at *60 (N.D. Ill. Sept. 1, 2016) (following a bench trial concluding that "[i]t would be a bizarre logic that would hold [the director defendants] accountable for 'causing' the ESOP to engage in a transaction when they hired an independent trustee for the specific purpose of deciding whether to cause the ESOP to engage in the Transaction.").

Plaintiffs now claim that Ramsay was responsible for making decisions related to the Transaction because he was appointed as trustee of the ESOP's predecessor profit sharing plan. The fact that Ramsay was trustee of this (different) plan—from which he was removed as trustee before the Transaction's close—is irrelevant. What matters is

how Ramsay *acted* “with respect to the particular activity at issue.” *Romano*, 120 F.4th at 739. Argent had and exercised the authority to enter into the Transaction on behalf of the Plan. Ramsay indisputably was not retained to evaluate the Transaction and in fact did not evaluate the ESOP Transaction on behalf of the Plan.

Plaintiffs have also resorted to conclusory accusations that the Board Defendants and Ramsay were orchestrating and influencing Argent’s decision. This “rubber stamp” theory is frivolous because it is flatly contradicted by the evidence that will be introduced at trial. There is no evidence whatsoever that the Board or Ramsay told Argent what to do, exerted any influence over Argent, or manipulated Argent’s determination. Plaintiffs further claim the Board Defendants withheld information from Argent about (1) preliminary discussions between the Sellers and a competitor, Centers for Diagnostic Imaging (“CDI”), to acquire Envision in 2016; and (2) four previous valuations performed of EMHI subsidiaries. But the Board *did inform* Argent and its advisors about the prior discussions with CDI (which were immaterial), and the Board *did provide* the four valuations to CSG during the transaction vetting process, with the full expectation that CSG, who set up the data room by which Argent received due diligence information, would provide the prior valuations if Argent or its advisors asked for them (which, in any event, were immaterial).

2. <u>The Board Defendants and Ramsay Satisfied Their Duty to Monitor</u>

Plaintiffs accuse the Board Defendants and Ramsay of violating ERISA’s duty to monitor. Plaintiffs launch attacks at the Board and Ramsay because of supposed conflicts they had by virtue of their roles as Sellers and, with respect to Ramsay, the recipient of equity incentive awards post-Transaction. Plaintiffs claim, through their expert Samuel Halpern, that the Sellers and Ramsay were categorically prohibited from appointing or monitoring Argent due to these supposed conflicts. This theory—which Halpern appears

to simply have manufactured—is entirely inconsistent with ERISA. ERISA *expressly allows* fiduciaries to serve in "dual roles," including positions that conflict with their fiduciary obligations. *See Tibble v. Edison Int'l*, No. CV 07-5359SVW(AGRX), 2010 WL 2757153, at *18 (C.D. Cal. July 8, 2010) (under ERISA, "a conflict of interest alone is not a per se breach: 'nowhere in the statute does ERISA explicitly prohibit a [fiduciary] from holding positions of dual loyalties.' "). And ERISA allows corporate Boards, regardless of any supposed conflicts, to appoint and then monitor other fiduciaries, including trustees. *In re Williams Companies ERISA Litig*., 271 F. Supp. 2d 1328, 1339 (N.D. Okla. 2003) (noting that the power of a board was "limited to appointing, retaining, and removing members" of a committee, and *not* to "control investment options . . .").

Once a trustee is appointed, the duty to monitor the trustee is inherently a *limited* fiduciary obligation to determine whether to continue the retention of the trustee. See *Lingis v. Motorola, Inc.*, 649 F. Supp. 2d 861, 881–82 (N.D. Ill. 2009), *aff'd sub nom. Howell v. Motorola, Inc.*, 633 F.3d 552 (7th Cir. 2011) (analyzing the duty to monitor and explaining that it is "limited to the selection and retention of fiduciaries.") It is a duty to determine whether the trustee is doing its job, not *how* the trustee is doing its job. *Hudson v. Nat'l Football League Mgmt. Council*, No. 1:18-CV-4483-GHW, 2020 WL 1547467, at *8 (S.D.N.Y. Mar. 31, 2020) (explaining that the duty to monitor "extends only to ensuring *that* appointing fiduciaries are performing their duties, not *how* they are performing those duties"). And the duty to monitor can be fulfilled in any number of ways, including based on interactions with the trustee. Nothing in ERISA or any governing authority mandates a formal or specific "monitoring" process.

