**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

**Civil Action No. 1:21-cv-304-CNS-MDB**

ROBERT HARRISON and GRACE HEATH, on behalf of themselves, the ENVISION MANAGEMENT HOLDING, INC. ESOP, and all other similarly situated individuals,

Plaintiffs,

v.

ENVISION MANAGEMENT HOLDING, INC. BOARD OF DIRECTORS, ENVISION MANAGEMENT HOLDING, INC. EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE, ARGENT TRUST COMPANY, DARREL CREPS, III, PAUL SHERWOOD, JEFF JONES, NICOLE JONES, AARON RAMSAY, TANWEER KHAN, and LORI SPAHN,

Defendants.

---

**DEFENDANT ARGENT TRUST COMPANY'S PRETRIAL BRIEF**

---

## TABLE OF CONTENTS

APPLICABLE STANDARD OF REVIEW ..... 5

ARGUMENT ..... 6

I. Argent Wins On Counts I and IV Because It Followed an Industry-Standard Process to Determine That the ESOP Should Enter Into the Transaction. ..... 6

A. The Court Must Examine Process, not Results, and Must Defer to Argent's Decisions Unless They were Arbitrary and Capricious. ..... 6

B. Argent Engaged Qualified Advisors, Provided Them All Material Information, and Reasonably Relied on their Analyses. ..... 8

1. Argent's Highly Qualified Team Engaged Expert Advisors. ..... 8

2. Argent Ensured ComStock Received All Material Information Necessary for its Valuation Analysis ..... 9

3. Argent Monitored ComStock to Confirm that It was Reasonable to Rely on ComStock's Analysis. ..... 12

4. Argent Negotiated Vigorously with the Sellers and Secured Key Concessions for the ESOP. ..... 13

C. Argent's Fiduciary Process Met Industry Standards. ..... 14

II. Argent Also Wins Because the ESOP Paid Less than Fair Market Value. ..... 15

A. Argent's Valuation Expert is Credible; Plaintiffs' is Not. ..... 15

B. Five Sophisticated Financial Institutions Invested in the Transaction Because They Believed the Purchase Price was Reasonable. ..... 17

III. Argent Fulfilled its Fiduciary Duty of Loyalty. ..... 18

IV. Plaintiffs' Valuation Positions Would Cause a Greater Loss to the ESOP Than the Supposed 2017 Overpayment, So They Cannot Show Loss Causation. ..... 19

CONCLUSION ..... 20

# TABLE OF AUTHORITIES

Cases

*Brundle v. Wilmington Tr. N.A.*,
241 F. Supp. 3d 610 (E.D. Va. 2017) ........ 13

*Chao v. Hall Holding Co.*,
285 F.3d 415 (6th Cir. 2002) ........ 2, 8, 11, 13

*Donovan v. Cunningham*,
716 F.2d 1455 (5th Cir. 1983) ........ 8

*Ershick v. United Miss. Bank of Kansas City, N.A.*,
948 F.2d 660 (10th Cir. 1991) ........ passim

*Eyler v. Commissioner of Internal Revenue*,
88 F.3d 445 (7th Cir. 1996) ........ 7

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014) ........ 6, 8

*Fish v. GreatBanc Tr. Co.*,
749 F.3d 671 (7th Cir. 2014) ........ 18

*Gamino v. KPC Healthcare Holdings, Inc.*,
No. 5:20-cv-01126, 2022 WL 4596576 (C.D. Cal. Aug. 15, 2022) ........ 18

*Henry v. Champlain Enters., Inc.*,
445 F.3d 610 (2d Cir. 2006) ........ 7, 8

*Hughes v. Northwestern Univ.*,
595 U.S. 170 (2022) ........ 6, 8

*In re Quest Diagnostics ERISA Litig.*,
179 F.4th 217 (3d Cir. 2026) ........ 6

*Keach v. U.S. Tr. Co. N.A.*,
313 F. Supp. 2d 818 (C.D. Ill. 2004) ........ 10, 11

*Kurtz v. Vail Corp.*,
511 F. Supp. 3d 1185 (D. Colo. 2021) ........ 2, 7

*Ramos v. Banner Health*,
461 F. Supp. 3d 1067 (D. Colo. 2020) ........ 19

*Rush v. GreatBanc Tr. Co.*,
182 F.4th 619 (7th Cir. 2026) ........ 6

*Spence v. Am. Airlines, Inc.*,
775 F. Supp. 3d 963 (N.D. Tex. 2025) .................................................................. 2, 7

*Walsh v. Bowers*,
561 F. Supp. 3d 973 (D. Haw. 2021)............................................................ 8, 11, 14

<u>Statutes</u>

29 U.S.C. § 1001.......................................................................................................... 2

29 U.S.C. § 1002(18) .................................................................................................. 7

29 U.S.C. § 1104(a)(1)(A) ......................................................................................... 18

29 U.S.C. § 1104(a)(1)(B) ...................................................................................... 7, 14

29 U.S.C. § 1106(a) .................................................................................................... 6

29 U.S.C. § 1108(e) ................................................................................................ 6, 7

On December 19, 2017, the Envision Management Holding, Inc. ("EMHI") Employee Stock Ownership Plan ("ESOP") acquired all of EMHI's stock for $177 million, or $1,770 per share ("Transaction"). The ESOP financed its purchase with debt: a loan from EMHI (borrowed from outside lenders) and promissory notes issued to the selling shareholders. The ESOP would pay back its debt only if EMHI gave it funds to do so; the ESOP's participants paid nothing. After accounting for EMHI's Transaction debt, EMHI's value immediately after the Transaction's close was $34.9 million, or $349.60 per share.