Importantly, the duty to monitor must also account for the rationale in appointing Argent as independent and discretionary trustee in the first instance, which was to remove the Board Defendants and Ramsay from the decision-making process on behalf of the Plan. *See Fish*, 2016 WL 5923448, at *53 (finding that requiring board to "inject themselves" into trustee's decision-making process to satisfy ERISA's duty to monitor "contrary to the very reason an ESOP sponsor should hire an independent fiduciary"). For this reason, the duty to monitor did not require the Board Defendants or Ramsay to act as a guarantor of the valuation, to double check Argent's work, or to review every step Argent took in approving the deal. *See* id. ("a monitoring fiduciary must balance its need to observe the trustee with the need to preserve the trustee's independence by not meddling with the trustee's fulfillment of its duties"); *see also In re Williams Companies*, No. 02-CV-153-H (M), 2003 WL 22794417, at *1 (N.D. Okla. Oct. 27, 2003) (monitoring fiduciary need not be "a guarantor for any and all actions by those fiduciaries.").

Here, the evidence will show that the Board Defendants and Ramsay had sufficient information, and no contrary information, that would cause them to question Argent's good faith process in assessing fair market value and take action to remove and replace Argent. Creps, Jones, and Ramsay knew Argent retained a law firm, qualified valuation advisor, and even a healthcare industry expert to vet the transaction. Creps, Jones, and Ramsay knew that Argent and ComStock had, through its advisor CSG, requested and received voluminous information about Envision's business. Ramsay assisted CSG in providing the requested information by uploading it to the data room CSG had created for the proposed transaction. Creps and Jones knew Ramsay was doing so. Creps, Jones, and Ramsay knew that Argent and ComStock were asking questions, having calls, and

performing due diligence. All three were at an October 30, 2017 all-day due diligence meeting when various valuation and financial issues were discussed. Creps, Jones, and Ramsay knew that Argent extensively negotiated the purchase price and other substantive deal terms.

Creps and Jones also had no reason to suspect that the Transaction price itself was more than fair market value—and it wasn't. CSG informed Creps and Jones that using a 6.6x LTM EBITDA multiple would result in an enterprise value of approximately $201 million and a subsequent equity value of $177 million. (Ex. 3174, EMH-Harrison0011867.) They were aware of other transactions, involving companies that they considered less valuable than Envision, for 6.5x to 9x. Creps and Jones thought Envision was larger, performing better, and growing faster than the centers involved in the 6.5x to 9x transactions. And the TCJA had an almost immediate effect on the value of their stock, by boosting EMHI's enterprise value by as much as $36 million, meaning they could have held out for tens of millions of dollars more than they received.

Plaintiffs claim the CDI discussions and the four prior valuations of EMHI subsidiaries gave the Board Defendants and Ramsay reason to believe the Transaction price was more than fair market value. Not so. The CDI discussions were stale by the time the Transaction closed. Moreover, they did not reflect "fair market value"—which is the statutorily mandated standard that must consider a hypothetical willing buyer and hypothetical willing seller. CDI testified that its value calculations were *specific to CDI*, not a hypothetical buyer as required by the fair market value standard. And preliminary discussions of the type CDI and Envision engaged in have "little relevance" to fair market value, because they do not reflect agreements between a willing buyer and seller. *Walsh*

*v. Bowers*, 561 F. Supp. 3d 973, 977 (D. Haw. 2021). Indeed, Creps and Jones testified that they *would not have agreed* to sell Envision for the numbers in the CDI value estimates.

As for the four prior valuations of the EMHI subsidiaries, one was four years old and one was three years old, and the more recent ones were drafts. Moreover, they were estimates of the value of individual subsidiaries (and some of the subsidiaries owned just one center each), not the Envision portfolio business as a whole. The record, and valuation practices, will prove that a portfolio company is worth significantly more than the value of its individual entities. Also, Plaintiffs' experts have not shown how providing any of these valuations would have changed ComStock's valuation of EMHI. The Board Defendants and Ramsay would not have thought anything was unusual about the Transaction because of stale and/or draft valuations of fundamentally different assets.

Plaintiffs also are going to waste time at trial arguing that the Plan should have obtained a so-called “discount for lack of control” because the Sellers agreed to continue serving on the Board after the Transaction. That is wrong for many reasons, not the least of which being that the Plan *did not pay for control* in the first instance. ComStock's valuation did not factor in an upward control adjustment, so Plaintiffs are not entitled to a discount for something they did not pay for in the first place. If that were not enough reason to dispense with Plaintiffs' meritless control-discount theory, Plaintiffs are not even focusing on the right question for purposes of assessing control pricing in a fair market value appraisal. The question is not who *served* on a board of directors; the question is who *owned the right to appoint* the board of directors. That right was sold by the Sellers

to the ESOP. The ESOP obtained the control right to appoint directors, and thus it actually could have paid *more* for the rights it received.