To call the ESOP's investment a triumph would be putting it mildly. The numbers tell the story. Between 2017 and 2024 (the date of EMHI's most recent produced valuation), EMHI's share value grew ***713%***, from $349.60 to $2,842.59 per share:




On average, the ESOP has provided each of EMHI's current 1,540 employee owners a nest egg now worth more than $50,000 per person on average—for free.

ESOP participants have Argent Trust Company ("Argent") and its team of ESOP, valuation, and industry professionals to thank. As the ESOP's trustee, Argent was responsible for conducting due diligence on EMHI, negotiating the Transaction's terms and purchase price, and deciding whether causing the ESOP to close the deal was

beneficial for the ESOP's participants and consistent with Argent's fiduciary duties under the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.* ("ERISA").

Notwithstanding this unqualified success story, two participants brought a lawsuit challenging Argent's decision to close the deal on the negotiated terms. As part of their suit, Plaintiffs allege two ERISA violations: that Argent violated duties of prudence and loyalty under § 1104 (Count IV), and that the Transaction's terms fail to satisfy the "adequate consideration" exemption for prohibited transactions under § 1108(e) (Count I). From these broad statutory standards, courts have derived several principles.

*First*, both of Plaintiffs' theories are process-based claims: that is, courts must not evaluate whether a trustee's decision was "right," but whether its process for arriving at the decision was appropriate. *Kurtz v. Vail Corp.*, 511 F. Supp. 3d 1185, 1196 (D. Colo. 2021). *Second*, because ERISA's standards are "inherently comparative," courts evaluate a trustee's process by comparing it to "the prevailing industry standard" process that actual, similarly-situated ESOP trustees follow. *Spence v. Am. Airlines, Inc.*, 775 F. Supp. 3d 963, 997 (N.D. Tex. 2025). *Third*, ESOP trustees meet the prevailing industry standard by engaging and relying on expert advisors, so long as the trustee (i) investigates the expert's qualifications, (ii) provides the expert with access to the material information it needs to perform its work, and (iii) assesses the expert's advice to ensure that it is reasonable to rely on it. *Chao v. Hall Holding Co.*, 285 F.3d 415, 430 (6th Cir. 2002).

At bottom, Argent wins on both Counts I and IV if it followed a reasonable, good faith process that is consistent with that of other ESOP trustees. It did:

- **Argent hired a coterie of highly qualified advisors**: (i) ComStock Advisors ("ComStock"), a nationally-recognized independent appraisal firm to perform a valuation of EMHI stock; (ii) Morrison Cohen LLP, a nationally-recognized legal advisor experienced in ESOP stock purchase transactions; and—going above-

and-beyond the ESOP industry standard—(iii) Charles Wilhoite, a business valuation professional experienced in valuing diagnostic imaging centers like EMHI, to review ComStock's valuation from a healthcare industry expert's perspective.

- **Argent's internal valuation and ESOP experts and its decision-making committee monitored ComStock**. Argent personnel were in near-daily contact with ComStock's team, over calls and emails. Argent's five-member committee received and reviewed four drafts of valuation reports from ComStock, then asked questions, gave comments, and requested changes in three formal meetings.

- **Argent negotiated hard and effectively**. Armed with ComStock's analyses, Argent exchanged ***eight counteroffers*** with the sellers over more than a month of negotiations, ultimately obtaining concessions that benefited the ESOP, including a $10 million decrease in purchase price; a shorter term and lower percentage for the warrants that EMHI would issue to the sellers of EMHI stock, which reduced EMHI's potential future payout to the sellers; and a clawback provision to protect the value of EMHI's interest in a key joint venture.

- **Argent ensured that its final reliance on ComStock's work was reasonable**. Argent instructed ComStock to issue an updated 100-plus page valuation report as well as a fairness opinion, in which ComStock opined that (i) the proposed purchase price was in the lower half of the range of EMHI's fair market value, and (ii) the final terms of the proposed Transaction were fair to the ESOP. Argent reviewed drafts of this report in three formal meetings that put all key sections and assumptions in ComStock's valuation under a microscope.

- **Crucially, Argent obtained $36 million in value for the ESOP—for free**. It did so by closing the deal just days before Congress passed the Tax Cuts and Jobs Act ("TCJA"), which lowered the corporate income tax rate to 21% from 35%. By closing the deal before the TCJA became law, without renegotiating the Transaction price, ***Argent ensured that the ESOP obtained the benefit of the tax value boost to EMHI—which equated to about $36 million in enterprise value***[1]***—without paying for it***.

Plaintiffs will offer no affirmative expert opining on industry standard processes for ESOP trustees. They instead will limp in with a rebuttal expert, Samuel Halpern, whose opinions are unhelpful at best and irrelevant at worst. He has never served as an ESOP's

[1] ComStock determined that EMHI's enterprise value ranged from $192.9 million to $213.3 million as of December 19, 2017 when the Transaction closed. ComStock also performed a post-Transaction valuation as of December 31, 2017 (just 12 days later) for ESOP administrative purposes, and concluded that EMHI's enterprise value had grown to a range of $229.0 million to $252.6 million. The growth at the low end of the range was approximately $36 million, which was attributable principally to the tax rate change.

trustee in a stock purchase transaction, and he would have the Court impose standards on Argent that have no support in statute, regulation, case law, or prevailing ESOP trustee practices and procedures in the industry. At bottom, his standalone *ipse dixit* is irrelevant to the Court's inquiry: how Argent's process compares to ESOP industry standards.