3. <u>Plaintiffs Are Not Entitled to Equitable Remedies Under ERISA § 502(a)(3) Against the Seller Defendants and Nicole Jones</u>

Plaintiffs claim that they are entitled to "appropriate equitable relief"—namely restitution and disgorgement of proceeds the Seller Defendants and Nicole received in the ESOP Transaction—under ERISA § 502(a)(3) due to these defendants' alleged "knowing participation" in a violation of ERISA § 406 as non-fiduciary parties-in-interest. Under ERISA § 502(a)(3), a participant or beneficiary may bring a claim for "appropriate equitable relief" to remedy a violation of ERISA or a plan. 29 U.S.C. § 1132(a)(3). The Supreme Court has explained that ERISA § 502(a)(3) permits a claim for appropriate equitable relief against non-fiduciaries who knowingly participate in a prohibited transaction. *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 250 (2000). With respect to the non-fiduciaries' knowledge requirement, Plaintiffs argue that they only have to prove that each Seller Defendant and Nicole knew or should have known that the ESOP Transaction was prohibited under ERISA § 406, and the burden is on Defendants to prove that they knew the ESOP Transaction was exempt under the adequate consideration exemption. This cannot possibly be the law.

Congress intended for liability to rest primarily with those who act as *fiduciaries* and have the decision-making authority on behalf of an ERISA plan. ERISA "allocates liability for plan-related misdeeds in reasonable proportion to respective actors' power to control and prevent the misdeeds," limiting liability against non-fiduciaries. *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262, 113 S. Ct. 2063, 2071, 124 L. Ed. 2d 161 (1993). For this reason, an equitable claim under ERISA § 502(a)(3) is fundamentally different from a

claim against the fiduciary who causes a prohibited transaction. The equitable claim relies on principles of *equity* that require balancing of various parties' competing interests in particular property. To determine whether a third party—here, the non-fiduciary Seller Defendants and Nicole—should be required in equity to return property to a trust—here, the Plan—the court considers whether the third party had knowledge of facts sufficient to indicate that it would be unjust for the third party to retain the trust's property. *Great–West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213–14, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002) ("where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession"). The type of knowledge required is knowledge of illegal or wrongful conduct. *Harris Tr.*, 530 U.S. 238, 251 ("the transferee must be demonstrated to have had actual or constructive knowledge of the circumstances that rendered the transaction unlawful").

Under ERISA, mere knowledge of a prohibited transaction is not the type of knowledge of illegality or wrongdoing required to impose equitable remedies on selling shareholders. Many common transactions involving ERISA plans, including ESOP transactions, are prohibited not because they are considered illegal, but because ERISA has a unique statutory structure that prohibits them subject to broad and numerous exemptions. 29 U.S.C. §§ 1106(a); (e). The transactions listed in ERISA § 406—including obtaining loans, contracting with service providers, obtaining services from the plan sponsor, transferring any plan assets to the custody of a party in interest, and acquiring or selling employer stock—occur almost daily in ERISA plans. *Del Castillo v. Cmty. Child Care Council of Santa Clara Cnty., Inc.*, No. 17-CV-07243-BLF, 2019 WL 6841222, at *6 (N.D. Cal. Dec. 16, 2019) ("[M]ere knowledge that a transaction is (or might be)

'prohibited' under ERISA § 406(a) does not mean that [defendants] knew or should have known of any wrongdoing, as required under *Harris*.").

The Supreme Court's decision in *Cunningham v. Cornell* does not change this analysis. Under *Cunningham*, a *fiduciary* has the burden of proving an exemption when accused of causing a prohibited transaction under ERISA § 406. *See Cunningham v. Cornell Univ.*, 604 U.S. 693, 701 (2025) (holding that fiduciary alleged to have committed prohibited transaction under § 406(a) must prove the applicability of a § 408 exemption). But for purposes of an ERISA § 502(a)(3) claim against a *non-fiduciary*, Plaintiffs have the burden of proving that the non-fiduciary knew or should have known of illegal or wrongful conduct as part of Plaintiffs' burden of proving entitlement to equitable relief.