Allergic to process, Plaintiffs will pivot to supposed problems with ComStock's valuation. They will nitpick purported "errors" from deep in the recesses of the report. They will second guess ComStock's reasonable judgment calls by arguing their expert's judgment is better. And they will use these so-called "errors" and different judgments to argue the ESOP paid more than fair market value—which is all that matters, they will say.

Plaintiffs are wrong—not only because process is paramount and Argent's was consistent with industry standards—but because the opinions of their valuation expert, Marc Brown, carry no weight. He has no experience valuing diagnostic imaging companies like EMHI—unlike Argent's expert, Nicholas Janiga, who specializes in valuing healthcare companies, and has extensive experience valuing diagnostic imaging centers exactly like those EMHI operates. Mr. Brown's inexperience contributed to his unfounded decision to hatchet away chunks of EMHI's value by applying enormous discounts to EMHI's subsidiaries. Mr. Brown's justifications for these discounts are inconsistent with generally accepted valuation principles, supported by nothing but his own *ipse dixit*, and require him to shun record evidence contrary to his conclusions.

A charitable read of Mr. Brown's opinion is that he did not exercise his professional judgment wrongly, just differently from ComStock, which also made reasonable judgments. Argent wins even under that generous view. That is because the Court must review Argent's decision under a "highly deferential" standard, meaning Argent's decision

"will be upheld unless [it was] arbitrary and capricious, not supported by substantial evidence or erroneous on a question of law." *Ershick v. United Miss. Bank of Kansas City, N.A.*, 948 F.2d 660, 666 (10th Cir. 1991). Argent's decisions would withstand *de novo* review; and they easily pass muster on an arbitrary and capricious standard.

Finally, Plaintiffs will try to liken this case to circumstances at issue in other, older trial decisions that found ESOP fiduciaries liable. Those cases are not this one:

- In *Perez v. Bruister* (D. Miss. 2014) the trustee's financial advisor was conflicted and had been convicted of fraud. Here, ComStock was unquestionably independent and the firm's and its professionals' credentials are unimpeachable.
- In *Perez v. First Bankers Trust Services, Inc.* (D.N.J. 2017), the company's management supplied overly optimistic financial projections that led to an overvaluation of the company's stock. Here, by contrast, EMHI management provided realistic projections. ComStock received the projections, thoroughly vetted them, determined them to be reasonable—and ***still*** made adjustments to account for potential risk that EMHI would not achieve the projected growth targets.
- In *Brundle v. Wilmington Trust* (E.D. Va. 2017), the trustee's financial advisor applied a 10% "control premium" to increase its fair market valuation, but the transaction included contractual protections to guarantee the selling shareholders (not the ESOP or its trustee) could control the company's board after the ESOP's purchase. Here, ComStock did not apply any control premium in its valuation, and the ESOP acquired the ability to select the Board after the Transaction.
- In *Su v. Bensen* (D. Ariz. 2024) and *Chesemore v. Alliance Holdings,* (W.D. Wis. 2012), ESOP transactions overburdened companies with debt that harmed their operations. Not so here; EMHI has enjoyed growth in enterprise and equity value.

At bottom, the ESOP's participants have Argent to thank for zealously representing their interests in the Transaction and continuing to shepherd their benefit plan to its current success. The Court should enter judgment in Argent's favor on all counts.

## <u>APPLICABLE STANDARD OF REVIEW</u>

The Tenth Circuit has held, in an ESOP case, that "[j]udicial review of fiduciary actions is highly deferential," and "[t]he decisions of a fiduciary will be upheld unless they are arbitrary and capricious, not supported by substantial evidence or erroneous on a

question of law." *Ershick*, 948 F.2d at 666. Several circuits have adopted a similar "abuse-of-discretion standard," recognizing that "judicial review of the decisions of an ERISA trustee as of other trustees is deferential unless there is a conflict of interest." *Rush v. GreatBanc Tr. Co.*, 182 F.4th 619, 630-631 (7th Cir. 2026); *see also In re Quest Diagnostics ERISA Litig.*, 179 F.4th 217, 228 (3d Cir. 2026) ("'[W]here discretion is conferred upon the trustee with respect to the exercise of a power,' as here, 'its exercise is not subject to control by the court except to prevent an abuse by the trustee of his discretion.'"). Under this standard, courts are instructed to apply "careful, context-sensitive scrutiny," and give due regard to the "range of reasonable judgments a fiduciary may make" in light of the "difficult tradeoffs" fiduciaries often face. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014); *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022). The evidence at trial—especially when viewed under a "highly deferential," abuse-of-discretion standard—will show Argent undeniably satisfied its duties in the Transaction.

## ARGUMENT

### I. Argent Wins On Counts I and IV Because It Followed an Industry-Standard Process to Determine That the ESOP Should Enter Into the Transaction.

The core of Plaintiffs' claims—their prohibited transaction claims in Count I and breach of fiduciary duty of prudence claim in Count IV—are defeated by one fact: Argent followed a prudent, good faith, industry-standard process through which Argent determined that the ESOP was buying EMHI stock for no more than fair market value.

#### A. The Court Must Examine Process, not Results, and Must Defer to Argent's Decisions Unless They were Arbitrary and Capricious.