Plaintiffs will not be able to do so at trial. As discussed previously, the Sellers knew Argent and its team were working and negotiating, and the ESOP Transaction price was in line with market multiples that Creps and Jones were aware of other radiology center businesses going for at the time. CSG conducted several comprehensive value estimates that were based on Envision's historical performance and reasonable projected future performance, and those estimates were in line with the Transaction price.

As for Nicole, she did not receive any funds from the ESOP in the first place—the portion of the Transaction that applied to her was a redemption of stock between her and EMHI, not the ESOP. Nicole never was in possession of any ESOP trust property. Additionally, she knew barely anything about the Transaction, much less anything about Argent or Argent's process. It would be *inequitable* to require Nicole to return funds because she never obtained them from the ESOP and she knew almost nothing about the Transaction.

4. The Board Defendants and Ramsay Are Not Liable As Co-Fiduciaries

Plaintiffs also claim the Board Defendants and Ramsay breached co-fiduciary duties. ERISA § 405 provides for co-fiduciary liability if there is an underlying breach by a fiduciary and a co-fiduciary knowingly participates in it; enables the other fiduciary to commit it; or has actual knowledge of such breach and fails to take reasonable steps to remedy the breach. 29 U.S.C. § 1105. For the reasons discussed previously regarding the duty to monitor and non-fiduciary claims, neither the Board Defendants nor Ramsay had any knowledge of any fiduciary breach on Argent's part. Plaintiffs will not be able to prove the Count VI co-fiduciary claim against the Board Defendants and Ramsay.

5. The Seller Defendants Did Not Violate ERISA § 406(b)(3)

Plaintiffs claim the Sellers violated ERISA § 406(b)(3), which states that a fiduciary with respect to a plan shall not "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(3). ERISA § 406(b)(3) is an anti "kick-back" prohibition. It bans a fiduciary from getting paid by someone dealing with the plan. *See* House Conference Report 93-1280, 1974 U.S.C.C.A.N. 5038, 5089 ("The substitute also prohibits a fiduciary from receiving consideration for his own personal account from any party dealing with the plan in connection with the transaction involving the income or assets of the plan. This prevents, e.g., 'kickbacks' to a fiduciary.").

At no point have Plaintiffs presented any evidence, or even alleged, that the Seller Defendants received anything from a *third party* "dealing" or transacting with the ESOP. What Plaintiffs appear to claim is that 406(b)(3) can reach the Sellers simply because they may have been fiduciaries as members of the Board and, as Sellers, they received

consideration *from the Plan* in the ESOP Transaction. This is completely at odds with decades of court interpretation about what ERISA requires in ESOP transactions. "Congress has expressly authorized an ESOP to enter into transactions in the employer's stock and with interested parties . . ." so long as the transaction is for adequate consideration. *Martin v. Feilen*, 965 F.2d 660, 670 (8th Cir. 1992). However, numerous courts have also held that 408 exemptions do not apply to 406(b) transactions. Thus, if 406(b)(3) were read the way Plaintiffs say it should, it would create a *per se* bar for every ESOP transaction where a Seller has any monitoring responsibility. This is at odds with the protections Congress has already put in place for ESOP transactions under the structure of 406 and 408(e).

6. EMHI Indemnification Provisions Do Not Violate ERISA

Plaintiffs claim that indemnification provisions in EMHI's articles of incorporation and bylaws, by their terms, violate ERISA § 410, which prohibits arrangements that "relieve a fiduciary from responsibility or liability"—in other words, exculpatory agreements. 29 U.S.C. § 1110(a). There is nothing exculpatory about the EMHI indemnification provisions on their face. Both provisions make clear that indemnification is permitted only to the "extent authorized by applicable law." Under the plain terms of the provisions, indemnification would not be prohibited under circumstances that violated ERISA § 410. The bylaws also allow for the advancement of expenses but require an undertaking to repay amounts advanced if it is ultimately determined that the recipient is not entitled to indemnification. The provisions do not violate ERISA § 410 on their face.

## IV. CONCLUSION

For these reasons, the Envision Defendants will prevail at trial on all claims.

Dated: September 29, 2026

**FAEGRE DRINKER BIDDLE & REATH LLP**

*/s/ Richard J. Pearl*
Richard J. Pearl
320 South Canal Street
Suite 3300
Chicago, Illinois 60606
Telephone: (312) 569-1907
Email: rick.pearl@faegredrinker.com

*Attorney for Defendants Darrel Creps III, Paul Sherwood, Jeff Jones, and Tanweer Khan*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on September 29, 2026, a true and correct copy of the foregoing was served on all counsel of record.

*/s/ Richard J. Pearl*