Every ESOP stock purchase transaction is technically "prohibited" by 29 U.S.C. § 1106(a). To encourage companies to establish ESOPs, Congress created an exemption in 29 U.S.C. § 1108(e), which permits ESOP stock purchases for "adequate

consideration." ERISA defines "adequate consideration" as "the fair market value of the asset as determined in good faith by the trustee." 29 U.S.C. § 1002(18). Crucially, "the adequate consideration test ***focuses on the conduct*** of the fiduciaries in determining the price, not the price itself." *Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 619-20 (2d Cir. 2006). It is not the court's role "to redetermine the appropriate amount [of consideration] for itself *de novo*." *Id.*; *see also Eyler v. Comm'r*, 88 F.3d 445, 455 (7th Cir. 1996).

The same is true for the duty of prudence that § 1104(a)(1)(B) imposes on fiduciaries: whether a fiduciary has acted prudently "expressly focuse[s] upon the *conduct* of the fiduciar[y]." *Henry*, 445 F.3d at 619. In the context of an investment decision, the appropriate inquiry is "not a test of the result of the performance of the investment," but rather "whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment." *Kurtz*, 511 F. Supp. 3d at 1196-97.

The prudence standard is "inherently comparative" to others in the industry: the statutory yardstick of a prudent process is "a prudent man ***acting in a like capacity*** and familiar with such matters would use in the conduct of an ***enterprise of a like character*** and with ***like aims***[.]" 29 U.S.C. § 1104(a)(1)(B) (emphasis added). To determine whether an ESOP fiduciary's process passes muster, a court must compare it to the processes of other, similarly situated ESOP fiduciaries. *Spence*, 775 F. Supp. 3d at 997-98.

Because the § 1104 duty of prudence and § 1108 adequate consideration analyses both focus on an ESOP fiduciary's ***conduct*** in arriving at the investment decision, courts apply a unified, process-based analysis to determine whether an ESOP fiduciary has any liability for a fiduciary decision. *Henry*, 445 F.3d at 619-20 (the "focal point" of a § 1108(e) defense is "whether [the fiduciary] acted with the prudence required of a fiduciary under

the prevailing circumstances at the time of the transaction"). In doing so, courts give "due regard to the range of reasonable judgments a fiduciary may make" and do not substitute their own preferences for an ESOP fiduciary's otherwise reasonable judgments. *Hughes*, 595 U.S. at 177; *see also Fifth Third Bancorp*, 573 U.S. at 425. For this reason, courts apply a "highly deferential" standard to a fiduciary decisions: a plaintiff prevails only by proving the fiduciary's decisions were "arbitrary and capricious, not supported by substantial evidence or erroneous on a question of law." *Ershick*, 948 F.2d at 666.

### B. Argent Engaged Qualified Advisors, Provided Them All Material Information, and Reasonably Relied on their Analyses.

ERISA does not require an ESOP trustee to be an "expert" in business valuations. *Donovan v. Cunningham*, 716 F.2d 1455, 1474 (5th Cir. 1983). A trustee is entitled to get advice from financial advisors and rely on it when making fiduciary decisions. *See Hall Holding*, 285 F.3d at 430. A trustee must (i) "investigate the expert's qualifications," (ii) "provide the expert with complete and accurate information," and (iii) "make certain that reliance on the expert's advice is reasonably justified under the circumstances." *Id.*

Armed with a qualified financial advisor's valuation, a prudent trustee then negotiates the stock price and deal terms to arrive at a transaction in the ESOP's best interest. *Walsh v. Bowers*, 561 F. Supp. 3d 973, 992-94 (D. Haw. 2021) (trustee acted prudently by "negotiat[ing] significant benefits for the ESOP"); *Henry*, 445 F.3d at 621 n.3 (fiduciary can show good faith by "negotiating . . . a lower share price"). Argent's fiduciary process and zealous negotiations for the ESOP surpassed each of these requirements.

#### 1. Argent's Highly Qualified Team Engaged Expert Advisors.

Though not necessary, Argent's internal team of professionals for the Transaction was stacked with valuation and ESOP experts. The team—consisting of David Williams,

Mark Shorthouse, Marc Hansberger, Ray Kukreja, and Steve Martin—collectively had decades of experience with ESOPs and stock purchases. FOF ¶¶ 27-28.[2] Three of them (Shorthouse, Hansberger, and Kukreja) were valuation professionals in their own right, and the team as a whole had an expert-level understanding of key valuation issues because they reviewed dozens of ESOP company valuations each year. FOF ¶ 28. Mr. Williams is an ERISA attorney with more than 40 years of legal and employee benefits experience, including advising ESOP-owned companies and ESOP fiduciaries. FOF ¶ 28.

Notwithstanding this internal expertise, Argent also engaged three well-qualified, independent advisors for the Transaction: (i) ComStock, to serve as financial advisor and provide Argent with a valuation analysis and fairness opinion; (ii) Morrison Cohen LLP, to serve as legal advisor to assist Argent with legal due diligence and negotiating and reviewing transactional documents; and (iii) Charles Wilhoite of Willamette Management Advisors–himself a qualified valuation professional with expertise in diagnostic imaging companies like EMHI—to provide yet another appraiser and subject matter expert safety net. FOF ¶¶ 29-50. Plaintiffs do not dispute the qualifications of Argent's advisors.

### 2. Argent Ensured ComStock Received All Material Information Necessary for its Valuation Analysis

To inform ComStock's valuation, Argent and ComStock engaged in months of due diligence with EMHI and its advisors. To start the diligence process, Argent and ComStock sent lists of detailed requests to EMHI. FOF ¶¶ 51-53. Based on these requests, EMHI and its advisors populated a data room with hundreds of documents that detailed EMHI's business, historical finances, and future prospects. FOF ¶ 54.

---

[2] Cites to "FOF" and "COL" are to Argent's Proposed Findings of Fact and Conclusions of Law, respectively, which are being filed contemporaneously with this brief.

Next, Argent and ComStock personnel met in person with EMHI management and the sellers in Colorado in October 2017. FOF ¶¶ 58-61. In the meeting the parties discussed the Transaction and EMHI. Thereafter, Argent and ComStock personnel exchanged calls and emails with the EMHI side to ask follow-up questions, request information, and receive updated financial data. The material information that Argent and ComStock considered was more than sufficient for ComStock to prepare its valuation.

Plaintiffs are expected to argue Argent's and ComStock's diligence was deficient because they requested a handful of documents that existed but EMHI did not provide. That argument will prove unavailing. The fact that a few documents out of hundreds may have been requested and not received does not prove a process defect or fiduciary breach. *See Keach v. U.S. Tr. Co. N.A.*, 313 F. Supp. 2d 818, 846 (C.D. Ill. 2004) (no fiduciary breach even though "some documents that were arguably requested . . . were not provided"). And the documents are immaterial in any event. Plaintiffs cannot show they would have changed Argent's determination of value, nor prove Argent's decisions lacked support by "***substantial*** evidence." *Ershick*, 948 F.2d at 666 (emphasis added).

First, Plaintiffs will argue Argent and ComStock did not receive preliminary "offer calculations" that the EMHI sellers exchanged in 2016 with a potential buyer, the Center for Diagnostic Imaging ("CDI"). Putting aside that the Trustee side ***did ask*** EMHI about prior offers, and ***did discuss*** the CDI outreach, FOF ¶¶ 60-61, Plaintiffs contend their process was deficient for not receiving the CDI offer calculations themselves. Not so.

The CDI offer calculations from 2016 were stale by December 2017 when the Transaction was closing, because EMHI's financial performance and thus value had surged. FOF ¶ 182. In addition, CDI's calculations did not reflect fair market value, the

proper valuation standard for EMHI. The fair market value standard considers a hypothetical—not specific—buyer and seller. COL ¶ 69. As CDI's witness testified, the offer calculations reflected the value of EMHI ***to CDI***; not a hypothetical buyer. FOF ¶ 183. Finally, unconsummated offers have "little relevance" to fair market value because they do "not represent what a willing buyer and willing seller ***would*** mutually agree to"; rather, they represent a value they ***would not*** agree to. *Walsh*, 561 F. Supp. 3d at 977.

Second, Plaintiffs will argue Argent and ComStock did not receive "prior valuations." But none of the valuations Plaintiffs raise were of EMHI—the entity whose stock the ESOP was buying. Instead, they were of sub-entities within EMHI, and some were years old. FOF ¶ 193; Relying on a subsidiary valuation to value a parent company is error. *See Hall Holding*, 285 F.3d at 431. Even if these valuations were relevant, Plaintiffs cannot establish that considering them would have changed Argent's valuation conclusion. Indeed, Mr. Brown does not even mention the valuations in his opinions, much less rely on them. Viewed in context of hundreds of EMHI documents the Trustee side received, the fact they did not receive these sub-entity valuations is a non-event. *See Keach*, 313 F. Supp. 2d at 846.

At bottom, the information Argent and ComStock received—through meetings and follow up calls and emails with the EMHI side, and review of hundreds of financial documents—was more than sufficient for ComStock to generate an estimate of the fair market value of EMHI stock on which Argent could reasonably rely. The purported gaps in diligence that Plaintiffs will raise—the CDI "offer calculations" and sub-entity valuations—fail to prove Argent's fiduciary decision to enter the Transaction for the ESOP was "not supported by substantial evidence." *See Ershick*, 948 F.2d at 666.

### 3. Argent Monitored ComStock to Confirm that It was Reasonable to Rely on ComStock's Analysis.

Starting on November 15, 2017, ComStock provided to Argent multiple turns of a valuation report that was ultimately more than 100 pages. FOF ¶ 125. The report included:

- Discussion and analysis of EMHI and its operations; the Transaction structure; the economic and industry outlook; and EMHI's financial statements. FOF ¶ 150.
- ComStock's valuation of EMHI, using three valuation methods—the discounted cash flow ("DCF"), guideline company, and mergers and acquisitions methods—with an explanation of how ComStock weighted the methods. FOF ¶¶ 94-95.
- ComStock's analysis of EMHI's financial projections and the adjustments that ComStock made to account for potential risk that EMHI's actual financial performance might fall short of the projections. FOF ¶¶ 99-103. For instance, ComStock included a "company-specific risk premium" in the discount rate in its DCF method, decreased the number of imaging centers that EMHI was projected to open in the future, and lowered EMHI's long-term projected growth rate. FOF ¶¶ 103, 115. All of these adjustments had the effect of lowering ComStock's fair market value conclusion, which ultimately ranged from $169.5 to $188.9 million. FOF ¶ 126.

Argent did not blindly accept its advisors' analyses. Far from it—an Argent Senior Vice President, Mark Shorthouse, oversaw the process and participated in day-to-day diligence alongside ComStock. FOF ¶ 51. And Argent's ESOP Committee met formally with its advisors three times (on November 17 and December 14 and 18, 2017) to probe their analyses, ask questions, and debate Transaction terms. FOF ¶¶ 76, 108, 113-18.

Testimony from Argent witnesses will bring to life the detailed minutes from each ESOP Committee meeting, which memorialize the wide-ranging discussions that the Committee had with Argent's advisors. In the meetings Argent's ESOP Committee members were well-prepared, engaged, and quizzical as they peppered ComStock and Argent's other advisors with questions and challenges to its valuation analysis. *Id.* They probed ComStock's key assumptions and the prospects of EMHI's business, and understood how good of a deal the ESOP would get by locking in the boost to EMHI's

value that would occur after its tax liability was decreased by the TCJA. FOF ¶¶ 114-16. And they received analysis from Charles Wilhoite, Argent's subject matter healthcare expert, who reviewed ComStock's valuation and concluded ComStock's valuation assumptions and analysis of EMHI's projections were reasonable. FOF ¶¶ 106, 117.

Through the ESOP Committee's review and meetings, Argent assured itself that it could reasonably rely on ComStock's valuation analysis that showed the ESOP would be buying EMHI stock for no more than fair market value. *See Hall Holding*, 285 F.3d at 430. In approving the Transaction, through which the ESOP's participants would be able to start accruing valuable benefits, Argent acted prudently and its decision to approve the Transaction was not arbitrary or capricious. *See Ershick*, 948 F.2d at 666.

#### 4. Argent Negotiated Vigorously with the Sellers and Secured Key Concessions for the ESOP.

Argent's team relied on ComStock's draft analyses and Argent's legal and industry advisors to negotiate the Transaction's price and other terms. The negotiation process began on October 31, 2017, when Argent received an opening offer from the sellers for 100% of EMHI's shares for $187 million. FOF ¶ 67. Argent instructed ComStock to provide a preliminary valuation analysis and convened a meeting of its internal ESOP Committee on November 17, 2017 to craft a counteroffer. FOF ¶¶ 71-78.

The ESOP Committee decided Argent would counter at $152 million—well below the bottom of ComStock's preliminary fair market value range (of $169 to $186 million). FOF ¶ 78. Argent's strategy of countering with a "low-ball" offer comports with court-observed best practices. *See Brundle v. Wilmington Tr. N.A.*, 241 F. Supp. 3d 610, 642-43 (E.D. Va. 2017) ("Most economically rational actors entering a negotiation would begin by low-balling their first offer . . . to test the waters and drive down their counterpart.").

The parties exchanged ***eight*** offers and counteroffers over roughly ***six weeks*** of negotiations. FOF ¶ 87. Ultimately, the parties agreed to a $177 million purchase price, which was $10 million below the sellers' initial offer and below the midpoint of ComStock's range. FOF ¶ 88. Argent would also negotiate for and secure several crucial concessions in Transaction terms—including a clawback to protect the value of EMHI's interest in a key joint venture (CHER)—and all of which benefited the ESOP. FOF ¶¶ 88-90. And on top of these wins, Argent recognized in late December that passage of the TCJA was imminent, so Argent proceeded to close the Transaction without re-opening negotiations over the purchase price. In so doing Argent locked in a $36 million boost to EMHI's enterprise value that the ESOP realized immediately after the Transaction closed—for free. *See* note 1 *supra.* These "significant benefits for the ESOP" that Argent won are evidence of its prudence. *See Walsh*, 561 F. Supp. 3d at 992-94.

**C. Argent's Fiduciary Process Met Industry Standards.**

As relevant here, the "prudent man acting in a like capacity" and "under the circumstances then prevailing," *see* 29 U.S.C. § 1104(a)(1)(B), would be a trustee representing an ESOP in a stock purchase transaction in 2017. At trial, the Court will therefore be comparing Argent's fiduciary process with the usual and customary processes of ESOP trustees in stock purchase transactions in 2017.

Argent's fiduciary process expert, Alberto Tarajano, offers opinions under this exact standard. Mr. Tarajano opines that Argent's fiduciary process in the Transaction (outlined in Section B *supra* and FOF ¶¶ 26-128) was consistent with—and in many ways surpassed—practices that were usual and customary for ESOP trustees to follow in 2017.

He is well-qualified to offer such opinions. Mr. Tarajano has been involved in the ESOP trustee community since 2008. In 2016 he founded Custos Fiduciary Services,

through which he provides trustee services to ESOPs, including having served as trustee in more than 75 ESOP stock purchases. FOF ¶ 156. He also has served on boards of ESOP-owned companies and evaluated ESOP transactions from that perspective. FOF ¶ 157. He will walk the Court through Argent's process and highlight how that process was consistent with typical practices for ESOP trustees in stock purchases in 2017.

Plaintiffs will present no affirmative testimony from a fiduciary process expert, even though they bear the burden in Count IV. Instead, the Court will hear from a rebuttal expert, Samuel Halpern, who—in contrast to Mr. Tarajano—has no relevant experience as an ESOP trustee. All he will offer is *ipse dixit* cloaked in what he calls "Recognized Practices" for trustees: self-authored standards divorced from actual ESOP trustee practice and endorsed by no one but himself. Mr. Halpern's unfounded opinions deserve no weight.

## II. Argent Also Wins Because the ESOP Paid Less than Fair Market Value.

In addition to its robust fiduciary process, Argent wins on Counts I and IV because the ESOP paid ***less*** than fair market value for EMHI's shares.

### A. Argent's Valuation Expert is Credible; Plaintiffs' is Not.

Argent will present testimony from Denver-based Nicholas Janiga of Healthcare Appraisers (now owned by Stout Risius Ross, LLC). He is well-qualified for this case because he specializes in valuing healthcare companies and has extensive experience valuing diagnostic imaging centers exactly like those EMHI operates. FOF ¶¶ 143-44.

Mr. Janiga first conducted an "appraisal review" of ComStock's valuation, in which he concluded that ComStock's valuation satisfied applicable appraisal standards. FOF ¶ 141. His review identified several of ComStock's conservative decisions that depressed its conclusion of value—including (i) selecting a 1% long-term growth rate, which is far below company-specific and market indicators; and (ii) assuming the higher, pre-TCJA

corporate tax rate. FOF ¶¶ 152-53. As Mr. Janiga will explain, choosing not to increase the former or decrease the latter—both of which would have been reasonable choices—yielded a lower conclusion of value that bolstered Argent's position in negotiations and caused the ESOP to pay less than it otherwise may have. FOF ¶¶ 152-53.

Mr. Janiga next performed his own independent, "ground up" appraisal of EMHI stock in which he arrived at his own range of fair market value for EMHI stock as of the Transaction date. FOF ¶ 152. He concluded the fair market value of EMHI stock ranged from $198.4 to $222.9 million, meaning the ESOP paid ***less*** than Mr. Janiga's range in the Transaction. His independent appraisal provides yet another data point to corroborate the prudence of the Transaction terms and stock price that Argent secured for the ESOP.

Plaintiffs will offer testimony from Marc Brown, who has no experience valuing companies like EMHI that operate diagnostic imaging centers. He will offer a series of "criticisms" of ComStock's valuation that allegedly caused ComStock to overvalue EMHI. But as the Court will learn, his bespoke approach is far outside the mainstream of valuation practice, designed to manufacture economic damages, and in fact would ***cause*** economic harm to ESOP participants if the Court were to accept his approach.

Mr. Brown opines that—despite all of the valuation professionals involved in Argent's review and diligence process—the ESOP overpaid by between $35.6 and $39.0 million, or over 20% of the purchase price. To lop off this much value, he applies major percentage discounts to ComStock's valuation. He applies these discounts to EMHI's sub-entities: to HIP (EMHI's most valuable sub-entity), a 10% discount for lack of control ("DLOC") and 20% discount for lack of marketability ("DLOM"); to CHER (the second most valuable sub-entity), a 20% DLOM; and to Envision Management, LLC, a 5% DLOC.

As the Court will hear from Mr. Janiga, these discounts are incompatible with well-accepted valuation standards. By applying his discounts to EMHI's sub-entities, rather than EMHI itself, Mr. Brown double counts certain discounts and fails to value EMHI as a going concern (like ComStock did). ComStock's valuation assumed (correctly) that EMHI would receive all of the future cash flows from its subsidiaries and joint venture interests to which it was entitled. Mr. Brown's discounts imply that EMHI would receive ***less*** value from these guaranteed cash flows, but there is no evidence of any limitations on EMHI's rights to future cash flows. Lastly, the discounts violate the fair market value standard, which considers a "hypothetical" buyer and seller. A hypothetical buyer of 100% of EMHI stock would acquire the unfettered ability to control and/or sell EMHI, and Mr. Brown's justifications for his discounts (even if correct) relate to the ESOP, which is a ***specific*** (non-hypothetical) buyer. COL ¶ 69. For these reasons, and others[3], the Court should give no weight to Mr. Brown's criticisms of ComStock's valuation, or his damages opinion.

**B. Five Sophisticated Financial Institutions Invested in the Transaction Because They Believed the Purchase Price was Reasonable.**

As part of the Transaction financing, EMHI borrowed $82 million from a syndicate of five third party lenders. That included $18 million from KeyBank, $16 million from Fifth Third Bank, $16 million from BMO Harris Bank, $14 million from Vectra Bank, and $14 million from Guaranty Bank and Trust. FOF ¶ 129. As evidence will show, each of these sophisticated third parties conducted diligence of the Transaction and EMHI's ability to service the debt. FOF ¶ 130. While five third-party lenders wanting to participate in the Transaction is not a substitute for Argent's own due diligence, it provides further

[3] Argent describes reasons for rejecting Mr. Brown's opinions in Defendants' motion to exclude his opinions and supporting reply, as well as Argent's proposed findings of fact and conclusions of law. *See* Dkt. Nos. 270, 301; FOF ¶¶ 166-80.

corroboration as to the prudence of the Transaction given that the five third parties deemed the Transaction and EMHI credit-worthy. *See Gamino v. KPC Healthcare Holdings, Inc.*, No. 5:20-cv-01126, 2022 WL 4596576, at *9 (C.D. Cal. Aug. 15, 2022) (considering facts of a $140 million third-party loan and multiple lenders who "considered KPC a worthy investment" as evidence that an ESOP transaction was "fair").

**III. Argent Fulfilled its Fiduciary Duty of Loyalty.**

ERISA imposes separate duties of prudence and loyalty. *See Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 679 (7th Cir. 2014). The duty of loyalty requires fiduciaries to act "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose" of "providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1)(A).

It is Plaintiffs' burden to demonstrate that Argent's actions in the Transaction "were for the purpose of providing benefits to [Argent] or someone else," because "having that effect incidentally is not enough." *Kurtz*, 511 F. Supp. 3d at 1202 (citing cases). Plaintiffs cannot simply "recast purported breaches of the duty of prudence as disloyal acts." *Id.* Yet, that is all Plaintiffs do in Count IV of their Complaint. They conflate the duties of prudence and loyalty and allege Argent breached both of them because "a prudent and loyal investigation . . . would have revealed that the price the ESOP paid was greater than fair market value of the [EMHI] stock at the time of the Transaction." Compl. ¶¶ 152-56.

Plaintiffs cannot point to any evidence showing Argent acted in the Transaction to benefit itself or the sellers. Indeed, evidence will show the opposite; that Argent acted "solely in the interest of the participants and beneficiaries" as ERISA requires.

Argent's loyalty to the ESOP is demonstrated by its robust fiduciary process and the negotiating concessions that Argent secured from the sellers for the ESOP's benefit. *See* Section B.4 *supra;* FOF ¶¶ 88-90. But in addition, perhaps the most compelling

evidence of Argent's loyalty to the ESOP (and not to the sellers) is that Argent knew the TCJA was about to be passed as the Transaction was about to close, and the ensuing decrease in the corporate tax rate would boost EMHI's value. FOF ¶ 114. Argent secured the sellers' agreement to proceed to closing before the enactment, such that the ESOP would reap the benefit of a $36 million jump in EMHI's enterprise value after the Transaction closed. *See* note 1 *supra*. Plaintiffs have no answer for how Argent could have acted disloyally while also securing that benefit for the ESOP at the sellers' expense.

## IV. Plaintiffs' Valuation Positions Would Cause a Greater Loss to the ESOP Than the Supposed 2017 Overpayment, So They Cannot Show Loss Causation.

It is Plaintiffs' burden to prove alleged breaches caused a loss to the ESOP. *See Ramos v. Banner Health*, 461 F. Supp. 3d 1067, 1121-22 (D. Colo. 2020) ("[T]he burden to prove . . . causation 'falls squarely on the plaintiff"). They cannot do so because the facts will show the ESOP paid no more than "adequate consideration" in the Transaction. Moreover, the ESOP and current participant-class members would be economically harmed—significantly so—if the Court were to accept Mr. Brown's sub-entity discounts.

EMHI pays eligible ESOP participants the value of their shares when they retire or otherwise separate. Argent sets the share price annually with the assistance of its financial advisor, which issues a valuation report that Argent reviews and approves. The higher the value of the shares, the more participants are paid when they leave. Argent and its advisor have valued EMHI consistently each year since the Transaction. COL ¶ 98. They have ***not*** applied Mr. Brown's discounts for lack of control or marketability, which collectively amount to an approximate 20% decrease in EMHI's value. COL ¶ 98.

In 2024, Argent's advisor valued EMHI's stock at $284.3 million. FOF ¶ 134. Had the advisor applied Mr. Brown's discounts in its 2024 valuation, the ESOP's shares would

have been worth about $227.4 million. In other words, accepting Mr. Brown's discounts would wipe out ***$56.9 million*** in value of the ESOP's EMHI stock ***in 2024 alone*** and reduce the value ***by the same 20% in every year since the Transaction***. The magnitude of this loss to ESOP participants dwarfs the $35.6 to $39 million in damages that Plaintiffs allege from the Transaction. COL ¶ 98. Thus, it is ***Plaintiffs' position*** in this litigation that will cause the ESOP a loss, not Argent's actions in 2017. Plaintiffs therefore cannot meet their burden of proving Argent caused the ESOP a loss. COL ¶¶ 94-99.

## CONCLUSION

The ESOP is a textbook example of a wildly successful employee stock ownership plan. When the ESOP was first formed, Argent did its job as trustee by conducting robust due diligence with qualified advisors, negotiating a price to buy EMHI stock well within a reasonable range of fair market value, and closing a purchase transaction so ESOP participants could start becoming employee owners through allocations of EMHI stock. Since 2017, participants have received allocations of EMHI stock, the value of which has ***increased dramatically every year; over 713% in total***. The Transaction has been an unmitigated success for all of the ESOP's 1,540 participants, including Plaintiffs.

As evidence at trial will show, Plaintiffs' claims all utterly fail. They nitpick Argent's fiduciary process with irrelevant hindsight attacks. And they put forward a valuation expert whose assignment was to concoct an opinion of economic damages with baseless discounts to EMHI's value which, if accepted, would leave ESOP participants ***worse off*** because it would wipe out tens of millions of dollars in current share value. The Court should enter judgment in Argent's favor on all counts of Plaintiffs' Complaint.

Respectfully submitted this 29th day of September, 2026.

**GROOM LAW GROUP, CHARTERED**

*/s/ Lars C. Golumbic*
Lars C. Golumbic
William J. Delany
Andrew D. Salek-Raham
Paul J. Rinefierd
Theodore A. Van Beek
Colleen J. Harrison
1701 Pennsylvania Avenue, NW
Suite 1200
Washington, DC 20006
Telephone: (202) 857-0620
Email: lgolumbic@groom.com
Email: wdelany@groom.com
Email: asalek-raham@groom.com
Email: prinefierd@groom.com
Email: tvanbeek@groom.com
Email: charrison@groom.com

*Attorneys for Defendant Argent Trust Company*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 29th day of September, 2026, a true and correct copy of the foregoing **DEFENDANT ARGENT TRUST COMPANY'S PRETRIAL BRIEF** was served on all counsel of record.

*/s/ Lars C. Golumbic*
Lars C. Golumbic